**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| Vanida Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, | ) ) ) | C.A. No. 7:21-cv-03775-TMC |
| PLAINTIFF, | ) ) | |
| v. | ) ) ) | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| BHG Holdings, LLC, and BHG XXXVIII, LLC, | ) ) | |
| DEFENDANTS. | ) ) ) | |

Defendants, by and through their undersigned counsel, hereby move for Summary Judgment against Plaintiff on all causes of action because Plaintiff's claims are fully grounded in medical malpractice and therefore, under well-established South Carolina and Fourt Circuit law, Defendants owed no duty to the deceased Plaintiff who was a non-patient third party.

## CASE INFORMATION, BACKGROUND, AND FACTS

Per Plaintiff, BHG Spartanburg is a "so-called drug treatment center that profits from dispensing methadone." See ECF No. 1, Pl's Compl. In fact, BHG XXXVIII, LLC ("BHG") is an opioid treatment medical facility licensed by the South Carolina Department of Health and Environmental Control ("DHEC") and accredited by The Joint Commission (i.e., the same body that accredits many of our state's hospitals).[1] The Substance Abuse and Mental Health Services Administration ("SAMHSA"), an agency within the United States Department of Health and

---

[1] Defendant BHG Holdings, LLC is the parent company of BHG. BHG XXXVIII, LLC (d/b/a BHG Spartanburg) is one (1) of over one hundred (100) Behavioral Health Group opioid treatment programs currently serving patients in the United States.

Human Services, requires that opioid treatment programs ("OTP") be accredited by a federally deemed accrediting body.[2]  Accrediting bodies approved by SAMHSA include The Joint Commission, CARF International, the Counsel on Accreditation, etc.[3]

OTPs provide medication-assisted treatment ("MAT") using full or partial agonist narcotics (i.e., Methadone or Buprenorphine) to treat individuals suffering from the catastrophic disease known as Opioid Use Disorder ("OUD").  BHG holds an active Drug Enforcement Administration ("DEA") license which allows it to administer these narcotics.  While Methadone is a Schedule II Narcotic, it is approved by the Federal Drug Administration ("FDA") and widely accepted in the medical community as the safest and most effective medication for treating individuals with OUD.[4]  In South Carolina, and across the country, there is a strong push to make MAT using Methadone or Buprenorphine more accessible to patients suffering from OUD.  In fact, the South Carolina State Health Plan promotes the development of more OTPs, and our regulatory bodies are actively eliminating barriers to physicians treating patients with OUD.[5] [6]

Opioid agonists, like Methadone, activate the opioid receptors in the brain, preventing withdrawal and reducing cravings for opioids like heroin and prescription pain medication.  While Plaintiff describes T.N. as a "junkie" in her Complaint, OTP patients are sometimes individuals

---

[2] See 42 CFR 8.11, Opioid Treatment Program Certification; 42 CFR 8.12, Federal Opioid Treatment Standards
[3] See https://www.samhsa.gov/medications-substance-use-disorders/become-accredited-opioid-treatment-program/approved-accreditation-bodies
[4] https://pubmed.ncbi.nlm.nih.gov/25747920/, "Medication-assisted treatment of opioid use disorder: review of the evidence and future directions"; https://www.samhsa.gov/medications-substance-use-disorders, "Medications for Substance Use Disorders; https://rockinst.org/blog/what-medications-are-used-in-medication-assisted-treatment/, "What Medications Are Used In Medication-Assisted Treatment"
[5] "Due to the increasing number of opioid deaths in South Carolina, additional [OTPs] are needed for the services to be accessible within 30 minutes' travel time for the majority of state residents. The benefits of improved accessibility will outweigh the adverse effects of the duplication of this existing service."  2020 S.C. Health Plan, p. 55.
[6] See Exhibit 1, SAMHSA- "Removal of DATA Waiver (X-Waiver) Requirement"

who were exposed to opioids in their youth and, often, are individuals suffering from chronic, painful illnesses, or they may be war veterans who utilized opioids upon returning from duty. Most medical experts agree that Methadone can help individuals combat their OUD and, hopefully, function as productive members of society.

DHEC Regulation 61-93 promulgates Standards for Licensing Facilities for Chemically Dependent or Addicted Persons ("Regulations").[7] These Regulations guide OTPs, staffing requirements thereof, and certain aspects of opioid treatment, e.g., urine drug screening, medication diversion control, etc. Section 505(A) of the Regulations provides, in part: "The Opioid Treatment Program Physician shall have authority over all medical aspects of care and make treatment decisions in consultation with treatment Staff consistent with the needs of the Patient . . . The Facility shall have at least one (1) Physician available during dosing and Facility operating hours . . .."

Section 505(B) of the Regulations provides that "the Facility shall have a pharmacist or other person licensed to dispense [OTP] Medications pursuant to the South Carolina Code of Laws . . .." Section 505(C) provides "[t]he Facility shall have one (1) Licensed Nurse present at all times . . .." And Section 505(D) provides "[t]he [OTP] shall have at least one (1) full-time counselor on staff for every fifty (50) Patients or fraction thereof. Counselors shall be qualified as specified in Section 508." Simply put, OTPs are medical facilities providing medical treatment to their patients suffering from OUD and, as part of that MAT, OTPs offer concomitant counseling services to their patients.

---

[7] See D.H.E.C. Reg. 61-93, Standards for Licensing Facilities for Chemically Dependent or Addicted Persons: https://scdhec.gov/sites/default/files/Library/Regulations/R.61-93.pdf

In fact, OUD treatment falls under the Mental Health Parity and Addiction Equity Act (MHPAEA) of 2008, requiring health insurers and group health plans to provide the same level of benefits for mental and substance use treatment and services that they do for medical and surgical care. There are also model guidelines for use by state medical boards in regulating OTPs and other office-based opioid treatment facilities (often referred to as OBOTs).[8]

On June 2, 2020, a patient named T.N. enrolled at BHG following years of habitual heroin and illicit drug use (e.g., non-prescribed fentanyl and benzodiazepines) that began at age fourteen (14). Prior to admission, T.N. informed BHG staff that he wanted to stop his illicit drug use. Given his history with OUD, T.N. was deemed appropriate for OTP admission by Dr. James Harber, BHG's Medical Director. Subsequently, T.N.'s Individual Treatment Plan was established, with participation by T.N. Individual Treatment Plans (i.e., Individual Plans of Care) are required by DHEC Reg. 61-93, Sections 706-707.

Upon admission, T.N. received and signed multiple patient education forms, including information on Methadone and a Benzodiazepine Education form which warned T.N. that "Combining benzodiazepines with [MAT] can have serious health risks . . .." See Ex. 2, T.N. Patient Education Forms.

On June 3, 2020, Dr. Harber ordered T.N.'s Methadone induction dose of 30mg, with increases of 5mg after every third dose if T.N. had a Clinical Opioid Withdrawal Scale of greater than or equal to 7, and the titration could continue up to 50mg or through August 3, 2020.[9] As part

---

[8] See Federation of State Medical Boards: Model Policy on DATA 2000 and Treatment of Opioid Addiction in the Medical Office (2013), http://legalsideofpain.com/uploads/FSMB-2013_model_policy_treatment_opioid_addiction.pdf

[9] The Clinical Opioid Withdrawal Scale (COWS) is a standard assessment tool for measuring opioid withdrawals over a period of time. See https://www.asam.org/docs/default-source/education-docs/cows_induction_flow_sheet.pdf?sfvrsn=b577fc2_2

of T.N.'s treatment plan, he was ordered concomitant counseling and would need to report to the OTP every single day (except when the OTP is closed on Sunday or major holidays) to receive his daily Methadone dose. On the days when BHG was closed, T.N. was allowed a take-home dose, as is standard practice in the OTP industry. Sometimes, once patients show compliance with their treatment regimen, they earn "phase ups" and are allowed more take-home doses. Take-home doses are a privilege in the OTP setting. T.N. never earned a "phase up" at BHG. He was required to show up every day during his admission for his daily dose.

T.N. was compliant with his appropriately randomized urine drug tests during his admission, for a total of approximately twenty-nine (29) tests. Approximately nine (9) were positive for benzodiazepines and twenty-seven (27) were positive for opiates. Despite these positive urine drug screens, this is most likely successful treatment if the patient is reducing his illicit use. See Ex. 3, Def. Expert Report of Eric Morse, MD. The "harm-reduction model" is the template for OTP care. "Harm reduction is an evidence-based approach that is critical to engaging people who use drugs and equipping them with life-saving tools and information . . .."[10] While the treatment provider's goal is usually full abstinence of illicit use, that may not be the patient's goal. Studies have shown that the best indicator of success is the length of treatment.[11] The longer a patient is in treatment, the more likely they are going to be opioid-free. In theory, so long as a patient is reporting to the OTP daily and dosing daily, the risk of illicit drug use and patient overdose is reduced.

---

[10] See SAMHSA: Harm Reduction, https://www.samhsa.gov/find-help/harm-reduction
[11] See TIPS, ASAM 2020 OUD Treatment Guidelines, SAMHSA 2011 OTP Survey.

T.N. attended and dosed over 90% of his admission days, which was above average during the COVID-19 pandemic. He did well with his Sunday and Thanksgiving take-home doses. T.N. missed several telehealth counseling appointments, but made one, and had one in-person counseling session on 10/23/2020 where his positive urine drug tests were reviewed. See Ex. 4, T.N. Counseling Notes. T.N. was encouraged to increase his dose to reduce his self-medicating needs. Id. Via telehealth on 11/19/2020, T.N. was counseled regarding the risks of his illicit Benzodiazepine use with methadone. Id.

Despite being directed to attend counseling by BHG's medical director, counselors, and staff, T.N. only attended two substantive counseling sessions during his BHG admission.[12] When a patient like T.N. is dosing regularly but struggling to remain abstinent from concomitant illicit drug use and not regularly attending counseling, a medical decision must be made. Here, BHG continued to dose T.N. on the basis that it is outside the standard of care to withhold Methadone from patients taking Benzodiazepines.[13] And, T.N. was still fitting within the widely accepted "harm-reduction model."

On December 24, 2020, T.N. reported to BHG for his regular daily Methadone dose and received one take-home Methadone dose for Christmas day, since BHG would be closed for the holiday. On December 26, 2020, T.N. was late to arrive at BHG and not permitted to dose. The BHG pharmacy window closed at 9:00 a.m., and T.N. did not call BHG to inform staff members of his tardiness. Instead, T.N. attempted to sneak through the side door of the program and was caught by a staff member, Ms. Portia Pratt. Ms. Pratt observed T.N., spoke with him, and

---

[12] See Ex. 5, T.N. Counseling Holds that were entered by BHG staff
[13] See Ex. 6, FDA Safety Announcement, September 20, 2017, ("FDA urges caution about withholding opioid addiction medications from patients taking benzodiazepines or CNS depressants: careful medication management can reduce risks.")

determined that T.N. was not visibly impaired. See Ex. 7, Depo. of Portia Pratt. No evidence exists to the contrary. Appropriately, T.N. was denied his daily dose and instructed to leave BHG for the day. This decision was not at the discretion of Ms. Pratt, but rather the Board of Pharmacy mandates set hours of operation and, upon daily closure, BHG pharmacy staff must perform routine closing and medication "lock-up" tasks.

Therefore, T.N. left BHG and drove away. At approximately 9:32 a.m., T.N. was driving on Highway 176 in Spartanburg, South Carolina, and struck Mr. Bill Sivilay's vehicle. Mr. Sivilay tragically died because of the injuries sustained in the collision caused by T.N.

T.N. was arrested, and his post-collision toxicology report showed recent marijuana use, recent benzodiazepine use (including "designer" benzodiazepines, which are "street" drugs not approved for use by the FDA), and Methadone use (as expected due to T.N.'s MAT at BHG). Also, after the collision, a small plastic bag with narcotic residue was found on his person.

In May 2021, Plaintiff, Vanida Khautisen, as Personal Representative of the Estate of Bill Sivilay, brought against T.N. a claim for wrongful death arising out of the collision. *See* 2021-CP-42-01634, Spartanburg County. That claim has been settled in full.

On November 18, 2021, Ms. Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, brought this wrongful death and survival action against Defendants. See ECF No. 1, Pl's Compl. Plaintiff *only* pled general negligence claims. Yet, Plaintiff's Complaint, despite being artfully worded to formulate general negligence claims, alleges that BHG owed an array of medical duties of care to third parties, including the Decedent, which arise from: "(a) the inherently dangerous dispensation of methadone to a known drug addict and continuing drug user, such as T.N.; (b) BHG's actual knowledge that T.N. continued to use prescription and illicit drugs;

7

(c) BHG's unique knowledge of the specific risk posed by T.N. and his continued prescription and illicit drug use coupled with methadone use . . . ; (d) BHG's decision to dispense methadone . . . in addition to the already dangerous cocktail of substances; (e) an affirmative obligation to warn T.N. of the dangers to himself and others posed by his methadone use in conjunction with other drugs; (f) an affirmative obligation to intervene to protect T.N. and others after BHG's dispensation of methadone . . . ; and (e) State and Federal law imposing strict limits on dispensation of methadone."  Pl's Compl. ¶ 43.

## <u>APPLICABLE LAW</u>

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure (FRCP), summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "While the question of breach of duty is a factual question best left for the jury, **'whether the law recognizes a particular duty is an issue of law to be determined by the court.'"**  <u>Delaney v. United States</u>, 260 F.Supp.3d 505, 512 (D.S.C. 2017), citing <u>Jackson v. Swordfish Inv., L.L.C.</u>, 365 S.C. 606, 620 S.E.2d 54, 56 (2005) (emphasis added).

Further, "The South Carolina Code sections relating to professional negligence claims are the substantive law of South Carolina" and apply in Federal Court. *Millmine*, 2011 WL 317643, at *2 (addressing whether S.C. Code § 15-79-125 was procedural or substantive law under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

## ARGUMENT

### I.  Plaintiff's allegations are grounded in medical malpractice, not ordinary negligence.

Pursuant to S.C. Code Ann. §15-79-110(6), "'Medical Malpractice' means doing that which the reasonably prudent health care provider or health care institution would not do or not doing that which the reasonably prudent health care provider or health care institution would do in the same or similar circumstances."

Whether an action sounds in medical malpractice or ordinary negligence is sometimes a subtle distinction because "no rigid analytical line separat[es] the two causes of action," and the differentiation depends heavily on the facts of the case. Dawkins v. Union Hosp. Dist., 758 S.E.2d 501, 503–04 (S.C. 2014).  In Dawkins, the South Carolina Supreme Court addressed whether a patient's claim sounded in negligence or medical malpractice and whether section 15-79-125(A) applied where a patient reported to a hospital's emergency room with stroke like symptoms, fell while unattended, and suffered injury. Id. at 501. The trial court characterized the claim as malpractice and granted the defendant hospital's motion to dismiss based on plaintiff's failure to file the notice and affidavit. Id. at 503. In describing the determination between medical malpractice and ordinary negligence as a fact-specific inquiry, the South Carolina Supreme Court reasoned that "at all times, the medical professional must 'exercise ordinary and reasonable care to ensure that no unnecessary harm [befalls] the patient.'" Id. at 504 (quoting Papa v. Brunswick Gen. Hosp., 517 N.Y.S.2d 762, 764 (App. Div. 1987)) (modification in original).

To help distinguish when ordinary negligence claims arise within the physician-patient relationship, the Dawkins Court reasoned that medical malpractice requires expert testimony to establish a duty and its breach, while ordinary negligence does not. Id. Based on these distinctions,

9

the Court held that "[t]he statutory definition of medical malpractice found in Section 15–79–110(6) does not impact medical providers' ordinary obligation to reasonably care for patients with respect to nonmedical, administrative, ministerial, or routine care." Id. Ultimately, the Court concluded that Dawkins' claim sounded in ordinary negligence and that the notice and affidavit statute did not apply, despite the broad language of § 15-79-110(6). Id. at 504–05.

Alternatively, a plaintiff in a medical malpractice case must establish by expert testimony both the standard of care and the defendant's failure to conform to the required standard. That is, of course, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the defendant's conduct. David v. McLeod Regional Medical Center, 367 S.C. 242, 248, 626 S.E.2d 1, 4 (2006); Carver v. Med. Soc'y of S.C., 286 S.C. 347, 350, 334 S.E.2d 125, 127 (Ct. App.1985). The Plaintiff must either present expert witness testimony or establish that the negligent act "lies within the ambit of common knowledge and experience, so that no special learning is needed to evaluate the conduct of the defendant." S.C. Code Ann. § 15–36–100(C)(2) (Supp.2013). Examples of medical professional acts that South Carolina Courts find to be "ordinary" negligence include exposing a patient with a known latex allergy to a latex glove (see Brouwer v. Sisters of Charity Providence Hospitals, 409 S.C. 514, 763 S.E.2d 200 (2014)); burning a patient with a hot surgical drill (see Thomas v. Dootson, 377 S.C 293, 659 S.E.2d 253 (Ct. App. 2008)); and ramming a sharp object into a dental patient's mouth (see Hickman v. Sexton Dental Clinic, P.A., 295 S.C. 164, 367 S.E.2d 453 (Ct. App. 1988)).

Here, Plaintiff's allegations of "ordinary" negligence, while artfully pled to portray common knowledge, have evolved through discovery to focus entirely on BHG's medical-based decisions to dispense Methadone, the amount of Methadone dispensed, inadequate clinical

10

assessments, failure to detox or titrate Methadone, and failure to warn of adverse medication effects and interactions.  See Pl's Compl. ¶ 44.  Plaintiff alleges that BHG failed to demand that T.N. attend more regular counseling sessions as part of his treatment for OUD.  Plaintiff also criticizes the content and duration of T.N.'s counseling sessions.  These issues absolutely require "special learning" to evaluate Defendants' conduct.   See S.C. Code Ann. § 15–36–100(C)(2) (Supp.2013).

In fact, once the parties moved past the pleadings phase of this case, discovery focused entirely on whether BHG **met the applicable standards of care** in treating T.N.  Plaintiff retained a psychiatrist, Dr. Nathan Strahl, to opine regarding whether "BHG met the Standard of Care for the treatment of [T.N.]."  See Ex. 8, Expert Report of Nathan Strahl, M.D.  Dr. Strahl's expert report concludes that "BHG failed to provide accurate diagnoses, failed to adequately intervene when T.N. continued to abuse multiple illicit substances and failed to provide adequate psychotherapy that culminated in the death of Khouanexay Bill Sivilay."  Id.

Even Plaintiff's 30(b)(6) deposition topics were centered on substance abuse treatment services offered at BHG; "Standards of care applicable to substance abuse treatment services offered at BHG . . ."; "Federal and South Carolina laws and regulations governing substance abuse treatment services offered" at BHG; "BHG's policies and procedures regarding substance abuse treatment services offered"; and the "treatment of T.N." at BHG.  See Ex. 9, Pl.'s 30(b)(6) N.O.D.

The facts at hand have striking similarities to a recent S.C. District Court case in front of Judge Norton.  In Delaney v. United States, 260 F.Supp.3d 505, 509 (D.S.C. 2017), Judge Norton was tasked during the pleadings phase of the case to determine whether a plaintiff's claims sounded in medical malpractice.  The underlying facts consisted of several psychiatric screenings during a

single day which noted a Marine receiving medical care at the US Naval Hospital suffered from suicidal ideations or posed a risk of harm to others.  Despite these notations in the medical chart, the hospital did not implement additional security or precautionary measures.  Id. at 507-08.  A short time later, the Marine fled the hospital, commandeered an unattended firetruck, and drove it onto the roadway killing a bystander.  Id.  Reciting allegations in the Complaint, Judge Norton concluded that the plaintiff's claims rested on the **"specialized knowledge that medical professionals practicing mental health care possess about screening patients for serious mental health issues and the need for implementing precautionary measures that may be guided by those mental health issues,"** meaning that the claims sounded in medical malpractice. Id. at 510-12 (emphasis added).[14]

Another similar case is Fox v. White Plains Medical Center, 509 N.Y.S.2d 614, 125 A.D.2d 538, (N.Y.App.Div. 1986).  In Fox, a post-surgical patient arose from his hospital bed and attempted to walk unassisted to the bathroom. The patient became dizzy and fell, injuring his back. Id.  The patient attributed the accident to the failure of the defendant hospital to have side rails on his hospital bed and maintained the gravamen of his action sounded in ordinary negligence. Id. Nevertheless, the New York appellate court determined the plaintiff-patient's action sounded in medical malpractice because the essence of his allegations was that an improper assessment of his condition and the degree of supervision required, particularly regarding his ability to ambulate post-operatively, led to the subject injuries. Id. (emphasis added).

---

[14] See also, Hoard v. Roper Hosp., Inc., 377 S.C. 503, 661 S.E.2d 113 (2008) ("Because many medical malpractice suits involve ailments and treatments outside the realm of ordinary lay knowledge, expert testimony is generally necessary."), citing Ellis v. Oliver, 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996).

Simply put, medical malpractice covers all sorts of intricate medical judgment calls that medical facilities must make when treating patients like T.N. with complex diseases such as OUD. It covers professional standards governing trained medical professionals and facilities. Even if Plaintiff attempts to narrow this case to counseling issues, S.C. Code Ann. § 15-36-100(G)(16) demands an expert affidavit if Plaintiff's claims are against "professional counselors." And mind you, Plaintiff has hired no professional counseling expert in this case.

The care rendered by BHG to T.N., about which Plaintiff complains, does not fall under the categories of "ministerial, administrative, routine, or non-medical care." Dawkins, 758 S.E.2d at 501. It does not boil down to reading a patient's medical record to see their allergies, dropping an immobile patient during a toileting transfer, touching a patient with a burning hot object, or jabbing a medical instrument inside a patient's mouth. By Plaintiff's own recognition and hiring of Dr. Strahl, Plaintiff needs a medical expert to establish the standards of care and duties allegedly breached by BHG in this case. Physicians and professional counselors with specialized knowledge in the unique world of opioid treatment are necessary to establish the appropriate course of medical action when T.N.'s UDSs were positive, and when he was refusing to take part in the counseling offered by BHG. Like the allegations in Delaney and Fox (*supra*), Plaintiff's allegations in this case are centered on BHG's assessment, screening, and clinical responses to T.N.'s substance use disorder during his BHG admission. This is a medical malpractice case.

It should be noted that even though Plaintiff may promulgate various theories of negligence such as failures to hire qualified individuals, failure to train, or "profit over patient care" (e.g., inflating medication costs, underpaying staff, etc.), or even dram shop-style theories, all these allegations are rooted in the quality of medical care rendered to T.N., a patient receiving specialized

medical treatment for the disease of OUD.  In any medical malpractice case, a plaintiff does not remove herself from the substantive and procedural laws governing medical malpractice simply by summarily alleging, e.g., that a hospital put profit over patient safety or that nurses were not adequately trained.

## II.   As a matter of law, the medical professional Defendants owed no duty of care to Plaintiff, a non-patient third party.

Only in very limited circumstances may a reasonably foreseeable third party maintain a suit against a medical provider for medical negligence.  Delaney, 260 F.Supp.3d at 512.  Our South Carolina courts have consistently held that a medical malpractice claim may only be maintained by the patient, unless the facts fit within a narrow category of cases.  Thus, if a physician deviated from accepted standards of professional care in treating a patient, he breached a duty of care to the patient and **not a third party**.  Sharpe v. S.C. Dep't of Mental Health, 292 S.C. 11, 354 S.E.2d 778 (Ct.App.1987), *cert. dismissed,* 294 S.C. 469, 366 S.E.2d 12 (1988) (duty of care owed to patient and not third parties) (emphasis added); see also, Tumblin v. Ball-Incon Glass Packaging Corp., 324 S.C. 359, 478 S.E.2d 81, 85 (Ct. App. 1996), citing Roberts v. Hunter, 310 S.C. 364, 426 S.E.2d 797 (1993) (The establishment of a doctor/patient relationship is a prerequisite to a claim of medical malpractice.").  Our S.C. Supreme Court in Roberts even went as far as to hold that no doctor/patient relationship was established between a medical patient plaintiff and neurologist, even though the examining room physician contacted neurologist and the neurologist agreed to examine the patient.  310 S.C. 364, 366-67.

Other jurisdictions agree with this requirement and do not allow injured third parties to recover against medical professionals.  See Moye v. United States, 735 F.Supp. 179 (E.D.N.C.1990) (there must be a physician-patient relationship between victim and doctor before

the court will find a doctor owes a victim harmed by his patient a duty of care to properly evaluate and treat patient); Russell v. Adams, 125 N.C.App. 637, 482 S.E.2d 30 (1997) (psychologists, like other health care providers, may be held liable in medical malpractice only to their patients). This is well-established law throughout the Fourth Circuit, and the list of cases supporting this rule is too extensive to cite herein.[15]

Further, South Carolina law does not recognize a general duty to warn of the dangerous propensities of others. Rogers v. S.C. Dep't of Parole & Community Corrections, 320 S.C. 253, 464 S.E.2d 330 (1987), supra; Sharpe, supra. While a narrow line of cases exist holding that a defendant physician may have a common law duty to warn potential victims of a patient's dangerous conduct (see Bishop v. S.C. Dep't of Mental Health, 331 S.C. 79, 502 S.E.2d 78, 87 (2017), citing Rogers v. S.C. Dep't of Parole & Community Corrections, 320 S.C. 253, 464 S.E.2d 330 (1987), (citing Restatement (Second) of Torts §§ 315 & 319)), the defendant must have the ability to monitor, supervise, and control an individual's conduct, and a special relationship must exist between the defendant and the individual (see Rogers, 464 S.E.2d at 332) (emphasis added). Then, and only then, the defendant may have a common law duty to warn potential victims of the individual's dangerous conduct. Id. This duty to warn arises when the individual has made a specific threat of harm directed at a specific individual. Id. (citing Rayfield v. South Carolina Dep't of Corrections, 297 S.C. 95, 374 S.E.2d 910 (Ct.App. 1988), cert. denied, 298 S.C. 204, 379 S.E.2d 133 (1989); Restatement (Second) of Torts §§ 315 and 319 (1965)).

---

[15] See also, Easter v. Lexington Mem'l Hosp., 303 N.C. 303, 278 S.E.2d 253, 255 (N.C. 1981) (the relationship of physician to patient must be established as a prerequisite to an actionable claim for medical malpractice); Iodice v. U.S.A., 289 F.3d 270 (4th Cir. 2002) (" . . . and we have not found, a single North Carolina case permitting unrelated third party victims of a patient to sue the patient's health care providers for medical malpractice, or even suggesting that such claims are possible.")

One case where such a provider/third party duty arose was <u>Hardee v. Bio-Medical Applications of South Carolina, Inc.</u>, 370 S.C. 511, 636 S.E.2d 629 (2006).  Though, <u>Hardee</u> provides only a very narrow circumstance where a medical provider's duty extends to a third party.  The <u>Hardee</u> Court concluded that it is well-accepted that a medical provider has a duty to warn of the dangers associated with medical treatment, including potential detrimental effects on a patient's capacities and abilities.  In the same regard, a physician "owes a duty to prevent harm to patients and to reasonably foreseeable third parties by warning the patient of the attendant risks and effects before administering the treatment." <u>Id</u>. at 516.  The <u>Hardee</u> Court held that if the provider knew that the patient "could experience ill effects following dialysis treatment," then the provider owed the third party "a duty to warn the [p]atient of the risks of driving." <u>Id</u>.  However, the Court expressly stated, "We note that this is a **very narrow holding that carves out an exception to the general rule that medical providers do not owe a duty to third party non-patients**.  Importantly, this duty owed to third parties is identical to the duty owed to the patient, *i.e.*, a medical provider must warn a patient of the attendant risks and effects of any treatment." <u>Id</u>. (emphasis added).

Here, there is no question of fact surrounding T.N.'s knowledge of the risks involved with combining Methadone and Benzodiazepines.  Plaintiff's experts have made no indication that BHG failed to warn T.N. of the dangers of driving a vehicle if he took Benzodiazepines or other illicit drugs.  Contrarily, T.N. was provided with patient education forms, which he signed, regarding the risks of combining Benzodiazepines and Methadone.  See Ex. 2, T.N. Patient Education Forms.

Therefore, the questions for this Court to consider are whether there is any evidence whatsoever to support that BHG had knowledge of a specific threat or risk of harm to the Plaintiff, and whether BHG had some special relationship with T.N. where they had the ability to monitor and control his conduct.  See Rogers, 464 S.E.2d at 332.

In Bishop v. S.C. Dep't of Mental Health, "the Department had a special relationship with mother because the Department had custody and control of mother.  Thus, if the Department knew or should have known a specific threat was made by mother, the Department had a duty to warn the threatened third party of mother's release."  See Bishop, *supra*.  Even though the mother did not make a specific threat while in custody to harm the victim, the Department knew the mother had made specific threats to harm the victim in the past.  However, it is important to note that even though a duty existed, the Court still declined to reverse the lower court's summary judgment in favor of the Department on the grounds that a third party's intervening negligence (i.e., the grandmother) was well aware that mother had made threats against victim, and grandmother knew the mother had been released from the Department, allowed mother to enter home, and allowed mother to take the victim for an unsupervised visit.

While the physician-patient relationship is not a requisite in *every* legal action against a medical provider, other jurisdictions also only allow third parties to recover for a physician's malpractice under highly unique circumstances.  *See* Molien v. Kaiser Foundation Hospitals, 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813 (1980) (because a negligent misdiagnosis of a communicable disease may foreseeably cause injury to close members of patient's family, the physician's duty of care extends to them); Hofmann v. Blackmon, 241 So.2d 752 (Fla.App.1970) (a doctor is liable to persons infected by his patient if he negligently fails to

diagnose a contagious disease); <u>Wojcik v. Aluminum Co. of America</u>, 18 Misc.2d 740, 183 N.Y.S.2d 351 (N.Y.Sup.1959) (doctor is liable for failing to warn patient's family of patient's contagious disease).

In this setting, T.N. is certainly a medical patient at a medical facility. He is receiving a controlled narcotic, prescribed by a medical provider within the OTP, dosed by in-house pharmacists/pharmacy techs, assessed by nurses, and counseled by professional counselors. SAMHSA requires that OTPs be accredited. OTPs must be authorized to operate and licensed by DHEC. BHG holds a license from the DEA. BHG's pharmacy must abide by the rules set forth by the S.C. Board of Pharmacy. Medical standards of care inside of OTPs fully govern BHG's decisions regarding T.N.'s treatment.

At the same time, BHG had no special relationship with T.N. T.N. enrolled at BHG voluntarily. He was free to come and go as he pleased. He was not in an in-patient setting. As all OTP patients do, T.N. drove or caught a ride to BHG for his daily methadone dose and he went through the daily program requirements to receive his dose (e.g., impaired patient assessments, return of empty take-home bottles, if any, etc.). He then drove or rode away from the OTP after receiving his daily dose. Many OTP patients have careers, part-time jobs, families, etc. Methadone allows them to function as normal and productive members of society. Many OTP patients stay in MAT for their entire life.[16] MAT with Methadone is not intended to be in-patient treatment. Unlike the patient-mother in <u>Bishop</u>, BHG has no special ability to monitor, supervise, or control T.N.'s (or any BHG patient's) conduct. See <u>Bishop</u>, *supra*; <u>Rogers</u>, 464 S.E.2d at 332.

---

[16] At BHG, the average length of admission for currently enrolled patients is 5.02 years. In 2020, the average length of admission for current patients was 5.26 years.

Patients are legally allowed to drive while taking Methadone, so long as they are not impaired. Patients do not undergo (and the laws do not require) daily urine drug screens before they receive their daily dose.[17]   Patients in the OTP setting assume responsibility for their own choices and conduct.  See Ex. 2, Patient Education Forms.  Methadone, by its very nature, is intended to reduce the risk of harm to a patient and those around him— it reduces the euphoric "high" feelings of opioids, it reduces opioid withdrawal symptoms, and it controls and sometimes eliminates the cravings for the opioid on which a person is dependent.[18]   MAT at OTPs is a unique form of addiction treatment that is intended to be a daily intervention for individuals who do not meet the criteria for in-patient addiction treatment.

More importantly, T.N. never made any specific threat of harm to any individual.  See Rogers, 464 S.E.2d at 332 (there was no evidence presented that the patient ever made a specific threat to harm the victim. Therefore, appellants had no common law duty to warn the victim of the Patient's release.); Thompson v. County of Alameda, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980) (defendants had no affirmative duty to warn of the release of an inmate who had made nonspecific threats of harm directed at nonspecific victims).  T.N. did not have a known history of driving while impaired and, as Ms. Pratt testified, T.N. did not appear impaired on the day he attempted to tardily sneak into treatment.  See Ex. 7, Portia Pratt Depo excerpt.  T.N. consumed

---

[17] See D.H.E.C. Reg. 61-93 § 904(E): "Patients granted take home dosages shall undergo random substance use testing on a monthly basis. For Patients whose substance use testing reports indicate positive results for any illicit substances, non-prescription Medications, or a negative result of Opioid Treatment Program Medication, the frequency for substance use testing shall be determined by the Opioid Treatment Program Physician or other Authorized Healthcare Provider.

[18] Alcohol and Drug Foundation: Methadone, https://adf.org.au/drug-facts/methadone/

the intoxicating drugs that contributed to his collision with Mr. Sivilay on his own time, and at his own will.

The issues in this case have evolved purely into whether T.N.'s medical treatment rendered by BHG was appropriate and within standards of medical care; and whether said treatment was the direct and proximate cause of T.N. electing to use illicit substances and drive while impaired, thereby causing a violent and tragic collision with the deceased Plaintiff.  Without implying that such medical decisions were a cause, even if they were there must be a duty owed to the deceased Plaintiff for BHG to be liable for the harms T.N. caused.  BHG owed no such duty to a non-patient third party.

## **CONCLUSION**

Defendants respectfully seek an Order from this Court granting summary judgment on all causes of action on the grounds that this is a medical malpractice case and, therefore, the medical professional Defendants owed no duty to Plaintiff, a non-patient third party.

Respectfully submitted,

HOLCOMBE BOMAR, P.A.

s/ Chance M. Farr
Chance M. Farr, Fed ID 12522
E. Brown Parkinson, Jr.
William B. Darwin, Jr.
PO Box 1897
Spartanburg, SC 29306
(864) 594-5300
cfarr@holcombebomar.com
ebparkinson@holcombebomar.com
kdarwin@holcombebomar.com
*Attorneys for Defendants*

20

This the 20th day of July 2023.
Spartanburg, South Carolina.