**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| Vanida Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, | C/A No. 7:21-cv-3775-TMC |
| Plaintiff, | |
| v. | **PLAINTIFF'S SECOND MOTION TO COMPEL** |
| BHG Holdings, LLC, and BHG XXXVIII, LLC, | |
| Defendants. | |

Plaintiff Vanida Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, through undersigned counsel, hereby moves pursuant to Rule 37(a)(3)(B) of the Federal Rules of Civil Procedure to compel Defendants BHG Holdings, LLC, and BHG XXXVIII, LLC (collectively, "BHG"), to answer Plaintiff's Interrogatories 22, 24, and 25, and to produce all non-privileged documents responsive to Plaintiff's Requests for Production 35, 36, 37 and 38.[1] Before filing this motion, undersigned counsel consulted extensively with opposing counsel, as described below.

## I.     Background

### A.     Factual Background and Plaintiff's Theory of the Case[2]

Mr. Sivilay was a Laotian immigrant to the United States. His family supported the United States' fight against Communism in the Vietnam War. After America withdrew from the war they

---

[1] For simplicity, in this motion Plaintiff refers to requests by the numbers assigned in requests directed to Defendants' parent company, BHG Holdings, but incorporates by reference the identically worded requests directed to the Spartanburg subsidiary BHG XXXVIII in the request for relief and arguments supporting relief.

[2] This factual background section is argumentative in support of Plaintiff's request to compel discovery. Plaintiff believes that presenting argument regarding her theory of the case at the outset

were forced to flee.  Mr. Sivilay's older brother came to America first, bringing over other family members like Mr. Sivilay as they were born and old enough to make the move.  They joined a burgeoning Laotian community in Spartanburg.

In 2003, Mr. Sivilay started working at PolyDeck, a manufacturing company in Spartanburg, doing setup work for $10 per hour.  He worked hard, earning increases in responsibility and pay until he was earning $70,000 per year as a team leader in 2020.  In 2008, he married his wife, Vanida, whom he had met in Laos ten years earlier, and brought her and her mother to America.  They had two daughters, aged 8 and 11 at the time of his death.

On December 24, 2020, Mr. Sivilay wrote a $2,000 check as a deposit to begin construction of his family's American dream home, a 2,300 square-foot ranch house to be built on an empty lot off Chesnee Highway in Spartanburg.  Also on December 24, 2020, Trent Neal[3] received his final methadone doses from BHG.  Trent Neal was then a 21-year-old heroin addict who sought treatment at BHG's Spartanburg methadone clinic.  BHG is a for-profit LLC owned by private equity investors that sells addictive narcotics to drug addicts at an enormous markup (over 1600%).

BHG's Chief Executive Officer (CEO) is Jay Higham.  Previously he was CEO of IntegraMed America.  He started at IntegraMed as a Vice President of Marketing in 1994 when the company had only 4 locations and $8 million in revenue.  In late 2012, as CEO, he sold IntegraMed to private equity firm Sagard Capital Partners, LP, for $169.5 million.  At that time, IntegraMed

---

of the motion is clearer and more concise than fragmenting it over discussions of particular discovery requests.

[3] Mr. Neal has executed a declaration waiving any privacy rights he may have regarding his time at BHG and declaring that he does not want BHG to assert any privacy rights on his behalf. **Exhibit A** (Decl. of Trent Neal, Jan. 20, 2022).  BHG's insistence on referring to him as "T.N." as if he were a child or sexual assault victim is entirely unnecessary.  Nor is any redaction of his records from BHG necessary, apart from personal identifiers like his Social Security number.

had 130 locations and was the largest network of fertility centers in the United States. Mr. Higham's self-written LinkedIn describing his tenure as CEO states he "[d]eveloped corporate infrastructure of IT, Finance and Accounting, Risk Management, HR and legal to support separate divisional management teams tasked with driving field operations and site level P&L," and that he "[b]uilt revenue cycle, sales and marketing, regional management and new clinic development infrastructure." He makes no mention of any positive results for patients or even what services the company provided.[4] After the sale, the burden of its breakneck, debt-financed acquisitions collapsed IntegraMed and, after charge-offs for tens of millions in goodwill impairment, it entered Chapter 7 liquidation.

Mr. Higham however had moved on to become CEO of BHG. At that time, BHG had approximately 31 locations. Now BHG has 117 locations. Mr. Higham was brought into BHG by its then-owners, Frontenac, a Chicago-based private equity firm, to lead a recapitalization and aggressive growth plan that tripled BHG' size. At the end of 2018, Frontenac sold BHG to its current owner, The Vistria Group, another Chicago-based private equity firm.

One of the clinics purchased in Mr. Higham's buying spree was the former Spartanburg Treatment Associates methadone clinic on the access road near the I-85 and I-585 interchange, which BHG bought in 2016. Methadone clinics provide medication-assisted treatment by providing addicts with long-acting opioids (like methadone) that delay opioid withdrawal symptoms from short-acting opioids like heroin and allow time for withdrawal management and therapy. Methadone clinics are required to provide counseling services. 42 C.F.R. § 8.12(f)(5). As BHG's medical director has testified, counseling is the treatment for the psychological side of

---

[4] It also included "Vein Clinics of America," a chain of 50 clinics specializing in varicose vein treatment.

addiction and generally is the only treatment for non-opiate substance abuse. Methadone merely assists treatment by preventing withdrawal symptoms and satisfying cravings for opioids, which is why it is called "medication-assisted treatment," but methadone too is an addictive narcotic. It is not a cure for addiction.

South Carolina regulations require at least one counselor for every fifty patients or fraction thereof. S.C. Dep't Health & Environ. Ctrl. Reg. 61-93 ¶ 505. Counselors must be qualified by certification or licensure, with a grace period for new hires to obtain certification. *Id.* ¶ 508. There are regulations regarding the frequency of assessments and counseling. *See, e.g.*, *id.* ¶¶ 703, 705, 706, 707, 904. Methadone clinics are also required to conduct urine drug screenings of patients. South Carolina regulations provide that "Results of substance use testing shall be addressed by the primary Counselor with the Patient, in order to intervene in Controlled Substance use behavior." *Id.* ¶ 904(C). BHG's own internal policies purportedly require efforts to counsel patients within ten days of a positive drug screening result, BHG Policy and Procedure No. 407, *Drug Testing and Sample Collection Procedure* ("The program provider will sign off on all positive UDS's and will ensure the counselor completes a clinical interview with the patient within 10 days of a positive result."), although even BHG's Vice President for Clinical Services—who was its Rule 30(b)(6) designee to testify for BHG about counseling—was unaware of the policy:

> Q. . . . And I believe BHG has some policies regarding counseling responses to positive urinalysis tests, doesn't it?
>
> A. Counseling responses? What do you mean?
>
> Q. Like a counselor speaking to someone who tested positive on a urinalysis; are there policies at BHG about that?
>
> A. Not in a transactional way but, yes, in the continuum of care with the patient, once you have the results, you communicate the results of what you found with the patient.

Q. Is there any policy of within so many days of a positive result, you know, follow-up with a patient?

A. No, not that specific. Not to the amount of days.

Samson Teklemariam Dep. Tr. 25:18–26:14.

Trent Neal began treatment at BHG on June 3, 2020. He was 21 years old and had used opiates since the age of 14. He had no criminal record and sought treatment on his own initiative because he wanted a better life. He was fully compliant with his treatment. Per BHG's own records and counselor testimony, Mr. Neal participated in counseling sessions when asked, and in those sessions, he was fully cooperative and engaged. But BHG only provided one counseling session during Mr. Neal's seven months of treatment.[5] That single session happened because Mr. Neal was transferred to a newly hired counselor.

Unsurprisingly, Mr. Neal's substance abuse did not get better. It only got worse. He began testing positive for non-opioid drugs, a common occurrence with patients beginning methadone treatment. Ruth Combs Dep. Tr. 24:5–9 ("A lot of times as the methadone begins to work and the opiates, you know, the blocker and the methadone works and the opiates don't work, then they will use other drugs that it can't block."). Most alarmingly, he began testing positive for benzodiazepines. When taken together methadone and benzodiazepines synergize to depress central nervous system activity in different ways, which intensifies the effects of both drugs creating a more intense high and more severe adverse effects, including shallow breathing, low blood pressure, respiratory arrest, cardiac arrest, and death. That is why BHG has new patients sign a document warning of the dangers of taking benzodiazepines when on methadone during

---

[5] There is a factual dispute regarding whether BHG provided one or two substantive counseling sessions in seven months. Plaintiff claims the only session was a 1.25-hour session on October 23, 2020. BHG claims there were two sessions, the second being a 15-minute telephone call Plaintiff's expert describes as a "case management" call rather than a therapeutic counseling session.

intake.  Despite BHG being aware of the dangers of Mr. Neal's use of benzodiazepines, and even though its own policies require counseling within 10 days of a positive drug test result, and even though Mr. Neal tested positive for illicit drugs in every one of the 30 drug screening urinalysis tests he had in those seven months, BHG only provided that single counseling session to introduce him to a new counselor.  Nor did it intervene in any other way.  BHG just wants to sell methadone.  As BHG's medical director testified, "I know that from talking to patients who tell me when I ask, why you transferring to our clinic, well, because they cut my dose from 100 to 50 [mg of methadone] because I used a benzodiazepine."  James Harber Dep. Tr. 44:5–8.  The director of the Spartanburg clinic testified that his pay includes a bonus based primarily on the number of patients purchasing methadone at the clinic—his goal is 700 patients which at $14 per patient per day would put clinic revenues at about $3.5 million.  Joseph Barr Dep. Tr. 14:10–17.  Success in treating their addiction is not considered at all in determining his bonus.

The week of December 20, 2020, Mr. Neal tested positive for illicit opiates, amphetamines, and benzodiazepines.  He had consistently tested positive for benzodiazepines since early November without any intervention by BHG.  He tested positive on December 21st and again on December 23rd.  Then on December 24th he received his daily methadone dose plus an additional dose to take home dose for Christmas.  The day after Christmas, he returned to BHG for his daily fix.  But he was a minute late and the front doors were locked.  He snuck in a side door and went to the dispensing counter, but the counter was closed, and he was turned away.  So, he got in his car and drove away.  A few minutes later, he ran a red light at full speed and crashed into the driver's side of a car driven by Mr. Sivilay, killing him.  The collision occurred at the intersection of Asheville Highway and Springfield Road in Spartanburg (1.8 miles from the clinic) at 9:32 a.m.  Mr. Neal was not seriously injured, but responding officers found him so intoxicated that he needed

6

their assistance to stand up.  Mr. Neal was arrested for driving under the influence.  His blood tested positive for methadone and benzodiazepines.

Plaintiff believes—but does not know since BHG has refused to provide relevant discovery—that BHG did not meet the regulatory requirements for number of counselors, their qualifications, or the frequency of counseling provided.  Plaintiff does know that BHG's counselors during the period of Mr. Neal's treatment failed to comply with the standard of care or BHG's own policies, and that BHG had incredible employee turnover because they were woefully underpaid.  Mr. Neal's first counselor only made $16/hour.  He described BHG as a "counselor factory":

> Q. When you were there, I want to try to get a sense of . . . what . . . the turnover was with the counselors.  Like how many people came and went?
>
> A. That's hard, man, 'cause a lot has came and left, man.  When I started, I think maybe six or seven counselors left.  Yeah, about six or seven counselors left.
>
> Q. You said when you started.  Is that like in that first year or first month or what do you mean?
>
> A. So, the first year, well, right before I started I know maybe five counselors left before I first started, and then after a year went by, maybe three or four counselors left.  Then that second year another three counselors left.  I mean, with that pay, I mean they're not going to stay there that long with that pay.
>
> Q. I mean, is that the reason why --
>
> A. Yes, sir.
>
> Q. -- is that the $16 an hour is not -- I mean, it must be hard to keep people?
>
> . . .
>
> A. It's hard to keep people, yes, sir.
>
> Q. And no overtime?
>
> A. Right.  And a lot of people went to, you know, find a better opportunity.

. . .

Q. And I guess so then all those people were replaced.  So there's new people coming in, three or four, you know, five, I guess, started before.  I guess maybe you're one of the replacements for those five; is that accurate?

A. Yes, sir.

Q. And then another new three or four new counselors and another three?

A. Yes, sir.  It's like a counselor factory. . . .

Timothy Nesbitt Dep. Tr. 48:25–50:11.

Mr. Neal was a 21-year-old with no criminal record who came to BHG on his own initiative seeking help.  He is in a jail cell facing a decade or more in prison.[6]  He paid $2,422.00 to receive a total of 9.605 grams of methadone (a little over $252 per gram), which likely cost Defendants less than $150.00,[7] a 93% profit margin (or, put another way, a 1,614% markup on wholesale cost of the methadone).  No wonder private equity investors invest in selling drugs to addicts.  As Mr. Neal's counselor testified:

Q. Did your -- while you were there, did any patients – what's the end?  How does this end?  Like do people actually, I don't want to maybe use the word cured, but do they get to the point that they no longer need the treatment services?

A. Honestly, you're going to forever need the treatment services, because once you get on, from what I seen, once you get on the methadone, it's hard to get off.  Yeah, it's hard to get off the methadone once you get on. . . .

---

[6] BHG has taken issue with Plaintiff describing Mr. Neal as a "junkie."  The sad fact is that Mr. Neal did not want to be a junkie, but he is one and he knows it.  That is why he came to BHG seeking help.  BHG took his money and gave him more narcotics (which cost BHG next to nothing) but no real treatment (which would have cost something).  As a result, Mr. Sivilay is dead, and Mr. Neal is in jail, facing a lengthy prison sentence.  After his arrest he was released on bail, but it was revoked when a probation officer noticed fresh track marks on his arms.

[7] Based on an advertised wholesale price of $147.43 for 1000ml of 10mg/ml methadone oral solution.  Plaintiff of course needs the discovery that is the subject of this motion to find out the actual cost to Defendants.

Q. In your experience there, I guess two-and-a-half years with your patients, did anyone ever stop treatment because they felt like they had achieved their goals and they didn't need it anymore?

A. No, sir.  Most of the time people stop because they couldn't afford it.  $14 a day add up.

*Id.* 44:17–45:9.

Of course, BHG has other costs than purchasing narcotics wholesale.  Plaintiff seeks to discover those costs with this motion.  But the regulatory environment gives BHG few levers for cost reduction.  The physician prescribing for over 700 addicts is already only there for 10 hours a week.  BHG tried cutting corners with personnel dispensing the methadone but was caught by the South Carolina Pharmacy Board in 2017 (public reprimand and fine for not having a pharmacist-in-charge for a period in 2016) and again in 2018 (public reprimand and fine for unlicensed persons dispensing methadone while on probation for the previous offense).  But as an addiction treatment center its major operating expense is addiction treatment services—i.e., counseling.  Hence the failure to meet minimum staffing or service level requirements.  BHG's decision to reduce those services to below the minimum standard while still dispensing narcotics at a 1,614% markup is the reason Mr. Sivilay is not alive and with his family today.

The front-line counseling staff at BHG's Spartanburg clinic, however, did the best they could in the circumstances BHG created.  This case is about the money-driven refusal to meet the standard of care by a "private equity backed" for-profit company that sells narcotics to drug addicts, led by a marketing executive who had no experience with addiction treatment prior to becoming CEO of BHG and who has been buying up clinics around the country to "flip" them like renovated houses.

Mr. Sivilay was 46 years old when he was killed.  His widow was forced to take a $16/hour job as a machine operator at a textile coating mill to support their two little girls and her mother.

Their children are now enrolled in public assistance programs.  The lot off Chesnee Road that was to be their little dream home is still an empty grass field.  But private equity investors in Chicago continue to sell narcotics to Upstate addicts at an enormous markup through BHG.

**B.    Procedural History and Consultations on Discovery**

Plaintiff filed this action on November 18, 2021.  The current discovery deadline is July 28, 2023.  Plaintiff served initial sets of interrogatories and requests for production on March 3, 2022.  There were some disputes and delays regarding responses to those requests, and a motion to compel was filed on April 24, 2022, but the parties' counsel have a good working relationship and were able to resolve those issues without the Court's intervention.  Expert reports and expert depositions occurred thereafter in the fall of 2022.  In the winter of 2022 and early 2023 Plaintiff's counsel prepared for and conducted the six-week Alex Murdaugh murder trial.  That trial ended in early March 2023, and on March 22, 2023, Plaintiff's counsel served a second set of discovery requests including the interrogatories at-issue in this motion along with interlocking requests for production.  Defendants responded to those requests on March 31, 2023.  **Exhibit B** (Defs.' Resp. to Pl.'s 2d Set of Interrogatories to BHG Holdings); **Exhibit C** (Defs.' Resp. to Pl.'s 2d Set of Interrogatories to Def. BHG XXXVIII); **Exhibit D** (Defs.' Resp. to Pl.'s 2d Set of RFPs to Def. BHG Holdings); **Exhibit E** (Defs.' Resp. to Pl.'s 2d Set of RFPs to Def. BHG XXXVIII).

The parties' counsel have communicated frequently to resolve discovery issues frequently via email or telephone, and at depositions.  Additionally, Plaintiff's counsel sent a former consultation letter to Defendants' counsel regarding deficiencies in that response on April 21, 2023.  **Exhibit F** (Ltr. From P. Barber to C. Farr, Apr. 21, 2023).  At that time, Plaintiff asserted issues with Defendants responses to Interrogatories 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, and 25.  Through continued consultations, the parties were eventually able to resolve issues regarding all interrogatories without Court intervention except for the three at issue in this motion (Numbers 22,

24, and 25).  On May 3, 2023, Defendants' counsel indicated to Plaintiff's counsel via email that Defendants "objections will likely stand on remaining items."

On May 19, 2023, Plaintiff served a third set of discovery requests including the requests for production at-issue in this motion.  **Exhibit G** (Pl.'s 3d Set of RFPs to Def. BHG Holdings); **Exhibit H** (Pl.'s 3d Set of RFPs to Def. BHG XXXVIII).  Defendants did not respond so, one week after the response deadline, Plaintiff sent a formal consultation letter to Defendants' counsel regarding deficiencies in that response, and remaining deficiencies in the response to the second set of discovery requests on June 26, 2023.  **Exhibit I** (Ltr. From P. Barber to C. Farr, June 26, 2023).  On July 11, 2023, Defendants provided a partial response to two of the requests for production in the third set of discovery requests (RFPs Nos. 35 and 38).  **Exhibit J** (Defs.' Resps. to Pl.'s 3d Set of RFPs to Defs.).  Some of the documents included in this response were provided earlier, on June 27, 2023.

On June 26, 2023, Plaintiff served a fourth set of requests for production.  **Exhibit K** (Pl.'s 4th Set of RFPs to BHG Holdings); **Exhibit L** (Pl.'s 4th Set of RFPs to BHG XXXVIII). Defendants' responses to these requests are not yet due, but Defendants' position on other, related requests clearly indicates they stand on the same relevancy objections they have previously asserted.  Further, Defendants' response to this motion will be due one day after the due date for their response to the fourth set of discovery requests.  Plaintiff therefore includes the fourth set of discovery requests in this motion to spare the Court and the parties duplicative motion practice regarding identical relevance issues.

## II.    <u>Legal Standard</u>

Rule 26(b)(1) of the Federal Rules of Civil Procedure states:

Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering

> the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable.

If a party declines to answer an interrogatory or request for production, the serving party "may move for an order compelling an answer, designation, production, or inspection." Fed. R. Civ. P. 37(a)(3)(B).  When considering a motion to compel, "a district court has wide latitude in controlling discovery and its rulings will not be overturned absent a showing of clear abuse of discretion." *Ardrey v. United Parcel Serv.*, 798 F.2d 679, 683 (4th Cir. 1986).

## III.    **Argument**

The at-issue discovery requests are discussed individually below.  Plaintiff first addresses an objection BHG repeats verbatim multiple times:

> Evidence related to the treatment of nonparty clients at its OTP is irrelevant to Plaintiff's claims.  Moreover, Plaintiff's effort to expose a company-wide trend has no bearing on whether, in this case, Trent Neal's treatment as rendered by BHG was the direct and proximate result of the specific harm pled in this case.

That is not true.  Plaintiff seeks evidence regarding the treatment of nonparty clients and financial information regarding ***only one of BHG's 117 clinics***—the Spartanburg clinic where Mr. Neal was treated—and ***only for the year 2020***, when Mr. Neal was treated.  Plaintiff believes BHG's drive to deliver profits to its private equity investors by selling addictive drugs to drug addicts leads it to cut corners at all its 117 clinics and to expose the public to danger across America.  But what BHG did as a result in, say, Nashville, Tennessee, is not relevant to this case.  What is relevant is what BHG did in Spartanburg in 2020, which is why Plaintiff restricted her discovery requests to that location and year.  Plaintiff needs to discover whether the "treatment as rendered by BHG" was inadequate because of BHG's profit-driven operational decisions in managing the Spartanburg

clinic of whether it was simply because Mr. Neal was particularly noncompliant or nonresponsive with treatment services.

## A.     Interrogatory 22

This Interrogatory asks for revenue generated from drug-dispensing treatment programs at the Spartanburg clinic in 2020.  BHG objects that the information is not relevant.  As Plaintiff sets forth above, inadequate counseling is the crux of this case.  The testimony to date suggests counseling is a major cost for BHG (e.g., testimony that there are 10 full-time counselors at the Spartanburg clinic) which BHG seeks to keep under tight control (e.g., Counselors make $16/hour with no overtime allowed).  The number of patients served, the revenues obtained from those patients, and the expenditures on counseling services for them—at the clinic Mr. Neal was treated during the year of his treatment—is relevant to BHG's failure to provide adequate counseling services to Mr. Neal.  It is relevant particularly to why he received such inadequate substance abuse counselling—whether it was a consequence of how BHG operated that clinic in that year (as Plaintiff argues), or was something specific to Trent Neal, like a lack of cooperation with treatment (as BHG may argue).  And it is also relevant to the factual defenses Plaintiff's expert witnesses have asserted regarding the impact of the Covid-19 pandemic on BHG's ability to meet the standard of care.  The Court therefore should order BHG to answer Interrogatory 22.

## B.     Interrogatory 24 and Requests for Production 40 and 41

This Interrogatory asks for the number of counseling sessions provided in 2020 at the Spartanburg clinic and the length of those sessions, identifying sessions as being in-person or by remote means.  BHG objects that this information is not relevant, but the number of counseling sessions provided, when compared to the number of patients, is relevant to the claim that Trent Neal's was provided counseling sessions that were woefully inadequate in number and length over an extended period.  It again is relevant particularly to why he received such inadequate substance

abuse counselling—whether it was an example of BHG's operational decisions or some idiosyncratic quality of Mr. Neal.

BHG also objects that producing this information would require review of every patient's medical chart. Plaintiff agrees that would be unduly burdensome but does not accept that such a review is necessary. BHG must have some record-keeping system of what the hourly counselors do all day apart from the individual patients' medical charts, and Plaintiff asked BHG to produce witnesses prepared to testify about this topic. Indeed, BHG witnesses Mr. Teklemariam and Mr. Barr have testified in detail about electronically stored information used to track productivity. Further, system reports BHG has produced for Trent Neal from its practice management software—the Substance Abuse Methadone Maintenance System (SAMMS)—plainly are generated by report generator software that queries an underlying database for this information, which has field for session type that includes, for example, a value for "Individual Counseling" given that the reports for Mr. Neal populate that field with that value. *E.g.*, **Exhibit M** (example counseling notes in SAMMS dated Dec. 31, 2020, 16907-A-0177). Similarly, there clearly are fields for session length and modality. *See id.* Thus, there is no reason BHG cannot query the SAMMS database for "Individual Counseling" sessions for a given date range, returning the number, length, and modality of the sessions.

If BHG asserts it lacks technical expertise needed to access this information, it should be compelled to produce the SAMMS database for inspection by an information technology expert retained by Plaintiff. To assist with this, Plaintiff has also promulgated discovery requests for production of the logical database schema in addition to an inspection of the database (Requests for Production 40 and 41, respectively), but Plaintiff will withdraw those requests if BHG can answer Interrogatory 24 without assistance from Plaintiff.

The Court therefore should order BHG to answer Interrogatory 24 or, alternatively, to produce responsive documents for Requests for Production 40 and 41.

**C.     Interrogatory 25**

This Interrogatory asks for the cost of counseling services provided at the Spartanburg clinic in 2020.  BHG provided rates charged to individual patients (which is publicly known) rather than the cost of counseling services paid by BHG.  Plaintiff raised this issue with BHG's counsel, but BHG appears to stand on its relevance objection regarding the production of counseling cost data.  Plaintiff asserts this information is relevant for the reasons set forth above in her theory of the case.  Specifically, BHG treats counseling as a cost to minimize to increase profits, and Mr. Neal received services below the standard of care and below regulatory requirements as a result. The Court therefore should order BHG to answer Interrogatory 25.

**D.     Request for Production 35**

This Request for Production asks for copies of personnel files for certain employees—the counselors, the program director (who supervises the counselors), and case managers (who may engage in services like counseling)—who were employed at the Spartanburg clinic from June 1, 2020, to December 31, 2020.  BHG has not objected to this request.  It simply refuses to produce the requested documents.  It produced personnel files for only two employees, two counselors who were at times assigned to provide counseling services to Trent Neal.  The purpose of this request is to determine whether the number and qualifications of the persons employed at the BHG Spartanburg clinic during Trent Neal's treatment satisfy South Carolina regulatory requirements— a question no BHG representative has been willing to answer in a deposition.  The Court therefore should order BHG to produce documents responsive to Request for Production 35.

E.      **Request for Production 36**

This Request for Production asks for the internal audit reports regarding the Spartanburg

clinic in 2020.  The reports document clinic compliance with applicable regulations.  They were

discussed in the Rule 30(b)(6) deposition of Marlin Martin, BHG's designee for compliance issues:

> Q. So in determining whether and ensuring that a clinic remains in compliance with
> the applicable regulations, how do you document compliance?
>
> A. So one of the ways in which we document compliance is through internal audits.
> So we're, obviously, doing and engaged in peer audits.  One counselor, for example,
> would examine a set number of patient records for another counselor.
>
> We also engage in a process in which an intake counselor's work would be reviewed
> and verified by the assigned counselor that would be coming in.  And then
> additionally, we do maintain our information from our joint commission surveys,
> also from our, any kind of independent, whether it's a payor or regulatory audit.  So
> we look at those and track the trends in our compliance department, in
> communication with our operations department.
>
> Q. Are there internal audits for the, what we've discussed previously as the relevant
> period? [June to December 2020]
>
> A. Yes, I would say that . . . .
>
> . . .
>
> Q. . . .we're talking about the internal audits to document compliance, that those
> would be documented, however -- however they were done for that period?
>
> A. Yes, that would be documented and that is maintained by our clinical area for
> clinical documentation.

Marlin Martin Dep. Tr. 10:25–11:19. 12:10–16.  Again, BHG has not objected to this request, it

simply refuses to provide the requested documents.  The Court therefore should order BHG to

produce documents responsive to Request for Production 36.

F.      **Request for Production 37**

This Request for Production asks for data collected or aggregated for the purpose of

evaluating the performance of the program director or any counselor at the Spartanburg clinic in

2020. This includes data used regarding the program director's performance pay, which, as discussed in his deposition, includes patient count, compliance, and employee turnover issues. It also includes supervisory metrics regarding counselors discussed in his deposition and Mr. Teklemariam's Rule 30(b)(6) deposition. This information is relevant since it directly bears on how BHG directs and controls the behavior of counselors providing services to persons at the clinic including Trent Neal, which as discussed above is the principal issue in this case. BHG has not objected to this request. It simply refuses to provide the requested information. The Court therefore should order BHG to produce documents responsive to Request for Production 37.

**G.    Request for Production 38**

This Request asks for materials used in training counselors at the Spartanburg clinic in 2020. The relevance of this request is obvious given that inadequate counseling is the crux of the allegations against BHG. The request is especially relevant given the testimony of BHG counselors that they were hired with no experience or qualifications at all, and that BHG's internal training was the only training they had ever received regarding substance abuse counseling. BHG has not objected to this request. Yet BHG has produced only a general employee handbook on company human resources policies and a barely legible spreadsheet listing training sessions   No training materials have been provided at all. The Court therefore should order BHG to produce documents responsive to Request for Production 38.

**H.    Request for Production 39**

This request asks for monthly budgets for the Spartanburg clinic in 2020, including actual results against budget. BHG's response to this request is not yet due but will be due before its response to this motion is due, and it appears BHG will stand on relevance objections and refuse to produce this information. The clinic director testified that he reviews budgets with his supervisor every month "and she'll let me know if I met budget or didn't meet budget for the

month." Joseph Barr Dep. Tr. 28:5–6. His testimony about the contents of those budgets however

was not credible at all:

> Q. . . . So, I mean, just if it helps you remember -- I assume you're not going to remember any of these numbers from 2020.
>
> A. I don't remember the numbers –
>
> Q. That's what I'm saying –
>
> A. -- two months ago.
>
> Q. -- but just the last one that you had, then. Just to give some sense, like, what was the bottom number?
>
> A. I honestly cannot remember. I know we –
>
> Q. Was it a positive number?
>
> A. I honestly don't remember. I know we met budget, so. I can't give you the -- the exact number.
>
> Q. Well, I'm going to assume -- am I fair to assume that meeting budget means that the bottom line was -- was more than zero?
>
> A. Yes.
>
> Q. Okay.
>
> A. Yeah.
>
> Q. And can you give me any sense of the scale of these numbers? And what I mean by that is, are we talking about, you know, a thousand dollars profit in a month, a million dollars, you know, profit in a month? Just some –
>
> A. Yeah.
>
> Q. -- idea because I honestly have --
>
> A. That's --
>
> Q. -- no idea how big a operation it is.
>
> A. Yeah. It's definitely not a million. I can say that. Yeah. To be honest, like, I really can't tell you because it's – it's very detailed. . . .

*Id.* 30:4–31:10.  Obviously, the clinic director remembers whether the bottom line from his most recent monthly budget meeting with his supervisor was a positive or negative number.  Likewise, he obviously knows the clinic's monthly bottom line at least within three orders of magnitude— after all, for years he has reviewed it every single month with his supervisor.  He simply did not want to answer the questions.

These monthly budget reviews budgets reflect the number of patients served, the revenues obtained from those patients, and the expenditures on counseling services for them at the clinic Mr. Neal was treated during the year of his treatment.  They appear to be BHG's primary means of control over clinic operations, including counseling services.  This information is relevant to BHG's failure to provide adequate counseling services to Mr. Neal, why he received such inadequate substance abuse counselling, including whether it was a consequence of how BHG operated that clinic in that year, and, again, to factual defenses Plaintiff's expert witnesses have asserted regarding the impact of the Covid-19 pandemic on BHG's ability to meet the standard of care.  The Court therefore should order BHG to produce documents responsive to Request for Production 39.

## IV.     <u>Conclusion</u>

For the foregoing reasons, the Court should grant this motion and order Defendants to answer Plaintiff's Interrogatories 22, 24, and 25, and to produce documents responsive to Plaintiff's Requests for Production 35, 36, 37, 38, 39 and, if Defendants are unable to answer Interrogatory 24, Plaintiff's Requests for Production 40 and 41.

Respectfully submitted,

s/Phillip D. Barber
Richard A. Harpootlian (Fed. ID No. 1730)
Phillip D. Barber (Fed. ID No.12816)
Andrew R. Hand (Fed. ID No. 12176)
RICHARD A. HARPOOTLIAN P.A.

19

1410 Laurel Street (29201)
Post Office Box 1090
Columbia, South Carolina 29202
Phone (803) 252-4848
Facsimile (803) 252-4810
rah@harpootlianlaw.com
pdb@harpootlianlaw.com
arh@harpootlianlaw.com

Matthew E. Yelverton (Fed. ID No. 7966)
YELVERTON LAW FIRM, LLC
60 Folly Road
Charleston, South Carolina 29407
(843) 574-8822
Facsimile (843) 574-8824
myelverton@ylitigators.com

ATTORNEYS FOR PLAINTIFF
VANIDA KHAUTISEN, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
KHOUANEXAY BILL SIVILAY

July 21, 2023
Columbia, South Carolina.