# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# SPARTANBURG DIVISION

| | |
|---|---|
| Vanida Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, <br><br> PLAINTIFF, <br><br> v. <br><br> BHG Holdings, LLC, and BHG XXXVIII, LLC, <br><br> DEFENDANTS. | C.A. No. 7:21-cv-03775-TMC |

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PROTECTIVE ORDER AND/OR TO QUASH PLAINTIFF'S NOTICE OF DEPOSITION OF BHG HOLDINGS, LLC'S CHIEF EXECUTIVE OFFICER

Defendants, BHG Holdings, LLC ("BHG Holdings"), in support of its Motion for Protective Order and/or to Quash the Notice of Deposition of Jay Higham, Chief Executive Officer of BHG Holdings, respectfully submits the following Memorandum of Law:

### BACKGROUND AND FACTS

On June 2, 2020, a patient named T.N. enrolled at BHG XXXVIII, LLC ("BHG Spartanburg") following years of habitual heroin and illicit drug use. He was deemed appropriate for OTP admission by Dr. James Harber, BHG's Medical Director. Upon admission, T.N. received and signed multiple patient education forms, including information on Methadone and a Benzodiazepine Education form which warned T.N. that "Combining benzodiazepines with [MAT] can have serious health risks. ..." See Ex. 1, T.N. Patient Education Forms. On June 3, 2020, Dr. Harber ordered T.N.'s Methadone induction and schedule/requirements for dose increases. As part of T.N.'s treatment plan, he was ordered concomitant counseling and would need to report to the OTP every single day (except when the OTP is closed on Sundays or major holidays) to receive

1

his daily Methadone dose. On the days when BHG was closed, T.N. was allowed a take-home dose, as is standard practice in OTPs.

T.N. was compliant with his appropriately randomized urine drug tests during his admission, for a total of approximately twenty-nine (29) tests. Approximately nine (9) were positive for benzodiazepines and twenty-seven (27) were positive for opiates. Despite these positive urine drug screens, this is most likely successful treatment and in line with the "harm reduction model." See Ex. 2, Def. Expert Report of Eric Morse, MD.[1]

T.N. attended and dosed over 90% of his admission days, which was above average during the COVID-19 pandemic. He did well with his Sunday and Thanksgiving take-home doses. T.N. missed several telehealth counseling appointments, but made one, and had one in-person counseling session on 10/23/2020 where his positive urine drug tests were reviewed. See Ex. 3, T.N. Counseling Notes. T.N. was encouraged to increase his dose to reduce his self-medicating needs. Id. Via telehealth on 11/19/2020, T.N. was counseled regarding the risks of his illicit Benzodiazepine use with methadone. Id. Despite being directed to attend counseling by BHG Spartanburg's medical director, counselors, and staff, T.N. only attended two substantive counseling sessions during his BHG Spartanburg admission.[2] When a patient like T.N. is dosing regularly but struggling to remain abstinent from simultaneous illicit drug use and not regularly attending counseling, a medical decision must be made. Here, BHG Spartanburg continued to dose T.N. on the basis that it is explicitly outside the standard of care to withhold Methadone from patients taking Benzodiazepines.[3]

---

[1] See SAMHSA: Harm Reduction, https://www.samhsa.gov/find-help/harm-reduction
[2] See Ex. 4, T.N. Counseling Holds that were entered by BHG staff.
[3] See Ex. 5, FDA Safety Announcement, September 20, 2017, ("FDA urges caution about withholding opioid addiction medications from patients taking benzodiazepines or CNS depressants: careful medication management can reduce risks.")

On December 24, 2020, T.N. reported to BHG Spartanburg for his regular daily Methadone dose and received one take-home Methadone dose for Christmas day, since BHG Spartanburg would be closed for the holiday. On December 26, 2020, T.N. was late to arrive at BHG Spartanburg and not permitted to dose. The BHG pharmacy window closed at 9:00 a.m., and T.N. did not call BHG to inform staff members of his tardiness. Instead, T.N. attempted to sneak through the side door of the program and was caught by the nursing supervisor, Portia Pratt, RN. Ms. Pratt observed T.N., spoke with him, and determined that T.N. was not visibly impaired. See Ex. 6, Depo. of Portia Pratt, RN. No evidence exists to the contrary. Appropriately, T.N. was denied his daily dose and instructed to leave BHG for the day. This decision was not at the discretion of Ms. Pratt, but rather the Board of Pharmacy mandates set hours of operation and, upon daily closure, BHG pharmacy staff must perform routine closing and medication "lock-up" tasks.

Therefore, T.N. left BHG and drove away. At approximately 9:32 a.m., T.N. was driving on Highway 176 in Spartanburg, South Carolina, and struck Mr. Bill Sivilay's vehicle. Mr. Sivilay tragically died because of the injuries sustained in the collision caused by T.N.

T.N. was arrested, and his post-collision toxicology report showed recent marijuana use, recent benzodiazepine use (including "designer" benzodiazepines, which are "street" drugs not approved for use by the FDA), and Methadone use (as expected due to T.N.'s MAT at BHG). Also, after the collision, a small plastic bag with narcotic residue was found on his person.

On November 18, 2021, Ms. Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, brought this wrongful death and survival action against Defendants. See ECF No. 1, Pl's Compl. On Friday, July 21, 2023, counsel for Plaintiff served on the undersigned counsel for Defendants a Notice of Deposition of BHG Holdings' CEO, Jay Higham. See Ex. 7,

N.O.D. of Jay Higham. The deposition was scheduled for six days later, on July 27, 2023, in Dallas, Texas. The Notice was served with no prior request for Mr. Higham's or counsel's availability, and with mediation set to take place in the interim, on July 24, 2023. The undersigned counsel for BHG Holdings asked Plaintiff's counsel to withdraw his Notice, but Plaintiff's counsel did not oblige. Plaintiff's counsel agreed to reschedule. See Ex. 8, E-mail correspondence.

In Plaintiff's pending Second Motion to Compel, Plaintiff correctly stated that BHG is a for-profit LLC.[4] BHG Holdings' CEO is Jay Higham. Previously, Mr. Higham was CEO of IntegraMed America. He started at IntegraMed as a Vice President of Marketing in 1994 when the company had only four locations. In late 2012, as CEO and after expanding IntegraMed into the largest network of fertility centers in the United States, Mr. Higham was involved in IntegraMed's profitable sale.

Mr. Higham moved on to become CEO of BHG Holdings. At the time of Mr. Higham's arrival at BHG, BHG had approximately 31 locations. Now BHG has nearly 120 locations. Around April 2016, BHG acquired the former Spartanburg Treatment Associates opioid treatment program, which is now BHG Spartanburg. Despite Plaintiff's personal attacks on Mr. Higham, he is dedicated to BHG Holdings' Mission: "We believe that with hope, respect, and caring, real recovery is possible." BHG Holdings wishes to continue expanding its presence throughout the United States to reach every possible person suffering from Opioid Use Disorder. In fact, the 2020 South Carolina State Health Plan sees the same need: "Due to the increasing number of opioid deaths in South Carolina, additional [OTPs] are needed for the services to be accessible within 30

---

[4] In fact, according to the American Hospital Association's "Fast Facts on U.S. Hospitals, 2023", over 20% of United States hospitals are investor-owned (for-profit). For-profit medical care is commonplace in the OTP world as well. Most all OTPs in South Carolina are for-profit.

4

minutes' travel time for the majority of state residents. The benefits of improved accessibility will outweigh the adverse effects of the duplication of this existing service."

## APPLICABLE LAW

Rule 26(b)(1), F.R.C.P., states ". . . parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." "However, such a broad rule allowing liberal discovery does not necessarily bestow upon a party the right to have his or her attorney depose a highly ranked corporate executive." Performance Sales & Marketing LLC v. Lowe's Companies, Inc., 2012 WL 4061680 (W.D.N.C. Sept. 14, 2012).

While the Fourth Circuit has neither expressly adopted nor rejected the "Apex Doctrine," courts throughout this Circuit frequently apply the Apex Doctrine which creates a "rebuttable presumption that the deposition of a high-ranking corporate executive constitutes good cause for [a protective] order as an annoyance or undue burden within the meaning of [Federal] Rule [of Civil Procedure] 26(c)(1)."  See Trustees of Purdue University v. Wolfspeed, Inc., 2023 WL 4564558, *4 (M.D.N.C. July 17, 2023), *citing* Performance Sales & Marketing LLC v. Lowe's Companies, Inc., at *4.  The Apex Doctrine "was developed as an aid in ensuring the rules of procedure for depositions are used only for their intended purpose and not as a litigation tactic to create undue leverage by harassing the opposition or inflating its discovery costs." Id. at *3. Before a plaintiff may be granted access to a company "apex" officer, the "plaintiff must show that '(1) the executive has unique or special knowledge of the facts at issue and (2) other less burdensome avenues for obtaining the information sought have been exhausted.'" Id., *citing* Wal-Mart Stores, Inc. v. Vidalakis, No. 5:07-39, 2007 WL 4591569, at *1 (WD.Ark. Dec. 28, 2007); see also Thomas v. Intl. Bus. Machines, 48 F.3d 478, 483 (II) (A) (10th Cir. 1995) (affirming

district court's grant of protective order prohibiting deposition of chairman of defendant's board of directors where chairman had no personal knowledge of plaintiff's claim and other employees had direct knowledge).

## ARGUMENT

**I.     Plaintiff cannot prove the information sought from BHG Holdings' CEO is unavailable from other sources.**

When applying the Apex Doctrine, a key consideration for the Court is whether plaintiff has "been unable to obtain full and complete discovery" from the other company representatives, including those already deposed in the case. General Motors, LLC v. Buchanan, 313 Ga. 811, 874 S.E.2d 52, 61, *citing* Chick-Fil-A, Inc. v. CFT Dev., LLC, No. 5:07-cv-501-Oc-10GRJ, 2009 WL 928226, *3 (II) (M.D. Fla. Apr. 3, 2009) (denying motion to compel deposition of president where moving party failed to convince the court that he possessed any "unique or superior knowledge concerning any information which is relevant and material to the issues in this case" or that the defendants had "been unable to obtain full and complete discovery" from the other company representatives already deposed in the case).

Here, and **without abandoning the position that the information Plaintiff seeks is entirely irrelevant to this case (this issue will be addressed in Defendant's response to Plaintiff's Second Motion to Compel)**, Plaintiff has seemingly reserved for the CEO in Dallas, Texas, an inquiry into the detailed bases for employee wages and market-based pricing and of Medication Assisted Treatment (MAT) at BHG Spartanburg.

At BHG Spartanburg, individuals pay $14 per day for their Methadone dose. BHG Spartanburg's Program Director (Joseph Barr), BHG Holdings' Chief Compliance Officer (Marlin Martin), BHG Holdings' Vice President of Clinical Services (Samson Teklemariam), or BHG Spartanburg's Medical Director (Dr. James Harber), were not asked for the detailed analysis behind

6

BHG Spartanburg's market-based pricing for MAT and resulting bases for employee compensation. Plaintiff also did not ask for a 30(b)(6) designee on these topics. See Ex. 9, Pl.'s 30(b)(6) N.O.D. Fundamentally, Defendants take no issue with this since this inquiry is irrelevant as to whether BHG Spartanburg met the applicable standards of medical care in treating T.N. Nonetheless, Plaintiff asked Joseph Barr details surrounding the BHG Spartanburg budget, which will only reveal profit/loss and expense statements (Plaintiff's Second Motion to Compel seeks these same budgets. Joseph Barr— a fact witness and not a 30(b)(6) witness— did not have this information on hand during his deposition). Operation costs and gross profit are nothing more than a snapshot of a medical facility's bases for setting costs of medical services or products.

Plaintiff takes issue with the "markup" of Methadone being approximately 1,614% and therefore wants to depose the CEO. Plaintiff fails to recognize that the $14/day includes **all treatment services** at BHG Spartanburg. Plaintiff further omits that $14/day is in line with the entire South Carolina OTP market (including Spartanburg and Greenville counties). The $14/day includes but is not limited to: (a) the physician prescribing and ordering the medication and treatment plan; (b) all physician visits; (c) the nursing staff who perform clinical assessments; (d) the pharmacist and pharmacy techs working inside of BHG to administer the dose; (e) the counseling services; and (f) miscellaneous medical office administration, e.g., patient intake and medical record personnel. This does not include routine operating costs such as facility costs, cleaning, etc. And, BHG accepts Medicaid patients as well as patients whose treatments are paid for by grant money. Beyond the $14/day, there are **no additional costs** for patients who are admitted to BHG Spartanburg (and patients can pay a lower daily price by paying monthly).

Our facts are like a situation considered by a North Carolina District Court in Trustees of Purdue University v. Wolfspeed, Inc. 2023 WL 4564558, *4 (M.D.N.C. July 17, 2023). The

7

plaintiff in Trustees of Purdue University claimed patent infringement and promulgated political collusion at the top of the corporate ladder being schemed to revive a failed challenge to the patent at issue in the case. The plaintiff sought to depose the defendant's CEO and even had evidence that the CEO was personally involved in meetings and calls with important customers who allegedly sought products that Plaintiff alleged infringed upon a patent at issue in the case. Id. at *5. The plaintiff also alleged that the CEO knew the factual bases for the discrepancies in the public and internal pronouncements on the defendant's ability to meet its sales, revenue, gross margin, and profit forecasts. Id. Nonetheless, the N.C. District Court concluded that the CEO possessed no unique or special knowledge that could not be obtained from another source. Id. The Court also noted that the plaintiff had already deposed multiple corporate 30(b)(6) witnesses and the topics on which plaintiff would depose the CEO "seem to be the same as those already covered [or to be covered] in these [30(b)(6)] depositions." Id. *citing* E.E.O.C. v. Freeman, 2012 WL 2370122, *2 (D.C. Maryland, June 21, 2012). Interestingly, the N.C. District Court reached this conclusion by "considering the proportionality principles of Rule 26(b)(2)(C)" and found that it did not matter whether the Apex Doctrine was adopted in the Fourth Circuit. Id. *citing* In re C.R. Bard, 2014 WL 12703776, *4.

     In the case at hand, Plaintiff has merely gathered the costs of treatment and the salaries/hourly wages of the ground-level individuals at BHG Spartanburg, then concluded that the individuals at the top (the apex officers) are inflating prices and suppressing wages for the sole purpose of increasing profit, and at the expense of patient care. While this argument is both common and expected, the law is clear that (beyond issues of relevancy) more is required for access to an apex officer. There is no question that $14/day may be expensive for some patients who are not on Medicaid or who have not procured grant money; but merely arguing that a markup

is unconscionable does not, by law, entitle Plaintiff access to an "apex" officer to try to expose some collusive profit scheme— particularly since the facts were available from other sources.

**II.     BHG Holdings' CEO has no special knowledge of T.N., the medical care T.N. received at BHG Spartanburg, or Plaintiff's claims in this case.**

The record before the Court at this time does not show under F.R.C.P. 26(b)(2)(C) that Mr. Higham possesses any special knowledge that could not be obtained (if ultimately found relevant and discoverable by this Court) "from a source that is more convenient, less burdensome, or less expensive." Trustees of Purdue University v. Wolfspeed, Inc., at *6, *citing* Cross by & Through Steele v. XPO Express, Inc., No. 4:15-CV-2480, 2017 WL 10544634, at *2 (D.S.C. May 8, 2017); see also Dixon v. Foot Locker, Inc., 623 F.App'x 594, 595 (4th Cir. 2015) (affirming district court's denial of plaintiff's motion to compel deposition where plaintiff "failed to establish that the CEOs had any direct or specialized knowledge relevant to the elements of his claims); Salter v. Upjohn Co., 593 F.2d 649, 651 (5th Cir. 1979) (affirming trial court order barring deposition of defendant CEO at least until plaintiff deposed defendant employees with more "direct knowledge of the relevant facts").

In Cross by & Through Steele, a South Carolina District Court denied plaintiff's access to depose the company CEO, despite plaintiff's contention that the CEO oversaw risk management, and that the CEO's testimony was necessary to address plaintiff's causes of action involving piercing the corporate veil, alter ego, amalgamation of interests between XPO Express, Inc. and XPO Logistics, Inc., and negligent hiring, supervision, maintenance, and retention. No. 4:15-CV-2480, 2017 WL 10544634, at *2 (D.S.C. May 8, 2017). The Court did not accept Plaintiff's theories and found that the CEO possessed no knowledge unique from that of the 30(b)(6) witnesses. Id.

Again, Plaintiff in this case has deposed two 30(b)(6) witnesses who were BHG Holdings employees, and the BHG Spartanburg Program Director and Medical Director. Plaintiff now wishes to depose the CEO of BHG Holdings, who is in Dallas, Texas, and will have no unique or specialized "ground-level" knowledge regarding the bases for treatment service prices in upstate South Carolina. Moreover, Mr. Higham will have no direct knowledge of the medical-based treatment claims that Plaintiff promulgates against BHG Spartanburg (that was Dr. James Harber). At BHG Spartanburg, Mr. Higham does not make treatment decisions or hiring decisions (that is Program Director Joseph Barr), and there are other individuals within the two companies who have specialized knowledge, documents, or information possessed by the companies that can support the market-based pricing and employee wages. The record before the Court does not support the notion that Mr. Higham can or needs to testify regarding any element of Plaintiff's claims, i.e., that BHG Spartanburg failed to meet the standards of medical care in treating T.N. See Salter v. Upjohn, at 651. BHG Holdings respectfully asks this Court to consider the expansive attack on Mr. Higham's career and BHG Holdings' growth as evidence that Plaintiff does not seek factual bases for medical service pricing— it is a plan to take Mr. Higham's career and shame him for it.

**III.   BHG Spartanburg is a separate legal entity from BHG Holdings.**

BHG Spartanburg is a South Carolina limited liability company headquartered in Spartanburg, South Carolina. BHG Spartanburg is a separate legal entity from its parent company, BHG Holdings. If Plaintiff argues that Mr. Higham's deposition should be allowed because his testimony needed to address potential corporate veil or alter ego piercing, Plaintiff cannot show that they are unable to procure the information they seek from other witnesses. See Cross by & Through Steele v. XPO Express, Inc., No. 4:15-CV-2480, 2017 WL 10544634, at *2 (D.S.C. May 8, 2017). At this time, it is entirely irrelevant and there is no evidence that BHG Holdings and

BHG Spartanburg have failed to follow corporate formalities. And, to date, there has been no verdict/judgment in this case, nor a proven inability to collect.

**IV.     Plaintiff's Notice of Deposition of BHG Holdings' CEO is only intended to create undue leverage.**

In Plaintiff's Second Motion to Compel, Plaintiff makes multiple attacks on Mr. Higham's career and BHG's growth. Of course, the "depersonalization" of the corporate defendant or the "ivory tower at the top" argument are often promulgated to create leverage in litigation and to inflame jurors. However, Plaintiff's Notice of Deposition was served on Defendants one day after Defendants filed their Motion for Summary Judgment and two days prior to mediation. The Notice was served with no prior request for dates for Mr. Higham's availability, and it set the date and time for the deposition on the sixth (6th) day following the notice, in Dallas, Texas, at BHG Holdings' headquarters. Plaintiff counsel did allow us to reschedule the deposition. However, there is no reason whatsoever why Plaintiff could not have inquired about the information sought during the 30(b)(6) phase of this case. Instead, this is an effort to expose financial information of BHG Holdings, a separate legal entity. This information has no bearing on whether BHG Spartanburg met the applicable standards of medical care in treating T.N.

In conclusion, Plaintiff can neither show good cause nor meet the elements of an Apex Doctrine analysis. As such, Defendant respectfully seeks an order of protection and/or an order quashing Plaintiff's Notice of Deposition of BHG Holding's CEO, Jay Higham.

        Respectfully submitted,

         s/ Chance M. Farr
        Chance M. Farr
        E. Brown Parkinson, Jr.
        HOLCOMBE BOMAR, P.A.
        101 West Saint John Street, Ste 200
        Spartanburg, South Carolina 29306

                                                          (864) 594-5300  
                                                          cfarr@holcombebomar.com  
                                                          ebparkinson@holcombebomar.com  
                                                          *Counsel for Defendant BHG Holdings*

This the 26th day of July 2023.