#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF SOUTH CAROLINA
#### SPARTANBURG DIVISION

| | |
|---|---|
| Vanida Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, ) ) ) | C.A. No. 7:21-cv-03775-TMC |
| PLAINTIFF, ) ) | |
| v. ) ) | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S SECOND MOTION TO COMPEL** |
| BHG Holdings, LLC, and BHG XXXVIII, LLC, ) ) | |
| DEFENDANTS. ) ) | |

Defendants, by and through counsel, in response to Plaintiff's Second Motion to Compel, respectfully submits to this Honorable Court the following Memorandum in Opposition:

### BACKGROUND AND FACTS

The Parties have engaged in extensive written discovery and depositions in this case. From Defendant's perspective, all of it has been amicable. It appears the Parties are now down to only a few discovery issues for this Court to consider. Namely, they surround the discovery of financial information and non-party medical patients' (patients who are also not associated with this case in any way) treatment information at BHG Spartanburg.

On June 2, 2020, a patient named T.N. enrolled at BHG XXXVIII, LLC ("BHG Spartanburg") following years of habitual heroin and illicit drug use. He was deemed appropriate for OTP admission by Dr. James Harber, BHG's Medical Director. Upon admission, T.N. received and signed multiple patient education forms, including information on Methadone and a Benzodiazepine Education form which warned T.N. that "Combining benzodiazepines with [MAT] can have serious health risks. ..." See Ex. 1, T.N. Patient Education Forms. On June 3, 2020, Dr. Harber ordered T.N.'s Methadone induction and schedule/requirements for dose increases. As part

1

of T.N.'s treatment plan, he was ordered concomitant counseling and would need to report to the OTP every single day (except when the OTP is closed on Sundays or major holidays) to receive his daily Methadone dose. On the days when BHG was closed, T.N. was allowed a take-home dose, as is standard practice in OTPs.

T.N. was compliant with his appropriately randomized urine drug tests during his admission, for a total of approximately twenty-nine (29) tests. Approximately nine (9) were positive for benzodiazepines and twenty-seven (27) were positive for opiates. Despite these positive urine drug screens, this is most likely successful treatment and in line with the "harm reduction model." See Ex. 2, Def. Expert Report of Eric Morse, MD.[1]

T.N. attended and dosed over 90% of his admission days, which was above average during the COVID-19 pandemic. He did well with his Sunday and Thanksgiving take-home doses. T.N. missed several telehealth counseling appointments, but made one, and had one in-person counseling session on 10/23/2020 where his positive urine drug tests were reviewed. See Ex. 3, T.N. Counseling Notes. T.N. was encouraged to increase his dose to reduce his self-medicating needs. Id. Via telehealth on 11/19/2020, T.N. was counseled regarding the risks of his illicit Benzodiazepine use with methadone. Id. Despite being directed to attend counseling by BHG Spartanburg's medical director, counselors, and staff, T.N. only attended two substantive counseling sessions during his BHG Spartanburg admission.[2] When a patient like T.N. is dosing regularly but struggling to remain abstinent from simultaneous illicit drug use and not regularly attending counseling, a medical decision must be made. Here, BHG Spartanburg continued to

---

[1] See SAMHSA: Harm Reduction, https://www.samhsa.gov/find-help/harm-reduction
[2] See Ex. 4, T.N. Counseling Holds that were entered by BHG staff.

dose T.N. on the basis that it is explicitly outside the standard of care to withhold Methadone from patients taking Benzodiazepines.[3]

On December 24, 2020, T.N. reported to BHG Spartanburg for his regular daily Methadone dose and received one take-home Methadone dose for Christmas day, since BHG Spartanburg would be closed for the holiday. On December 26, 2020, T.N. was late to arrive at BHG Spartanburg and not permitted to dose. The BHG pharmacy window closed at 9:00 a.m., and T.N. did not call BHG to inform staff members of his tardiness. Instead, T.N. attempted to sneak through the side door of the program and was caught by the nursing supervisor, Portia Pratt, RN. Ms. Pratt observed T.N., spoke with him, and determined that T.N. was not visibly impaired. See Ex. 6, Depo. of Portia Pratt, RN. No evidence exists to the contrary. Appropriately, T.N. was denied his daily dose and instructed to leave BHG for the day. This decision was not at the discretion of Ms. Pratt, but rather the Board of Pharmacy mandates set hours of operation and, upon daily closure, BHG pharmacy staff must perform routine closing and medication "lock-up" tasks.

Therefore, T.N. left BHG and drove away. At approximately 9:32 a.m., T.N. was driving on Highway 176 in Spartanburg, South Carolina, and struck Mr. Bill Sivilay's vehicle. Mr. Sivilay tragically died because of the injuries sustained in the collision caused by T.N.

T.N. was arrested, and his post-collision toxicology report showed recent marijuana use, recent benzodiazepine use (including "designer" benzodiazepines, which are "street" drugs not approved for use by the FDA), and Methadone use (as expected due to T.N.'s MAT at BHG). Also, after the collision, a small plastic bag with narcotic residue was found on his person.

---

[3] See Ex. 5, FDA Safety Announcement, September 20, 2017, ("FDA urges caution about withholding opioid addiction medications from patients taking benzodiazepines or CNS depressants: careful medication management can reduce risks.")

On November 18, 2021, Ms. Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, brought this wrongful death and survival action against Defendants. See ECF No. 1, Pl's Compl.

In effort to try to expose a BHG Spartanburg corporate-wide patient medical treatment trend, and/or to bolster a common and expected "ivory tower at the top" theory (as it relates to BHG Holdings, LLC), Plaintiff now seeks BHG Spartanburg's financial information and patient counseling data for all BHG Spartanburg patients during the year 2020.

## APPLICABLE LAW

Rule 26(b)(1), F.R.C.P., states ". . . parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." The scope of discovery is defined by "whether the information sought is (1) privileged, (2) relevant to a claim or defense, and (3) proportional to the needs of the case." United States ex rel. Adams v. Remain at Home Senior Care, LLC, 2021 WL 3285300, *1 (D.S.C. August 2, 2021), *citing* Gordon v. T.G.R. Logistics, Inc., Case No. 16-cv-00238-NDF, 2017 WL 1947537, at *2 (D. Wyo. May 10, 2017). "While the party seeking discovery has the burden to establish its relevancy and proportionality, the party objecting has the burden of showing the discovery should not be allowed and doing so through 'clarifying, explaining and supporting its objections with competent evidence.'" Id., *citing* Wilson v. Decibels of Or., Inc., Case No. 1:16-cv-00855-CL, 2017 WL 1943955, at *2 (D. Or. May 9, 2017) (quoting La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, 285 F.R.D. 481, 485 (N.D. Cal. 2012) (internal citations omitted)).

The court has broad discretion in deciding to grant or deny a motion to compel. See, *e.g.*, Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc, 43 F.3d 922, 929 (4th Cir. 1995).

However, there are limits. The court should recognize "the simple fact that [just because] requested information is discoverable under Rule 26(a) does not mean that discovery must be had." Trustees of Purdue University v. Wolfspeed, Inc., 2023 WL 4564558, *4 (M.D.N.C. July 17, 2023); *citing* Nicholas v. Wyndham Int'l, Inc., 373 F.3d 537, 543 (4th Cir. 2004).

Defendants recognize that the Honorable Judge Anderson has lamented the increasing litigation and judicial resources unnecessarily consumed by disputes over discovery in our court system. It has always been Defendants' sincere desire (and seemingly Plaintiff's too) to not engage in a "contentious and extensive discovery battle" in this case, nor is it the Defendant's desire to "present challenges to the judicial system" or the Plaintiff's path to obtain justice, if appropriate, in this matter. See Network Computing Services Corp. v. Cisco Systems, Inc., 223 F.R.D. 392 (D.S.C. 2004).

## ARGUMENT

**I.   Requests for Production 35, 36 and 37: Copies of personnel files; Internal audit reports regarding BHG Spartanburg in 2020; Data collected or aggregated for the purpose of evaluating the program director or any counselor at BHG Spartanburg in 2020.**

Since the filing of Plaintiff's Second Motion to Compel, Defendants' counsel has further consulted with Plaintiff's counsel. BHG Spartanburg continues to gather personnel files for Joseph Barr (program director), Ruth Combs, Dr. James Harber (medical director), and Wendy Thompson. BHG Spartanburg believes this is all the information needed to resolve these Requests. The personnel files for the two counselors who were involved in T.N.'s medical care have already been provided. Upon information and belief, any individual "audits" of the two relevant counselors and the program director will be in their personnel files, which will be produced promptly upon receipt.

Furthermore, on July 26, 2023, in attempt to resolve portions of Plaintiff's Second Motion to Compel (and without waiving any objections to the relevancy or discoverability of the

5

information produced), Defendant BHG Spartanburg provided a supplemental response to Requests for Production 36 and 37, including the 2020 Annual Report of Substance Use Disorder Illicit Drug Use at BHG Spartanburg (this will summarize positive urine drug screening results of ALL patients at BHG Spartanburg in 2020); 2020 BHG Spartanburg End of Year Report; 2020 Evaluation of Medication Errors and Sentinel Events; Q4 Compliance Monitoring Program Report for BHG Spartanburg; Q4 2020 BHG Spartanburg Team Member Audits; Q4 2020 BHG Spartanburg Site Checklists.

To the extent that Plaintiff believes other documents should be produced, while Defendants are not currently aware of other responsive documents, they maintain that production thereof would be entirely disproportionate to the needs of this case and irrelevant to whether BHG Spartanburg met the applicable standards of medical care in treating T.N. Particularly, the personnel files of counselors who had no part in T.N.'s medical care at BHG Spartanburg are not relevant to this case and disproportionate to the needs of this case in which T.N.'s medical care is at issue.

**II.  Request for Production 38: Materials used in training counselors at BHG Spartanburg in 2020.**

On July 27, 2023, BHG Spartanburg produced to Plaintiff's counsel the materials available, and which were used for counselor training in the year 2020. Upon information and belief, the materials produced should satisfy this Request.

**III.  Interrogatories 22 and 25, and Request for Production 39: Revenue generated from drug-dispensing treatment programs at BHG Spartanburg; Cost of counseling services provided at BHG Spartanburg in 2020; Monthly budgets for BHG Spartanburg in 2020.**

This request for company-wide financial information is both premature and irrelevant.

**A.    There is a pending Motion for Summary Judgment and, therefore, Plaintiff's Request is premature.**

A defendant's financial information becomes relevant if the defendant is potentially liable for punitive damages. Long v. M&M Transp., LLC, 2014 WL 235517 (N.D.W.V., January 22, 2014), *citing* Stamathis v. Flying J, Inc., 389 F.3d 429, 442 (4th Cir. 2004); Blount v. Wake Elec. Membership Corp., 162 F.R.D. 102, 105 (E.D.N.C. 1993).  Our Fourth Circuit courts require a heightened showing of entitlement to financial records to support a punitive damage claim because "[t]he ease with which claims for punitive damages can be asserted makes it apparent that such claims may result in abuse and harassment if their mere assertion entitles plaintiffs to financial discovery." Long, 2014 WL 235517, *2; *citing* Moore v. DAN Holdings, Inc., 2013 WL 1833557 (M.D.N.C. April 30, 2013) (quoting Moran v. International Playtex, Inc., 103 A.D.2d 375, 377 (N.Y.App. Div., 2d Dep't 1984)). "Thus, in general, a plaintiff must establish that a claim for punitive damages is viable before discovery into a defendant's financial information will be allowed."  See Robinson v. Quicken Loans Inc., 2013 WL 1704839 (S.D.W.V. April 19, 2013) (collecting cases).

This *prima facie* showing of viability is generally made by "presenting evidence to support the factual allegations in the complaint or by surviving a summary judgment on claims for which punitive damages are available."  Long, 2014 WL 235517, *2, *citing* George Golf Design, Inc. v. Greenbrier Hotel, Inc., 2012 WL 5285410, at *3 (S.D.W.Va. Oct 23, 2012) (information about defendant's financial worth only discoverable once plaintiff survived a motion for summary judgment); Hester v. Cottrell Contracting Corp., 2001 WL 1764200 (E.D.N.C. April 27, 2001) (defendant's financial condition discoverable only when plaintiff presents evidence of possible entitlement to punitive damages and plaintiff survives a motion to dismiss).  The line of cases on this issue generally hold that a plaintiff can only meet their burden by surviving a motion for

7

summary judgment, particularly a pending motion for summary judgment. See, *e.g.*, Long, 2014 WL 235517; Robinson, 2013 WL 1704839, *2; Cutaia v Radius Engineering International, Inc., 2013 WL 12338471, *1 (W.D.Va. July 5, 2013) ("there is no question that [defendant's] financial information will be relevant if an only if the claim for punitive damages survives summary judgment").

Here, there is a pending Motion for Summary Judgment on all of Plaintiff's Causes of Action on the basis that, as a matter of well-established law, BHG Spartanburg, an opioid treatment medical facility, owed no duty of care to Plaintiff, a non-medical patient third party. See ECF Nos 74 and 74-1. Further, if the Court finds it necessary to address the issue, there is no evidence currently on the record that supports willful, wanton, or gross negligent conduct by Defendants. Mr. Sivilay's death was a tragedy, but beyond owing no duty to Mr. Sivilay, Defendants adamantly contest liability in this case on the grounds that BHG Spartanburg met all applicable standards of medical care in treating T.N., a patient with substance use disorder. See Ex. 2, Def. Expert Report of Eric Morse, MD.

Finally, it should be noted that Defendants are two separate and distinct legal entities. Plaintiff has not alleged alter ego/piercing the corporate veil claims, nor has Plaintiff shown a need to do so; and therefore the financial information is not discoverable for those purposes. See, *e.g.*, Minelli Constr. Co. v. United Derrickmen & Riggers Ass'n, 1990 WL 180550, *5 (S.D.N.Y. November 14, 1990). More importantly, there has been no verdict and a proven inability to collect. BHG Spartanburg's financial information should not be discoverable at this phase of the case, or at any time.

**B.      Plaintiff's claim that BHG Spartanburg's financial information is necessary to establish a medical facility-wide business practice is both unfounded and irrelevant.**

At BHG Spartanburg, individuals pay $14 per day for their Methadone dose. Plaintiff takes issue with the "markup" of Methadone being approximately 1,614%. Plaintiff fails to recognize that the $14/day includes **all treatment services** at BHG Spartanburg. Plaintiff further omits that $14/day is in line with the entire South Carolina OTP market (including Spartanburg and Greenville counties). The $14/day includes but is not limited to: (a) the physician prescribing and ordering the medication and treatment plan; (b) all physician visits; (c) the nursing staff who perform clinical assessments; (d) the pharmacist and pharmacy techs working inside of BHG to administer the dose; (e) the counseling services; and (f) miscellaneous medical office administration, e.g., patient intake and medical record personnel. This does not include routine operating costs such as facility costs, cleaning, etc. And BHG accepts Medicaid patients as well as patients whose treatments are paid for by grant money. Beyond the $14/day, there are **no additional costs** for patients who are admitted to BHG Spartanburg (and patients can pay a lower "daily price" by paying monthly).

Recently, a West Virginia District Court directly addressed a similar financial information "discoverability" issue. See McCollum v. GEICO, 2020 WL 6947904 (N.D.W.V., August 24, 2020). In McCollum, the plaintiff sought certain financial information from the defendant. Id. at *3-4. The plaintiff expressly argued that the financial information was "necessary to demonstrate a generalized business practice" (e.g., the defendant's claim adjustment practice). Id. at *4. The Court was not persuaded by the plaintiff's argument. Id. The Court held that "Looking at financial information in a vacuum does not prove a generalized business practice . . . In other words, information regarding revenue, profits, and/or losses alone does not establish a generalized

9

business practice. It is possible that such evidence could bolster an already established claim, but, alone, such evidence would not establish a generalized business practice . . ..." Id.

Here, medical program revenue, cost of services, and monthly budgets are nothing more than numbers in a vacuum. It is wholly unjust (not to mention irrelevant) to look a medical facility's budget and conclude they have a corrupt practice because they've structured themselves to make a profit. BHG Spartanburg's operation costs and profit (or any medical facility's, for that matter) are nothing more than a snapshot of the medical facility's bases for setting costs of medical services or products. Plaintiff has merely gathered the costs of treatment and the salaries/hourly wages of the ground-level individuals at BHG Spartanburg, then seemingly concluded that the individuals at the top are inflating prices and suppressing wages for the sole purpose of increasing profit, and at the expense of patient care.

In sum, Defendants object to these Interrogatories and Requests for Production on the grounds that they are not relevant and necessary to this case, particularly when weighed against any particularized harm Plaintiff may suffer. See Hollman v. Woolfson, 384 S.C. 571, 578 (2009). At the very least, they are premature. As stated herein, this case is about whether BHG Spartanburg met the applicable standards of medical care in treating T.N., a patient with substance use disorder.

IV.    **Interrogatory 24 and Requests for Production 40 and 41: Number of counseling sessions provided in 2020 at the Spartanburg clinic and the length of those sessions.**

BHG is aware of a discovery Order entered by the Honorable Terry Wooten, Chief United States District Judge, whereby Judge Wooten required production of nationwide patient records of an Opioid Treatment Program in the Columbia area. Santandreu v. Colonial Management Group, LP, 2018 WL 11462187 (D.S.C. May 25, 2018). However, an important distinction must be made here. Even if produced, the total number and lengths of counseling sessions would be completely out of context and irrelevant to establishing whether standards of medical care were met. Each

10

patient has different counseling needs and overall circumstances. South Carolina D.H.E.C. Reg. 61-93 provides the Standards for Licensing Facilities for Chemically Dependent or Addicted Persons. These Regulations govern Opioid Treatment Programs (like BHG Spartanburg) in our State. Per D.H.E.C. Reg. 61-93 § 903(A)(3), "The frequency and duration of counseling provided to Patients shall be determined by **the needs of the Patient and be consistent with the Individual Plan of Care**" (emphasis added). This information cannot simply be summarized into a column on a spreadsheet, as Plaintiff seems to imply. Treating individuals with opioid use disorder is not as simple as providing all with the same counseling services. More importantly, these figures do not take in to account each individual patient's desire to accept the counseling services offered— not to mention the OTP's difficulty of operating within the aforementioned "harm reduction model" when the patient continues to show up for treatment.

The context of every patient's counseling frequency and duration would need to be carefully assessed by experts to determine whether everyone's counseling was adequate and within the applicable standards of medical care. It is no different with T.N. (and again, this does not even consider his desire to accept the counseling services offered). Accordingly, Defendant would need to be afforded the opportunity to defend every single patient's counseling record. Without intending, in any way, to minimize the tragic loss of Mr. Sivilay's life, the information sought is absolutely outside the realm of proportion to the needs of this case when the primary issue is whether T.N., a unique medical patient with substance use disorder, had **his individual counseling needs met** at BHG Spartanburg, pursuant to D.H.E.C. Reg 61-93 § 903(A)(3) and the applicable standards of medical care.

The lack of search and production of non-associated patient counseling information will not impair the presentation of Plaintiff's case on the merits to the point that an unjust result is real,

rather than a mere possibility.  Hollman, 384 S.C. 571, at 579.  Evidence related to the care and treatment of nonparty patients (much less patients who are, in no way, associated with the facts of a case) is irrelevant to Plaintiff's negligence claims in that it cannot be used to show that Defendant breached the standard of care in treating T.N.  Id.

Plaintiff's apparent attempts to expose a corporate-wide trend of short counseling sessions or underutilized counseling services has absolutely no bearing on whether, in this case, Mr. Sivilay's death was the direct and proximate result of the specific medical care rendered to T.N., which are at issue in this case.  Id. at 581.  The central issue in this case is T.N.'s treatment on the dates of his BHG Spartanburg admission, and the information Plaintiff seeks in this Request is not remotely relevant to the issues at hand in this case.  See Oncology and Hematology Assoc. of S.C. LLC v. DHEC, 387 S.C. 380, 388-389 (2010).

In conclusion, Defendant is aware that the entire thrust of discovery involves full and fair disclosure, to prevent trial from becoming a guessing game or one of surprise for either party.  Samples v. Mitchell, 329 S.C. 105, 495 S.E.2d 213, 217 (Ct. App. 1997). The evidence requested in this Request for Production will not make a trial "a game of blind man's bluff."  In re Anonymous Member of South Carolina Bar, 346 S.C. 177, 552 S.E.2d 10, 18 (2001), citing, United States v. Proctor and Gamble Co., 356 U.S. 677, 682, 78 S.Ct. 983, 986-87, 2 L.Ed.2d 1077 (1958). Non-associated patients' (who are, of course, also non-parties) counseling information and BHG Spartanburg budgetary data should not be discoverable in this case.

    Respectfully submitted,

    s/ Chance M. Farr
    Chance M. Farr
    E. Brown Parkinson, Jr.
    HOLCOMBE BOMAR, P.A.
    101 West Saint John Street, Ste 200

                                                    Spartanburg, South Carolina 29306
                                                    (864) 594-5300
                                                    cfarr@holcombebomar.com
                                                    ebparkinson@holcombebomar.com
This the 27th day of July 2023.          *Counsel for Defendants*