**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| Vanida Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, | C/A No. 7:21-cv-3775-TMC |
| Plaintiff, | |
| v. | **RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| BHG Holdings, LLC, and BHG XXXVIII, LLC, | |
| Defendants. | |

Plaintiff Vanida Khautisen, as Personal Representative of the Estate of Khousanexay Bill Sivilay, by and through undersigned counsel, hereby responds in opposition to Defendants BHG Holdings, LLC, and BHG XXXVIII, LLC's (collectively, "BHG") motion for summary judgment (ECF No. 74).

## I.    <u>Introduction</u>

BHG is the largest chain of methadone clinics in America. Methadone clinics are supposed to help persons addicted to opioid drugs to stop using those drugs. But BHG is owned by a Chicago-based, private-equity investment fund and is led by a marketing executive with no experience in addiction medicine who was hired to triple BHG's size. Private-equity investors in Chicago do not invest in selling drugs to addicts in the Upstate to help addicts improve their lives or the community in which they live. They invest in selling drugs to addicts in the Upstate because they sell those drugs at a 1600% markup. To increase profit margins, BHG does not provide actual addiction treatment to addicts. It just sells drugs to them. According to the testimony of its own former employee, no one who starts taking methadone at BHG beats their addiction. No one.

Trent Neal was a 21-year-old heroin addict who came to BHG seeking help in June 2020.[1] He received methadone at BHG's Spartanburg clinic daily for seven months. While at BHG he had thirty state-mandated urine drug tests. He tested positive for illegal opiates every time. After a few months he also began testing positive for other drugs, including benzodiazepines that have a debilitating effect when combined with methadone. BHG was aware of the danger but took no action other than to continue to sell methadone to Mr. Neal. In fact, BHG never provided actual addiction treatment services to Mr. Neal at all. It is just a script mill selling drugs at a markup even Pablo Escobar's Medellin Cartel never achieved.[2] In seven months, Mr. Neal paid BHG about $2,500 for methadone that cost BHG about $150. *Compare* **Exhibit A** (Trent Neal payment history) *and* **Exhibit B** (Trent Neal dosing and toxicology history showing total doses received of 9,605mg) *with* **Exhibit C** (exemplar wholesale advertisement for 1 liter of 10mg/mL methadone for $147).

On the day after Christmas in 2020, Trent Neal ran a red light and slammed into the driver's side door of a car driven by Plaintiff's husband, Bill Sivilay, killing him. He was arrested at the scene and tested positive for methadone and benzodiazepines.

Mr. Sivilay was 46 years old. He is survived by his wife and two daughters, then 8 and 11 years old. His widow was forced to take a $16/hour textile mill job to support their little girls, who are now enrolled in public assistance programs.

---

[1] Mr. Neal has executed a declaration waiving any privacy rights he may have regarding his relationship with BHG and declaring that he does not want BHG to assert any privacy rights on his behalf. Decl. of Trent Neal, Jan. 20, 2022, ECF No. 75-1. BHG's insistence on referring to him as "T.N." as if he were a child or sexual assault victim is unnecessary.

[2] In the mid-1980s, it cost Pablo Escobar's Medellin syndicate $5,000 to refine a kilogram of cocaine and smuggle it into Miami, where it sold for $50,000 to $70,000. Peter S. Green, *Cocainenomics*, The Wall Street Journal, https://www.wsj.com/ad/cocainenomics. Even at $70,000 per kilogram, the markup on the cocaine was less than BHG's markup on methadone.

BHG's argument for summary judgment is that "Plaintiff's claims are fully grounded in medical malpractice" and so "Defendants owed no duty to the deceased Plaintiff who was a non-patient third party." Mem. Supp. Mot. 1, ECF No. 74. BHG argues its private-equity investors owe no duty of care to members of the community in which it sells drugs to addicts at a 1600% markup. Unfortunately for BHG, however, South Carolina law has long recognized third-party claims against a medical provider for ordinary negligence when foreseeable harm is inflicted because of its treatment of a patient. The Court should deny BHG's motion because even if BHG was providing medical services, Plaintiff's claims sound in ordinary negligence under several theories, including BHG's failure to warn Mr. Neal, BHG's special relationship to Mr. Neal, BHG's creation of the risk of harm to Mr. Sivilay, federal and state laws and regulations, and BHG's own policies and procedures. Further, the evidence in this case shows BHG was not even acting as a bona fide medical service provider when administering methadone to Mr. Neal while he was taking benzodiazepines, and so no claims arising from that act can possibly sound in medical malpractice.

## II.   <u>Background</u>

### A.   Statement of Facts

Mr. Sivilay was a Laotian immigrant to the United States. His family supported the United States' fight against Communism in the Vietnam War. After America withdrew from the war the Sivilays were forced to flee. Mr. Sivilay's older brother came to America first, bringing over other family members like Mr. Sivilay as they were born and old enough to make the move. They joined a burgeoning Laotian community in Spartanburg.

In 2003, Mr. Sivilay started working at Polydeck, a manufacturing company in Spartanburg, doing setup work for $10 per hour. He worked hard, earning increases in responsibility and pay until he was earning $70,000 per year as a team leader in 2020. In 2008, he married his wife, Vanida, whom he had met in Laos ten years earlier, and brought her and her

mother to America.  They had two daughters, born in 2009 and 2012.  On December 24, 2020, Mr. Sivilay wrote a $2,000 check as a deposit to begin construction of his family's dream home, a 2,300 square-foot ranch house to be built on an empty lot off Chesnee Highway in Spartanburg. Refugees from a Communist country on the other side of the world, they found in Spartanburg what has been called "the *American dream*, that dream of a land in which life should be better and richer and fuller for everyone, with opportunity for each according to ability or achievement." James Truslow Adams, The Epic of America 404 (1931) (emphasis in original).

Also on December 24, 2020, Trent Neal received his final methadone doses from BHG. Trent Neal was then a 21-year-old heroin addict who sought treatment at BHG's Spartanburg methadone clinic.  BHG is a for-profit LLC owned by private equity investors that sells addictive narcotics to drug addicts at a 1600% markup.  *See* **Exhibit D** (Jay Higham LinkdedIn page).

BHG's Chief Executive Officer (CEO) is Jay Higham.   Previously, he was CEO of IntegraMed America.  He started at IntegraMed as a Vice President of Marketing in 1994 when the company had only 4 locations and $8 million in revenue.  *Id.*   In late 2012, as CEO, he sold IntegraMed to private equity firm Sagard Capital Partners, LP for $169.5 million.  Press Release, *Healthcare Services Provider IntegraMed® America Agrees to be Acquired by Sagard Capital Partners for $169.5 Million*, https://www.sec.gov/Archives/edgar/data/885988/ 000089109212003342/e48773ex99-2.htm.  At that time, IntegraMed had 130 locations and was the largest network of fertility centers in the United States.  *Id.*  Mr. Higham's self-written LinkedIn describing his tenure as CEO states he "[d]eveloped corporate infrastructure of IT, Finance and Accounting, Risk Management, HR and legal to support separate divisional management teams tasked with driving field operations and site level P&L," and that he "[b]uilt revenue cycle, sales and marketing, regional management and new clinic development infrastructure."  Ex. D.  He

makes no mention of any positive results for patients or even what services the company provided.[3] After the sale, the burden of its breakneck, debt-financed acquisitions collapsed IntegraMed and, after charge-offs for tens of millions in goodwill impairment, it entered Chapter 7 liquidation. *See* Jeff Manning, *Bankruptcy turns high-stakes fertility treatment into financial quagmire for patients at OHSU and many other clinics*, The Oregonian, Jan 17, 2021, *available at* https://www.oregonlive.com/business/2021/01/bankruptcy-turns-high-stakes-fertility-treatment-into-financial-quagmire-for-patients-at-ohsu-and-many-other-clinics.html.

Mr. Higham, however, had moved on to become CEO of BHG. Ex. D. At that time, BHG had approximately 31 locations. Ex. D. Now BHG has 117 locations. *See* About, Behavioral Health Group – BHG, https://www.linkedin.com/company/bhgrecovery/about/. Mr. Higham was brought into BHG by its then-owners, Frontenac, a Chicago-based private equity firm, to lead a recapitalization and aggressive growth plan that tripled BHG' size. *See* Ex. D & Press Release, *Frontenac Completes Sale of Behavioral Health Group*, https://frontenac.com/ frontenaccompletessaleofbehavioralhealthgroup/. At the end of 2018, Frontenac sold BHG to its current owner, The Vistria Group, another Chicago-based private equity firm. *Id.* Other companies Frontenac successfully grew and sold include Chipotle Mexican Grill and DeVry University. Portfolio, Frontenac, https://frontenac.com/portfolios/.

One of the clinics purchased in Mr. Higham's buying spree was the former Spartanburg Treatment Associates methadone clinic on the access road near the I-85 and I-585 interchange, which BHG bought in 2016. Press Release, *BHG Acquires South Carolina Treatment Centers*, https://www.bhgrecovery.com/blog/south-carolina-expansion.      Methadone      clinics      provide

---

[3] That company also included "Vein Clinics of America," a chain of 50 clinics specializing in varicose vein treatment.

medication-assisted treatment by providing addicts with long-acting opioids (like methadone) that delay opioid withdrawal symptoms from short-acting opioids like heroin and allow time for withdrawal management and therapy.  Methadone clinics are required to provide counseling services.  42 C.F.R. § 8.12(f)(5).  As BHG's medical director has testified, counseling is the treatment for the psychological side of addiction and generally is the only treatment for non-opiate substance abuse.  James Harber Rule 30(b)(6) Dep. Tr. 13:11–15 (attached as **Exhibit E**).  Methadone merely assists treatment by preventing withdrawal symptoms and satisfying cravings for opioids, which is why it is called "medication-assisted treatment," but methadone too is an addictive narcotic.  It is not a cure for addiction.

South Carolina regulations require at least one counselor for every fifty patients or fraction thereof.  S.C. Dep't Health & Environ. Ctrl. Reg. 61-93 ¶ 505 (attached as **Exhibit F**).  Counselors must be qualified by certification or licensure, with a grace period for new hires to obtain certification.  *Id.* ¶ 508.  There are regulations regarding the frequency of assessments and counseling.  *See, e.g.*, *id.* ¶¶ 703, 705, 706, 707, 904.  Methadone clinics are also required to conduct urine drug screenings of patients.  South Carolina regulations provide that "Results of substance use testing shall be addressed by the primary Counselor with the Patient, in order to intervene in Controlled Substance use behavior."  *Id.* ¶ 904(C).  BHG's own internal policies purportedly require efforts to counsel patients within ten days of a positive drug screening result, BHG Policy and Procedure No. 407, *Drug Testing and Sample Collection Procedure* ("The program provider will sign off on all positive UDS's and will ensure the counselor completes a clinical interview with the patient within 10 days of a positive result.") (attached as **Exhibit G**).  However, that policy appears to exist only for the benefit of the Joint Commission, an accrediting agency.  BHG does not attempt to implement any such policy when caring for "patients," and,

indeed, BHG's Vice President for Clinical Services—who BHG designated as its Rule 30(b)(6) witness to testify for BHG about counseling—was entirely unaware of the policy:

> Q. . . . And I believe BHG has some policies regarding counseling responses to positive urinalysis tests, doesn't it?
>
> A. Counseling responses? What do you mean?
>
> Q. Like a counselor speaking to someone who tested positive on a urinalysis; are there policies at BHG about that?
>
> A. Not in a transactional way but, yes, in the continuum of care with the patient, once you have the results, you communicate the results of what you found with the patient.
>
> Q. Is there any policy of within so many days of a positive result, you know, follow-up with a patient?
>
> A. No, not that specific. Not to the amount of days.

Samson Teklemariam Rule 30(b)(6) Dep. Tr. 25:18–26:14 (attached as **Exhibit H**).

Trent Neal began treatment at BHG on June 3, 2020. He was 21 years old and had used opiates since the age of 14. He had no criminal record and sought treatment on his own initiative because he wanted a better life. He was fully compliant with his treatment. Per BHG's own records and counselor testimony, Mr. Neal participated in counseling sessions when asked, and in those sessions, he was fully cooperative and engaged. Ex. H. 28:21–38:20 (Teklemariam); McKinley Anderson Dep. Tr. 29:19–34:6, 36:18–41:13 (attached as **Exhibit I**); **Exhibit J** (McKinley Anderson notes from the only counseling session with Trent Neal, Oct. 23, 2020):

> The patient was verbally receptive to the conversation with the counselor and made great eye contact. They were neatly dressed and use[d] active listening skills. The patient expressed that they really enjoyed being able to open[ly] communicate with someone who understood them. The patient was able to sit down and relax and speak [about] it effectively.

But BHG only provided one counseling session during Mr. Neal's seven months of treatment.[4]

That single session happened because Mr. Neal was transferred from his first assigned counselor,

Timothy Nesbitt, to a newly hired counselor, McKinley Anderson.  Ex. I 33:10–16 (Anderson).

In fact, BHG never even prepared an Individual Plan of Care for Mr. Neal as required by

South Carolina regulations governing methadone clinics.  Regulation 61-93 provides:

> 706. Individual Plan of Care (II).
>
> The Facility shall develop an Individual Plan of Care with participation by the Patient or responsible party and Interdisciplinary Team as evidenced by their signatures and dates. The Individual Plan of Care shall contain specific goal-related objectives based on the needs of the Patient as identified during the Assessment phase, including adjunct support service needs and other special needs. The Individual Plan of Care shall also include the methods and strategies for achieving these objectives and meeting these needs in measurable terms with expected achievement dates. The type and frequency of counseling, as well as Counselor assignment, shall be included. The criteria for terminating specified interventions shall be included in the Individual Plan of Care. . . .
>
> 707. Individual Plan of Care for Opioid Treatment Program (II).
>
> A. The Facility shall develop and document an Individual Plan of Care within thirty (30) calendar days of admission with participation by the Patient and the primary Counselor.
>
> B. The primary Counselor shall review the Patient progress in treatment and accomplishment of Individual Plan of Care goals not less than every ninety (90) calendar days during the first year of treatment and every six (6) months thereafter. The Counselor and Patient or responsible party shall sign and date any changes.

Regulation 61-93 (Ex. F).  BHG admits it never did a proper individual treatment plan.  Mr. Neal's

one and only treatment plan was prepared by intake counselor Ruth Combs, who was a bail

bondswoman in Kentucky before becoming a counselor at BHG.  Ruth Combs Dep. Tr. 5:13–19

---

[4] Plaintiff claims the only substantive counseling BHG ever provided Mr. Neal was a 1.25-hour session on October 23, 2020.  Ex. J.  BHG claims it provided two sessions in the seven months Trent Neal attended the clinic, the second being a 15-minute telephone call on November 19, 2020, which Defendants' own expert describes as a "case management" call rather than a therapeutic counseling session.  *See* **Exhibit K** (McKinley Anderson notes from call with Trent Neal, Nov. 19, 2020).

(attached as **Exhibit L**); **Exhibit M** (Trent Neal Individual Treatment Plan). Although signed by medical director Harber, he was not involved in the plan's production. James Harber Dep. Tr. 50:21–54:8 (attached as **Exhibit N**); Ex. E 31:3–9 (Harber 30(b)(6)). It is a mostly blank boilerplate form that obviously fails to meet the requirements of Regulation 61-93. The only goal listed is "to achieve stability in treatment." It has boilerplate objectives like "patient will attend clinic daily" that were identical for all patients starting at BHG, not the "specific goal-related objectives based on the needs of the patient . . . including adjunct support service needs" the regulation requires. It does not include "methods and strategies for achieving" any objectives that are "in measurable terms with expected achievement dates" as the regulation requires. It does not identify the name of the assigned counselor nor the "type and frequency" of counseling, as the regulation requires. It does not provide criteria for terminating interventions, as the regulation requires.

Ms. Combs explained that the treatment plan failed to meet these requirements because it was not meant to be the "real" treatment plan at all:

> A. Yes. Which is very standardized, you know, because the first 30 days is about stability and trying to get the patient stable. So we try to get them into -- we do a 30-day one and then try to do a more in-depth one.
>
> Q. So this 30-day one, would this be the same for anyone who came in addicted to heroin?
>
> A. Yes.
>
> . . .
>
> Q. And there are no further, I guess, 2 goals after that 30-day goal, is that because he never achieved the --
>
> A. Well, that's because, as you can see, it has an establish date and a target date, that's 30 days for him to begin to work with the counselor, who is going to be gathering further history and make a new treatment plan.

Q. Got it.  And that counselor would be Mr. Nesbitt?

A. Yes.

Ex. L 17:2–9, 18:1–11 (Combs).  Her references to "30 days" are about the regulatory requirement that an Individual Plan of Care be developed and documented within 30 days of admission of the patient.  That never happened for Mr. Neal.  Nor did the primary counselor or anyone else at BHG review Mr. Neal's "progress in treatment and accomplishment of Individual Plan of Care goals" every 90 days thereafter, as the regulation requires.  BHG had no need to worry about that because BHG accomplished *its* "Plan of Care goals" when it hooked Mr. Neal into buying methadone at a 1600% markup.

Unsurprisingly, Mr. Neal's substance abuse did not get better during his time at BHG.  It only got worse.  He always tested positive for illicit opiates, but now also began testing positive for non-opioid drugs.  Ex. B.  This was a common occurrence with patients beginning methadone treatment at BHG.  Ex. L 24:5–9 (Combs) ("A lot of times as the methadone begins to work and the opiates, you know, the blocker and the methadone works and the opiates don't work, then they will use other drugs that it can't block.").  Most alarmingly, he began testing positive for benzodiazepines.  Ex. B.  When taken together, methadone and benzodiazepines synergize to depress central nervous system activity in different ways, which intensifies the effects of both drugs, creating a more intense high and more severe adverse effects, including shallow breathing, low blood pressure, respiratory arrest, cardiac arrest, and death.  *See* Nathan Strahl Dep Tr. 58:7–9, 64:15–18 ("[Trent Neal] added benzodiazepines, which dramatically increase the risk of catastrophic something or other to occur. . . . the combination of benzodiazepines and opiates, be it methadone, be it fentanyl, be it heroin, are a very dangerous combination that can lead to [all] sorts of negatives, including cognitive impairment.") (attached as **Exhibit O**).  That is why BHG

has new patients sign a document warning of the dangers of taking benzodiazepines when using methadone during intake.  **Exhibit P** (BHG benzodiazepine education form).

Despite BHG being aware of the dangers of Mr. Neal's use of benzodiazepines, and even though its own policies require counseling within 10 days of a positive drug test result, and even though Mr. Neal tested positive for illicit drugs in *every single one* of the 30 drug screening urinalysis tests he had in those seven months, BHG only provided that single counseling session to introduce him to a new counselor.  BHG did not intervene in Mr. Neal's drug abuse because BHG just wants to sell methadone. As BHG's medical director testified, "I know that from talking to patients who tell me when I ask, why you transferring to our clinic, well, because they cut my dose from 100 to 50 [mg of methadone] because I used a benzodiazepine." Ex. N 44:5–8 (Harber). The director of the Spartanburg clinic testified that his pay includes a bonus based primarily on the number of patients purchasing methadone at the clinic—his goal is 700 patients which, at $14 per patient per day, would put clinic revenues at about $3.5 million.  Joseph Barr Dep. Tr. 14:10–17 (attached as **Exhibit Q**).  Success in treating patients' addiction is not considered at all in determining his bonus.

The week of December 20, 2020, Mr. Neal tested positive for illicit opiates, amphetamines, and benzodiazepines.  Ex. B at 28.  He had consistently tested positive for benzodiazepines since early November without any intervention by BHG.  *Id.* at 25–28.  He tested positive on December 21st and again on December 23rd.  *Id.* at 28.  Then on December 24th he received his daily methadone dose plus an additional dose to take home for Christmas.  *Id.* at 16.  The day after Christmas, he returned to BHG for his daily fix.  Portia Pratt Dep. Tr. 7:13–9:20 (attached as **Exhibit R**).  But he was a minute late and the front doors were locked.  *Id.*  He snuck in a side

door and went to the dispensing counter, but the counter was closed, and he was turned away. *Id.* So, he got in his car and drove away.

A few minutes later, Mr. Neal ran a red light at full speed and crashed into the driver's side of a car driven by Mr. Sivilay, killing him. The collision occurred at the intersection of Asheville Highway and Springfield Road in Spartanburg (1.8 miles from the clinic) shortly before 9:32 a.m. **Exhibit S** (police report). Mr. Neal was not seriously injured, but responding officers found him so intoxicated that he needed their assistance to stand up. *Id.* at 7. Mr. Neal was arrested for driving under the influence. *Id.* His blood tested positive for methadone and benzodiazepines. **Exhibit T** (toxicology report).

BHG did not meet the regulatory requirements for the number of counselors, their qualifications and training, or the frequency of counseling provided. BHG's counselors during the period of Mr. Neal's treatment failed to comply with the standard of care or BHG's own policies, and BHG had extreme turnover of counselors because they were woefully underpaid. Mr. Neal's first counselor only made $16/hour. He described BHG as a "counselor factory":

> Q. When you were there, I want to try to get a sense of . . . what . . . the turnover was with the counselors. Like how many people came and went?
>
> A. That's hard, man, 'cause a lot has came and left, man. When I started, I think maybe six or seven counselors left. Yeah, about six or seven counselors left.
>
> Q. You said when you started. Is that like in that first year or first month or what do you mean?
>
> A. So, the first year, well, right before I started I know maybe five counselors left before I first started, and then after a year went by, maybe three or four counselors left. Then that second year another three counselors left. I mean, with that pay, I mean they're not going to stay there that long with that pay.
>
> Q. I mean, is that the reason why --
>
> A. Yes, sir.

Q. -- is that the $16 an hour is not -- I mean, it must be hard to keep people?

. . .

A. It's hard to keep people, yes, sir.

Q. And no overtime?

A. Right.  And a lot of people went to, you know, find a better opportunity.

. . .

Q. And I guess so then all those people were replaced.  So there's new people coming in, three or four, you know, five, I guess, started before.  I guess maybe you're one of the replacements for those five; is that accurate?

A. Yes, sir.

Q. And then another new three or four new counselors and another three?

A. Yes, sir.  It's like a counselor factory. . . .

Timothy Nesbitt Dep. Tr. 48:25–50:11 (attached as **Exhibit T**).

Mr. Neal was a young man with no criminal record who came to BHG on his own initiative seeking help.  He is now in a jail cell facing a decade or more in prison.  He was charged $2,512 (and actually paid $2,422, with $90 being owed at the time of his arrest) to receive a total of 9.605 grams of methadone, which likely cost Defendants less than $150.00, a markup exceeding 1600%. It is no wonder private equity investors invest in selling drugs to addicts.  *Cf.* Alison Kodjak, *Investors See Big Opportunities In Opioid Addiction Treatment*, National Public Radio (June 10, 2016); Jeanne Whalen & Laura Cooper, *Private-Equity Pours Cash Into Opioid-Treatment Sector*, The Wall Street Journal (Sept. 2, 2017).  As Mr. Neal's counselor testified:

Q. Did your -- while you were there, did any patients – what's the end?  How does this end?  Like do people actually, I don't want to maybe use the word cured, but do they get to the point that they no longer need the treatment services?

A. Honestly, you're going to forever need the treatment services, because once you get on, from what I seen, once you get on the methadone, it's hard to get off.  Yeah, it's hard to get off the methadone once you get on. . . .

> Q. In your experience there, I guess two-and-a-half years with your patients, did anyone ever stop treatment because they felt like they had achieved their goals and they didn't need it anymore?
>
> A. No, sir.  Most of the time people stop because they couldn't afford it.  $14 a day add up.

*Id.* 44:17–45:9.

Of course, BHG has costs other than purchasing narcotics wholesale.  But the regulatory environment gives BHG few levers for cost reduction.  The physician prescribing methadone for over 700 addicts is only there for 10 hours a week.  Ex. N 10:10–14 (Harber).  BHG tried cutting corners with personnel dispensing the methadone but was caught by the South Carolina Pharmacy Board in 2017 (public reprimand and fine for not having a pharmacist-in-charge for a period in 2016) and again in 2018 (public reprimand and fine for unlicensed persons dispensing methadone while on probation for the previous offense).  **Exhibit U** (S.C. Pharmacy Board orders).  But an addiction treatment center does have one major operating expense to cut: addiction treatment services, i.e., counseling.   Hence the failure to meet minimum staffing or service level requirements or even to prepare a plan of care, much less actually provide care, for Mr. Neal.

Mr. Sivilay was 46 years old.  His daughters were only 8 and 11 years old when he was killed.  Without the solid middle-class income Mr. Sivilay had worked hard for twenty years to earn, his widow was forced to take a $16/hour textile mill job to support them and to place them in public assistance programs.  The lot off Chesnee Road that was to be their American dream home is still an empty grass field.  But private equity investors in Chicago continue to sell narcotics to Upstate addicts through BHG at an astonishing markup.

## B.    Procedural History

Plaintiff filed this action on November 18, 2021.  Discovery began in March 2022 and ended on July 28, 2023, but there are a few discovery disputes pending before the Court: Plaintiff's

motion to compel responses to various discovery requests, including data on Spartanburg clinic budgets, financial performance, the number of counseling sessions provided, the number and qualifications of counselors employed there, and compliance with applicable regulations, and Defendants' motion for a protective order to prevent Plaintiff from deposing BHG CEO Jay Higham.

Mediation occurred on July 24, 2023. Two business days before the mediation, BHG filed the motion for summary judgment *sub judice*.

## III.    <u>Legal Standard</u>

Summary judgment is proper only where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). "[S]ummary judgments should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not necessary to clarify the application of the law." *McKinney v. Bd. of Trustees of Mayland Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir. 1992). "A district court should not grant summary judgment unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under the circumstances." *Campbell v. Hewitt, Coleman & Assoc. Inc.*, 21 F.3d 52, 55 (4th Cir. 1994).

## IV.    <u>Argument</u>

The Court should deny BHG's motion for summary judgment because its methadone clinic owed Mr. Sivilay duties of care giving rise to Plaintiff's ordinary negligence claims. BHG contends it has no such duties and that precedent allowing a medical provider to be held liable by a non-patient for ordinary negligence—*Bishop v. S.C. Dep't of Mental Health*, 502 S.E.2d 78 (S.C.

15

1998) and *Hardee v. Bio-Med. Applications of S.C., Inc.*, 636 S.E.2d 629 (S.C. 2006)—is distinguishable from this case. Or BHG simply fails to discuss the precedent because it is profoundly unfavorable to its position. *E.g.*, Order, *Santandreu v. Colonial Mgmt. Grp., LP*, 3:16-cv-3042-TLW, slip op. at 7 (D.S.C. Apr. 28, 2017) (denying a motion to dismiss and holding negligence claims against a methadone clinic by the personal representative of a decedent with no physician-patient relationship to the defendant facility "arise in ordinary negligence") (attached as **Exhibit V**).

BHG, however, is mistaken, as then-Chief Judge Wooten ruled five years ago when this exact issue was litigated in a nearly identical case that BHG notably fails to mention at all. In *Santandreu*, Robert Moore was a patient at Colonial Metro Treatment Center, a methadone clinic. Complaint, *Santandreu*, 3:16-3042-TLW (D.S.C. Sept. 8, 2016) (attached as **Exhibit W**). Like Mr. Neal in this case, Mr. Moore consistently tested positive for illicit drugs while receiving methadone at the clinic. *Id.* Like Mr. Neal in this case, Mr. Moore tested positive for benzodiazepines while receiving methadone at the clinic, which did nothing in response. *Id.* Like Mr. Neal in this case, the combination of methadone and benzodiazepines caused him to crash into another car, killing its occupants. *Id.* Like Mr. Neal in this case, he had tested positive for benzodiazepines the same week as the fatal collision. *Id.* Like Plaintiff in this case, the plaintiffs in Santandreu sued the methadone clinic for negligence. *Id.* Like BHG in this case, the Santandreu defendant argued the negligence claim was grounded in medical malpractice. Ex. V at 3–4.

Chief Judge Wooten rejected that argument, observing, "South Carolina recognizes third party negligence actions against medical providers," and after a review of *Bishop*, *Hardee*, and *Dawkins v. Union Hosp. Dist.*, 758 S.E.2d 501, 503–04 (S.C. 2014), held:

> After careful consideration of these cases, this Court concludes that Plaintiff's
> claims arise in ordinary negligence and Columbia Metro has not shown that § 15-

79-125(A) applies to these claims.  Read together, *Dawkins*, *Bishop*, and *Hardee* do not require compliance with § 15-79-125(A) where a third party asserts negligence claims against a medical provider based on the medical provider's negligence towards the patient.  *See Dawkins*, 758 S.E.2d at 501–04 (notice and affidavit only required for medical malpractice claims); *Bishop*, 502 S.E.2d at 84 (third parties may bring claims under limited circumstances); *Hardee*, 636 S.E.2d at 631 (actions may arise against medical providers in other contexts than medical malpractice).

. . .

Accordingly, Plaintiff's claims against Columbia Metro can and do arise in ordinary negligence.

. . .

In summary, the Court concludes, based on Plaintiff's allegations and the cases cited, that Plaintiff is not required to comply with section 15-79-125(A) because Plaintiff's claims arise in ordinary negligence.

Ex. V at 7–9.  BHG makes no attempt to explain why this Court should reach a different conclusion when applying the same South Carolina law to essentially the same facts.

Instead, BHG claims support in *Delaney v. United States*, a federal tort claims case that turned on the foreseeability of being injured by a mentally ill person fleeing a facility while being admitted, stealing a firetruck, and crashing the fire truck into a pedestrian and several cars.  260 F. Supp. 3d 505 (D.S.C. 2017).  Not surprisingly, the attenuation between the naval hospital's purported lapse in allowing the un-admitted patient to escape and the harm suffered by the pedestrian plaintiff resulted in summary disposition, as Judge Norton found the proposition that the hospital owed a duty to keep an individual voluntarily committing himself for an evaluation safe to protect a bystander at another location from being hit by a stolen fire truck "a rather expansive interpretation of *Hardee*[.]"  *Id.* at 512–13.  Here, however, there is a factually supported nexus between the duties BHG violated, the warning signs it ignored, and the harm inflicted.

The better view is the one the Court has already endorsed in *Santandreu*, that *Dawkins*, *Bishop*, and *Hardee* support a claim "where a third party asserts negligence claims against a medical provider based on the medical provider's negligence towards the patient."  Ex. V at 7.  Here, a jury can conclude BHG violated multiple duties, the breach of which is actionable under

17

ordinary negligence principles.

The record in this case allows a jury to find BHG negligent under multiple theories, including a failure to warn, negligent administration, creation of the risk, failure to comply with controlling state and federal regulations, failure to abide by its policies and procedures, and a failure to intercede to protect Mr. Neal and others based on its special knowledge of the threat he posed. Even BHG concedes several of these theories are legally valid if supported by record evidence: "Therefore, the questions for this Court to consider are whether there is any evidence whatsoever to support that BHG had knowledge of a specific threat or risk of harm to the Plaintiff, and whether BHG had some special relationship with [Trent Neal] where they had the ability to monitor and control his conduct." Mem. Supp. Mot. Summ. J. 17. As explained below, the answers to those questions are "yes."

Plaintiff does not dispute that in the abstract a methadone clinic can provide efficacious drug treatment, but she does dispute that *this* methadone clinic was doing anything more than enabling an addicted individual to layer methadone on top of an already potent mixture of prescription and illicit drugs. This is because BHG's *raison d'etre* is not to treat patients successfully. It is to generate the largest possible return for its private-equity owners, which it does by selling drugs to addicts at a 1600% markup. This casts doubts on the utility of precedent weighing third-party claims against medical providers as the proper analytical framework to review BHG's conduct. Because there are few indicia of bona fide medical treatment occurring, there are theories of liability both within the *Bishop/Hardee* framework and beyond.

A.    **BHG owed Plaintiff a duty of reasonable care under several theories, each sounding in ordinary negligence.**

South Carolina law has long recognized third-party claims against a medical provider for ordinary negligence when foreseeable harm is inflicted because of its treatment of a patient. This

rule, as the Court has already recognized in *Santandreu*, flows from *Hardee* and *Bishop*. Ex. V at 7–9. It flows from two key propositions. First, "[t]he establishment of a doctor/patient relationship is *prerequisite* to a claim of medical malpractice." *Fay v. Grand Strand Reg'l Med. Ctr., LLC*, 771 S.E.2d 639, 644 (S.C. Ct. App. 2015) (quoting *Roberts v. Hunter*, 426 S.E.2d 797, 799 (S.C. 1993)). Accordingly, "[i]n South Carolina, a malpractice claim can only be maintained by the patient." *Bishop*, 502 S.E.2d at 84. Without such a relationship, there is no professional negligence claim.

Second, not every claim against a medical facility is one for medical malpractice. Instead, "medical malpractice is *a category* of negligence," and the distinction between a medical malpractice claim and ordinary negligence "is subtle," fact-specific, and devoid of a rigid analytical line. *Dawkins*, 758 S.E.2d at 503–04 (emphasis added) (citing *Estate of French v. Stratford House*, 333 S.W.3d 546, 555 (Tenn. 2011)). For example, in *Dawkins*, the patient was admitted to the hospital emergency room complaining of headaches, dizziness, and instability; was left unattended, awaiting treatment; and fell while attempting to use the restroom. *Id.* at 502–03. The South Carolina Supreme Court declined to construe the claim as one for medical malpractice because "not every injury sustained by a patient in a hospital results from medical malpractice or requires expert testimony to establish the claim." *Id.* at 504. The Court distinguished ordinary negligence from malpractice, explaining:

> While providing medical services to a patient, the medical professional acts in his professional capacity and must meet the professional standard of care, as established by expert testimony. However, at all times, the medical professional must "exercise ordinary and reasonable care to insure that no unnecessary harm [befalls] the patient." *Papa v. Brunswick Gen. Hosp.*, 132 A.D.2d 601, 517 N.Y.S.2d 762, 763–64 (1987). The statutory definition of medical malpractice found in section 15-79-110(6) does not impact medical providers' ordinary obligation to reasonably care for patients with respect to nonmedical, administrative, ministerial, or routine care. Thus, *medical providers are still subject to claims sounding in ordinary negligence*.

*Dawkins*, 758 S.E.2d at 504 (emphasis added).

The seminal South Carolina case on the circumstances in which a third-party plaintiff can bring a negligence claim against a medical provider is *Hardee v. Bio-Med. Applications of South Carolina, Inc.*, 636 S.E.2d 629 (S.C. 2006). In *Hardee*, a patient was driving herself home after receiving dialysis treatment when she caused a wreck injuring a third-party motorist. *Id.* at 630. The motorist sued the dialysis center for negligently failing to warn of the dangers of driving immediately after receiving dialysis. *Id.* The Court recognized the motorist lacked a medical malpractice claim against the dialysis center because the motorist was not a patient:

> At the outset, it is important to characterize the precise nature of the cause of action to which this statement in *Bishop* alluded. As we noted in *Bishop,* a medical malpractice action is instituted by a patient and is predicated upon a physician's deviation from accepted standards of professional care in treating that patient. Not every cause of action asserted against a medical provider, however, is an action for medical malpractice. Thus, our statement in *Bishop* affirms the validity of the general rule *prescribing* the class of permissible plaintiffs in medical malpractice actions, but also recognizes that causes of action may accrue in other contexts by virtue of a medical provider's actions or omissions.

*Hardee*, 636 S.E.2d at 631 (emphasis added).

The Court also took guidance from *Bishop*, where it recognized the possibility of medical provider liability to a third party, and recognized an exception to the general rule that medical providers do not owe duties to third party non-patients:

> We believe South Carolina tort law ought to recognize such a duty. Generally, a medical provider has a duty to warn of the dangers associated with medical treatment. Thus a medical provider who provides treatment which it knows may have detrimental effects on a patient's capacities and abilities owes *a duty to prevent harm* to patients and to reasonably foreseeable third parties by warning the patient of the attendant risks and effects before administering the treatment.

*Hardee*, 636 S.E.2d at 631–32 (emphasis added, footnote omitted). This conclusion found footing in the foundational tort principle: "Duty is not sacrosanct in itself, but only an expression of the

sum total of those considerations of policy which lead the law to say the particular plaintiff is entitled to protection." *Id.* at n.2 (brackets and quotes omitted) (quoting William L. Prosser, *Handbook of the Law of Torts* § 53, 325–26 (4th ed. 1971)).

The *Hardee* Court found a narrow exception warranted because the duty owed to the third-party motorist was "identical" to the duty the dialysis clinic owed its patient—a duty to warn of the risks and effects of treatment. *Id.* at 632 ("Thus, our holding does not hamper the doctor-patient relationship."). In other words, the Court weighed the policy considerations in favor of a duty that protected the driving public because it was the same duty owed a "brittle" Type 1 diabetic and imposing a duty would prevent a foreseeable harm caused by the patient losing control of his vehicle. *Cf. id.* at 630. Thus, when divining the line between those acts to which liability attaches, foreseeability is the key. State law has long permitted "[a] reasonably foreseeable third party, who is harmed by a physician's malpractice in treating a patient, may initiate an action against a physician for malpractice under limited circumstances." *Bishop*, 502 S.E.2d at 84. In *Hardee*, the risk of harm to a third-party motorist was foreseeable, while in *Bishop*, the Court found, as a matter of law, the department of mental health "could not reasonably foresee" that the child-victim's grandmother would be permitted an unsupervised visit with the mother she had involuntary committed because of threats to the child. *See Bishop*, 502 S.E.2d at 83–84.

With this framework in mind, BHG violated its duty to warn Mr. Neal and to administer methadone with care, and these duties are actionable in ordinary negligence under *Hardee*.

1.    ***BHG owed a duty to prevent harm to Plaintiff by effectively warning Mr. Neal of the risks of driving while mixing methadone and benzodiazepines.***

BHG owed Plaintiff a duty to prevent harm by warning Mr. Neal of the risks of driving after ingesting methadone together with benzodiazepines. This duty arises both as a matter of

common law (*Hardee*)[5] and from federal regulations. Federal opioid treatment standards outline certain minimum program requirements for an opioid treatment program (OTP). "Maintenance treatment" is defined as dispensing methadone to a dependent individual for more than 21 days. 21 U.S.C. § 802. Among other OTP requirements, to provide maintenance treatment an OTP must ensure that "relevant facts concerning the use of the opioid drug are clearly and adequately explained to the patient[.]" 42 CFR § 8.12 (e)(1).

There is no evidence in the record that Mr. Neal was warned of the specific risks of driving while under the influence of methadone mixed with other substances even though BHG was aware of the potentially catastrophic risks. BHG claims a "Benzodiazepine Education" form Mr. Neal signed on June 2, 2020, provided such a warning, but that form fails to provide an effective warning for two reasons. First, it does not mention any risk to anyone other than Mr. Neal. Its only states: "Combining benzodiazepines with medication assisted treatment can have serious health risks: decreased respiration, heart complications, and even potential death may result." Ex. P. That is the entirety of its warning. It is silent on any risk of impairment in the conduct of driving or any other activity. Second, Mr. Neal was told to sign the form along with many others at his intake on June 2nd, exactly *five months* before he began to take benzodiazepines with methadone. It is not reasonable to believe that having a drug addict sign an education form effectively warns him of anything five months later.

A reasonable time to warn would be when BHG first became aware that Mr. Neal was taking benzodiazepines while on methadone, which occurred on November 2, 2020. After then,

---

[5] *Cf. Moore v. W. Carolina Treatment Ctr., Inc.*, 182 F. Supp. 3d 825, 832–38 (E.D. Tenn. 2016) (finding a duty to warn under Tennessee law where the injury to a third party by an opiate-addicted person on methadone driving a vehicle was foreseeable).

the only warning Mr. Neal ever received was an off-hand comment during a 15-minute telephone call on November 19, 2020:

> The counselor brought to the attention of the client their positive UDS for BZO, AMP, OPI, and THC. The counselor explained to the patient the harmful effects that those substances could have on their health and even fatal if continued. The counselor asked the patient if they had prescriptions for any of those substances. The patient stated that they did not. The patient mentioned that they did not use illicit substances all the time, but just recreationally. They said that they did not do it to get high, but to open their awareness mentally, the counselor encouraged to patient to focus on their recovery with the assistance of the counseling and methadone treatments.

"BZO" means benzodiazepines. Ex. I 22:25 (Anderson). Like the benzodiazepine education form given to Mr. Neal months earlier, BHG merely warned of the potential consequences to Mr. Neal's own health, i.e., the risk of overdose. The counselor on that call explained what "harmful effects" were discussed with Mr. Neal:

> Q. Okay. And now I'm kind of turning back to the counseling notes from November 19. It says the counselor explained to the patient the harmful effects that substances can have on health and even fatal if continued. What are those harmful effects?
>
> A. Well, when you're using like a benzodiazepine with methadone they automatically slow your -- one slows your heart rate down anyway, which would be a benzo. And when it's coupled with methadone, that sounds like a ticking time bomb. It may not affect you then, but in time illicit use of a benzo coupled with a methadone will slow your heart down to death, to a heart attack and you just stop breathing.

Ex. I 24:15–25:2 (Anderson). As in the benzodiazepine education form given to Mr. Neal months earlier, the warning given in November only regards the risk to himself. Moreover, the warning in November only concerns delayed, long-term risks after the acute influence of the drugs—the "high"—wears off, risks like having a heart attack at some point in the future. No warning whatsoever was given about impairment in activities like driving or the consequential risks to others while under the influence of the drugs or "high." And after that call, Mr. Neal tested positive for benzodiazepines on November 20th, November 25th, December 2nd, December 21st, and

December 23rd. No warnings of any sort were given after those positive tests, even though BHG's policies require a follow-up on the positive drug test results within 10 days. Ex. G.

BHG's Benzodiazepine Education form does state: "I further acknowledge that If I am taking illicit benzodiazepines (i.e. without a prescription), that my dose may be decreased per physician order and that I may be discharged." Ex. P. A dosage decrease or discharge certainly is a warning that would get attention. That would be consistent with the standard of care Plaintiff's expert Dr. Nathan Strahl testified to: "Now, the patient has responsibility, but our responsibility is greater to offer and then demand that there be changes or else, and the power of the pen says or else we can't continue methadone or else we need to send you to an inpatient service." Ex. O 31:24–35:3 (Strahl). It would also be consistent with the position of the American Association of the Treatment of Opioid Dependence:

> Therefore, benzodiazepine using individuals should not be categorically denied admission to OTPs.
> . . .
> A gradual taper from opioid agonist treatment can be therapeutic, combined with continued attempts to help patients address benzodiazepine use and decrease risks, with a goal of keeping them in treatment if possible. However, continued refusal to address benzodiazepine use on the part of the patient may be grounds for discharge from an OTP.

Policy Statement, Addressing Benzodiazepine Use in OTPs, Am. Assoc. for the Treatment of Opioid Dependence (Apr. 6, 2017). Other methadone clinics may do that, but it is not what BHG does. BHG just sells methadone: "I know that from talking to patients who tell me when I ask, why you transferring to our clinic, well, because they cut my dose from 100 to 50 [mg of methadone] because I used a benzodiazepine." Ex. N 44:5–8 (testimony of BHG's medical director, Dr. Harber).

On these facts, this claim should be permitted to proceed under a warning theory.

**2.      *BHG owed Plaintiff a duty to take care in dispensing methadone to Mr. Neal based on its special relationship to Mr. Neal.***

BHG's special relationship to Mr. Neal gave rise to a duty to act with due care.  "An affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or some other special circumstance." *McCullough v. Goodrich & Pennington Mortg. Fund, Inc.*, 644 S.E.2d 43, 46 (S.C. 2007); *see also Cummins Atl., Inc. v. Sonny's Camp-N-Travel Mart, Inc.*, 481 F. Supp. 2d 531, 535 (D.S.C. 2007).  One who acts, even without an obligation to do so, becomes obligated to act with due care.  *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 638 S.E.2d 650, 657 (S.C. 2006) (collecting cases).  While there is no "general duty" to control the conduct of another or to warn a third-party victim, South Carolina law recognizes five exceptions to this rule: (1) where the defendant has a special relationship to the victim; (2) where the defendant has a special relationship to the injurer; (3) where the defendant voluntarily undertakes a duty; (4) where the defendant negligently or intentionally creates the risk; and (5) where a statute imposes a duty on the defendant. *Faile v. S.C. Dep't of Juvenile Justice*, 566 S.E.2d 536, 546 (S.C. 2002) (collecting cases).

In *Madison*, the South Carolina Supreme Court held there was a special relationship between a disabled woman and the special needs treatment center that arose from their agreement requiring the center to provide her care.  638 S.E.2d at 657.  This duty created a jury question whether the center was negligent in allowing the disabled woman to abscond in the middle of the night with other residents and travel to a house where those residents convinced her to have sex. *See id.* 654–55.  This implicated "the first, third, fourth, and fifth exceptions specified in *Faile*, as well as within the circumstances outlined in Restatement (Second) of Torts §§ 323–324."  *Id.* at 657.  The court held the center had a common law duty as a business that "accepts the responsibility of providing care, treatment, or services" to disabled clients to exercise reasonable care supervising

the client and controlling her conduct "to the extent necessary to prevent her from harming herself or to prevent others from harming her while staying at the center." *Id.* at 657–58.

Likewise, in *Faile*, the Department of Juvenile Justice had a special relationship to a child it knew to be aggressive, impulsive, and explosive based on the common law as explained in the Restatement (Second) of Torts:

> The Restatement provides no duty exists "to control the conduct of a third person as to prevent him from causing physical harm to another unless ... a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." Restatement (Second) of Torts § 315(a) (1965). Section 319 provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) of Torts § 319 (1965).

566 S.E.2d at 546. In *Faile*, the Plaintiffs did not allege a duty to warn; rather, they asserted "a breach of the duty to supervise and control a dangerous juvenile by the custodial entity." *Id.* at 547. While noting South Carolina courts have typically applied §§ 315 and 319 in the context of duty to warn cases, the Supreme Court made it clear that "application of § 319 is not limited to duty to warn cases." *Id.* at 546. Accordingly, the Court recognized a duty to control where "there is an established authority relationship and a substantial risk of serious harm." *Id.* at 548.

Here, the clinic had an extensive, seven-month relationship with Mr. Neal, who was at the clinic almost every day in that period. Like the disabled woman and the center in *Madison*, Mr. Neal and BHG entered into a voluntary services-for-cash agreement that required BHG to exercise care and control over Mr. Neal's methadone consumption. This obligation to control Mr. Neal's methadone consumption also arises under federal law, *see* 42 CFR § 8.12, and under the standard of care for addiction medicine:

> But what I said in my previous statement is that I could request and demand that he talk with the doctor who is prescribing. The therapist isn't prescribing. It's the physician who is prescribing, to have the physician and he talk about potential value

of either keeping the methadone w[h]ere it's at or increasing the methadone.  If the patient comes along and says, well, I'm not going to do that, the power of the pen would be then, we have to get to inpatient because we can't continue like this because there's a danger, and you continued to use opiates and benzos and meth and cannabis at the same time.  We have to make a decision, regardless of what your position is about making appropriate treatment.

It's the therapist and doctor's jobs to know what's best for the patient.  No, I would never force the patient to take higher, but if the patient doesn't want to comply with what I feel is appropriate treatment, then it's their time to be referred elsewhere.  And I have done that, and doctors, I believe, have done that numerous times where patients are failing to comply with what I feel is an appropriate measure of treatment and need a higher level or a change in venue, going somewhere else would be better for them.

Ex. O 39:13–40:12 (Strahl).

The fact is that under the auspices of an OTP where they are prescribing methadone as a means of curtailing or maybe even harm reduction, and the harm is increasing rather than decreasing, more needed to be done.

The whole crux of my argument had nothing to do with methadone itself.  It had to do with the lack of recognizing long-range potential of polysubstance abuse in an OTP that is supposed to know better because that's their job.  That's specifically their job, and that they didn't do anything of any substantial change to make things better for Mr. Neal.

They let him say, I'll control my treatment.  Sure.  I don't feel like it right now.

Okay.

Whose responsibility is that?  Is that Mr. Neal's responsibility, or is it the clinic's responsibility to say, if that's the way you feel, you're continuing to use, we need to do something else.  And what else would that be?  Well, higher level of care, intensive therapy every day, group therapy twice a week, inpatient treatment for detox.  All those are accessible and possible and can be mandated without him having to raise the methadone up one milligram.

The clinic has the power and the pen to demand that there be compliance with treatment.  The patient is not the one to control their treatment. With substances that are addictive, if patients control their treatment, a bad outcome is invariable.

Invariable.

*Id.* 60:14–61:18.

Dr. Strahl forcefully makes the point that the methadone clinic also had a duty to administer

27

methadone to Mr. Neal with due care because of its special, authoritative relationship with Mr. Neal. Simply put, it had a duty of care because it was in charge of his treatment. This means it had an obligation to act in response to evidence Mr. Neal continued using illicit drugs, especially illicit drugs having an especially dangerous effect when combined with methadone. Here, BHG did absolutely nothing in response to Mr. Neal failing every one of his *thirty* drug screening tests while receiving methadone at BHG, including *two* that tested positive for benzodiazepines *in the same week as the fatal collision*.

In this context, it was entirely foreseeable—inevitable, in Dr. Strahl's opinion—that Mr. Neal would drive impaired and harm an innocent third party, which he did. These facts fall squarely within the foreseeability analysis employed in *Hardee* and provide a basis to recognize a duty here. Further, reading *Hardee* to find a duty under ordinary negligence comports with foreign precedent the same or a similar claim. *See, e.g.*, *Cheeks v. Dorsey*, 846 So. 2d 1169 (Fla. Dist. Ct. App. 2003) (methadone clinic potentially liable to third-party motorist for negligent administration of methadone to patient); *Taylor v. Smith*, 892 So. 2d 887 (Ala. 2004) (same); *Vasquez v. Cmty. Health Care, Inc.*, No. ESCV201002570D, 2014 WL 4364827 (Mass. Super. July 7, 2014) (same).

## 3.     *BHG owed a duty to prevent harm to Plaintiff because it created the risk of harm to Plaintiff.*

BHG had a duty to intervene in Mr. Neal's polypharmacy abuse because of its role in creating the risk. When a defendant negligently or intentionally creates a risk that places another person in peril, it has a duty to act to prevent the harm it created. *Faile*, 566 S.E.2d at 546 (citing *Montgomery v. Nat'l Convoy & Trucking Co.*, 195 S.E. 247 (S.C. 1938)); *see also Childers v. Gas Lines, Inc.*, 149 S.E.2d 761, 765 (S.C. 1966) (motorcyclist injured by debris placed in road could hold defendant liable "for anything which appears to have been a natural and probable consequence of his negligence" regardless of whether tortfeasor foresaw the harm or the manner in which it

occurred).

The creation-of-the-risk doctrine supports a finding that BHG owed a duty of care once it dispensed methadone to intervene when danger arose. BHG created the risk to Mr. Sivilay when it gave methadone to someone it knew was taking benzodiazepines:

> Q. All right. Doctor, I just -- I want to – I'm going to try my best to summarize what I've heard your testimony to be today. I'm not trying to put words in your mouth. So, please, correct me if you think I'm wrong.
>
> Are you saying and are you going to testify at trial, if it comes to that, that 150 ng per milliliter of methadone, in combination with this cocktail of benzodiazepines, all of which were either at a therapeutic or impairing level, and in combination with an impairing level of marijuana, that that 150 ng/mL of methadone was a substantial contributing factor to Mr. Neal's intoxication, at the time of this wreck?
>
> A. Yes.
>
> MR. FARR: Okay. All right. I have no further questions.

David Eagerton Dep. Tr. 88:17–89:8 (attached as **Exhibit X**). Professor Eagerton was the Chief Toxicologist at the South Carolina Law Enforcement Division for 12 years. BHG's *own experts* testified,

> Q. And I'll -- what do those -- what does SAMHSA recommend be done when someone is using benzodiazepines while in opioid-dependence treatment?[6]
>
> A. I believe the recommendation is to continue to treat them with methadone or buprenorphine.
>
> Q. Is there any -- anything else that would be recommended in response to the benzo use?

---

[6] Dr. Morse did not know the answer to this question. For illicit benzodiazepine use concurrent with methadone treatment, the U.S. Department of Health and Human Service's Substance Abuse and Mental Health Services Administration (SAMSHA) recommends ensuring patients understand the risk, determining whether the patient requires supervised withdrawal or tapering from benzodiazepines, attempting gradual outpatient supervised withdrawal for benzodiazepines, and increasing the frequency of counseling. Substance Abuse & Mental Health Servs. Admin., Treatment Improvement Protocol 63, Medications for Opioid Use Disorder, pt. 3 pp. 19–20 (2021), *available at* https://store.samhsa.gov/sites/default/files/pep21-02-01-002.pdf. BHG did none of that for Mr. Neal.

> A. Well, like I said earlier, you would want to encourage them to discontinue the use of benzodiazepines, you know, and address the positive tests and counseling sessions.
>
> Q. And do you -- was that done in this case with Mr. Neal?
>
> A. The only two that I found in the record were -- was the two sessions: one in October, one in November.

Eric Morse Dep. Tr. 11:20–12:12 (attached as **Exhibit Y**).  The October session Dr. Morse to which

Dr. Morse referred was the only substantive counseling session with Mr. Neal, and it was before

Mr. Neal tested positive for benzodiazepines.  The November session was the 15-minute telephone

call.  Another BHG expert testified,

> Q. So just I guess in your opinion, how should BHG have responded to these positive tests in November and December?
>
> A. Well, basically, if I remember correctly, one of the things that is normal best practice, and it's in the DHEC regulations, is that the patient would need to have been counseled on that, which I want to say it was sometime in November that he did have a counseling session. Yeah, 11/19.  And in that session, the counselor did bring that up about -- in the previous one in October, the counselor had brought up about possibly increasing his dose, increasing the amount of methadone that he had, and it was the one -- if my memory serves true, the one in November, the counselor brought up the additional -- you know, the frequency of the drugs used.
>
> . . .
>
> Q. So I guess is it your opinion that this 15-minute -- single 15-minute telehealth session was adequate response to the nine positive tests that we just discussed?
>
> MR. FARR: Object to the form of the question.  You can answer.
>
> THE WITNESS: My direct feeling is or my main feeling is that I think you need to put it in context.  I think it needs to be put in the context of the time that this happened, which was November of 2020, which was smack dab in the middle of COVID, which was very much when clinics were doing their best to try and stay open, and the primary goal -- a lot of clinics were short on clinicians. A lot of clinics, especially here in South Carolina, it was challenging at best.
>
> So, technically speaking, you know, what this is, and at 15 minutes, it was a case management session.

Edward Johnson Dep. Tr. 9:12–10:3, 11:1–20 (attached as **Exhibit Z**).

Having created a risk by furnishing Mr. Neal with methadone, the clinic abdicated its responsibility by failing to take remedial action when heightened risks to innocent third parties materialized and became known to BHG.  BHG knew on November 2, 2020, that Mr. Neal was taking benzodiazepines and methadone at the same time.  It knew the risk that created.  It certainly was aware of what happened in *Santandreu*, which was reported in newspapers.  John Monk, *Secrecy surrounds $10.5 million settlement involving 3 deaths, Lexington drug clinic*, The State (Dec. 5, 2018).  BHG had been sued before for doing nothing to address benzodiazepine use concurrent with methadone treatment which resulted in a fatal traffic collision.  *E.g.*, *Lampe v. Behavioral Health Group, Inc.*, Case No. 2016-CI-16352 (Bexar Cnty. Dist. Ct., Tex. 2016) (complaint attached as **Exhibit AA**).  Yet it continued to give methadone to him *54 times*, and did nothing beyond telling Mr. Neal once, in a telephone call, that the combination might cause him to risk a heart attack at some point in the future.  Whether Covid-19 provides an adequate excuse for BHG's breach of its duty, as BHG's expert Johnson suggests, is a question for the jury.

**4.    *BHG owned a duty to take care in dispensing methadone to Mr. Neal based on federal and state laws and regulations and BHG's own policies and procedures.***

The Court can also look to BHG's policies and procedures and the state and federal regulations that mandate them as an independent source of an affirmative legal obligation to act with due care when dispensing a controlled substance.  "Plaintiff may show an affirmative legal duty of care to him arising from a statute if the plaintiff is a member of the class of persons the statute is intended to protect, and the essential purpose of the statute is to protect the plaintiff from the kind of harm he suffered." *Ajaj v. United States*, 479 F. Supp. 2d 501, 549 (D.S.C. 2007) (citing *Rayfield v. S.C. Dep't of Corrs.*, 374 S.E.2d 910, 914 (S.C. 1988)).

Methadone is a controlled substance Congress recognized might "have a useful and legitimate medical purpose," notwithstanding its finding that "illegal importation, manufacture,

distribution, and possession and improper use of controlled substances ha[s] a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(1)–(2); *see also id.* § 812 (defining methadone as a Schedule II substance in the same class as opiates). A methadone clinic can treat patients with the drug, provided it registers with the Attorney General and complies with controlling regulations. *See* 21 U.S.C. § 823.

These regulations require a valid certification from SAMHSA, which is obtained by meeting the federal opioid treatment standards in 42 CFR § 8.12; being accredited by an accreditation body, and by complying with any other conditions established by SAMHSA. 42 CFR § 8.11(1)–(2). The requirements of § 8.12 include an obligation to (1) ensure adequate patient care; (2) continuously improve care through the ongoing assessment of patient outcomes; (3) employ "specific" measures that reduce the possibility of diversion; (4) provide adequate medical, counseling, educational, and other treatment services that reflect the patient's current needs; (5) maintain procedures adequate to ensure methadone is administered and dispensed in accordance with program requirements and consistent with the regulatory take-home schedule. *See* 42 CFR § 8.12(b), (c), (f), (h) & (i). If SAMHSA determines these regulations have been violated, it can suspend and revoke a methadone clinic's certification to protect public health and safety. *See* 42 CFR § 8.14(a)–(b).

Methadone clinics are also subject to regulation by the South Carolina Department of Health and Environmental Control (DHEC). DHEC regulations establish minimum levels for staffing and qualification of methadone clinic counselors (all counselors must meet specified qualifications and there must be at least one counselor for every fifty patients or fraction thereof), and impose specific requirements for individual plans of care for patients, regarding both for content and timing of the care plans. Ex. F (DHEC Regulation 61-93).

Two of BHG's most significant breaches of duties imposed by law, regulation, and its own policies are (1) BHG's failure to ever create a compliant Individual Plan of Care for Mr. Neal, and (2) BHG's failure to follow its own policies requiring a counselor follow up with the patient within ten days of a positive drug screening result. Mr. Neal tested positive thirty times in seven months but was offered only one substantive counseling session, which happened only to introduce him to a newly hired counselor, and which did not concern benzodiazepines at all.

BHG did nothing but sell methadone at a 1600% markup. There was no attempt to provide the treatment required by federal and state regulations:

> Q. For a patient with these urine results, does having one 15-minute session in a two-month period with these urine results, is that within the standard of care? Does that meet the --
>
> A. It does not. It's wholly inadequate.
>
> Q. Is it grossly below the standard of care?
>
> MR. FARR: Object to the form.
>
> THE WITNESS: Egregiously below the standard of care.

Ex. O 81:13–21 (Strahl).

The purpose of these regulations, guidelines, and policies that set forth the standard of care BHG "egregiously" failed to meet is to ensure the efficacious use of methadone while preventing the public dangers in illicit drug use—something Congress and our General Assembly have deemed a threat to the health and welfare of the American people. The legal use of methadone is not highly restricted so that private-equity firms can make amazing profit margins. It is highly restricted to protect the public. Persons impaired or "high" on addictive drugs pose a major danger to society. That is why those drugs are, generally, illegal. That is why people who sell those drugs illegally are sentenced to years or decades in prison. That is why billions have been spent on a "war on drugs." Methadone clinics exceptions to the rule against selling addictive drugs to addicts,

highly regulated so that they may help addicts without endangering the communities in which they are located. Methadone clinics therefore have a duty to their communities to at least attempt to comply with those regulations.

**B.       Alternatively, BHG was not acting as a medical provider and so owed ordinary duties of care regardless of the *Hardee* analysis.**

Alternatively, the Court could look to the record and conclude this claim sounds in ordinary negligence because BHG was not acting as a bona fide medical provider. "[N]ot every injury sustained by a patient in a hospital results from medical malpractice or requires expert testimony to establish the claim." *Dawkins*, 758 S.E.2d at 504. When a patient receives "nonmedical, administrative, ministerial, or routine care, expert testimony establishing the standard of care is not required, and the action instead sounds in ordinary negligence." *Id.* (internal quotation marks quotations omitted). The record here indicates there was no "medical" treatment offered by the methadone clinic, just the routine sale of drugs to drug addicts.

BHG's so-called medical director testified he worked at the clinic just two and one-half hours per day, four days per week. Ex. N 10:10–14 (Harber). Joseph Barr, the program director, has no medical training, nor did any counselors who routinely met with patients. The counselors were not supervised by any medical provider, and the medical director testified bluntly that "I am not involved in the counseling." Ex. N. 56:3–57:8. These facts indicate little, if any, medicine was being practiced at BHG. Further, there is no evidence any counselors were professionally certified. In part, this is because BHG refuses to provide discovery on that issue. But a search of licensees at the South Carolina Board of Examiners for Licensure of Professional Counselors, Marriage and Family Therapies, Addiction Counselors and Psycho-Educational Specialists shows no active or past licenses for Mr. Neal's counselors, Timothy Nesbitt and McKinley Anderson, his intake coordinator, Ruth Combs, or the program administrator, Joseph Barr.

Based on this record, the Court can conclude the claim here arises from the sort of nonmedical, administrative, ministerial, and routine care the *Dawkins* Court held remains an ordinary negligence claim.

*     *     *

BHG's decision to reduce addiction treatment services to well below the minimum standard while still dispensing narcotics at a 1600% markup is the reason Mr. Sivilay is not alive and with his family today. The local, front-line counseling staff at BHG's Spartanburg clinic did the best they could in the circumstances BHG created. This case is about the money-driven refusal to meet the standard of care by a "private equity backed" for-profit company that sells addictive narcotics to drug addicts, led by a marketing executive with no experience in addiction treatment prior to becoming CEO of BHG and who has been buying up clinics around the country to "flip" them like renovated houses.

As stated at the beginning of this memorandum, Mr. Sivilay was 46 years old when he was killed. His widow was forced to take a $16/hour job as a machine operator at a textile coating mill to support their two little girls and her mother. Their children are now enrolled in public assistance programs. The lot off Chesnee Road that was to be their little dream home is still an empty grass field. But private equity investors in Chicago continue to sell narcotics to Upstate addicts at an enormous markup through BHG because, in their opinion, they have "no duty" to anyone in this community who is not a drug addict.

## V.    <u>Conclusion</u>

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

<u>s/Phillip D. Barber</u>                                   August 3, 2023
Phillip D. Barber (Fed. ID No. 12816)
RICHARD A. HARPOOTLIAN P.A.
1410 Laurel Street                                      Phone (803) 252-4848
Columbia, South Carolina 29201            Facsimile (803) 252-4810
                                                                   pdb@harpootlianlaw.com

35