# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# SPARTANBURG DIVISION

| | |
|---|---|
| Vanida Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, | C/A No. 7:21-cv-3775-TMC |
| Plaintiff, | |
| v. | **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR A PROTECTIVE ORDER** |
| BHG Holdings, LLC, and BHG XXXVIII, LLC, | |
| Defendants. | |

Plaintiff Vanida Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay, through undersigned counsel, hereby responds in opposition to Defendants BHG Holdings, LLC, and BHG XXXVIII, LLC's (collectively, "BHG") motion for a protective order to prevent the deposition of its Chief Executive Officer (CEO) Jay Higham.

## I.      Background

On July 21, 2023, Plaintiff served a notice of deposition for BHG's CEO, Jay Higham. The notice set the deposition for July 27, 2023, at BHG's headquarters in Dallas, Texas. Plaintiff's counsel did not consult with Defendants' counsel prior to setting that date. However, the letter to opposing counsel transmitting the deposition notice stated, "If this date and time does not work for you and your client, please provide me with proposed alternative dates for the deposition." ECF No. 77-8 at 1. When BHG's counsel responded that "date does not work," Plaintiff's counsel suggested dates in late August. Defendants' counsel responded, "I appreciate the courtesy of rescheduling. . . . We can work to schedule dates; however, we will concurrently move to quash this notice under the apex doctrine . . . ." ECF No. 77-9 at 1. On July 26, 2023, BHG filed the present motion for a protective order to quash the deposition notice.

**II.     Legal Standard**

Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure provides,

On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

The "apex doctrine" is "a tailored application of [Rule 26(b)(2)(C)] in specific instances involving high-level or 'apex' officials." *Est. of Valentine ex rel. Grate v. South Carolina*, No. CV 3:18-00895-JFA, 2020 WL 12783948, at *1 (D.S.C. Aug. 13, 2020).

> The Apex doctrine recognizes that "deposition notices directed at an official at the highest level or 'apex' of corporate management . . . creates a tremendous potential for abuse or harassment." *Celerity, Inc. v. Ultra Clean Holding, Inc.*, No. C 05-4374, 2007 WL 205067 at *3 (N.D. Cal. Jan. 25, 2007). The purpose of the doctrine is to ensure that the liberal rules of procedure for depositions are used only for their intended purpose and not as a litigation tactic to create undue leverage by harassing the opposition or inflating its discovery costs. *Smithfield Bus. Park, LLC v. SLR Int'l. Corp.*, No. 5:12-cv-282, 2014 WL 547078 at * 2 (E.D.N.C. Feb. 10, 2014).

*In re Lipitor (Atorvastatin Calcium) Mktg.*, No. 2:14-MN-02502-RMG, 2014 WL 12621613, at *2 (D.S.C. Nov. 13, 2014). "Most courts applying the apex doctrine have required that, before deposing a defendant's high ranking officer, 'the plaintiff must show (1) the executive has unique or special knowledge of the facts at issue and (2) other less burdensome avenues for obtaining the information sought have been exhausted.'" *Id.* (quoting Smithfield Bus., 2014 WL 547078 at *2). "Put simply, the apex doctrine is the application of the rebuttable presumption that the deposition of a high-ranking corporate executive either violates Rule 26(b)(2)(C)'s proportionality standard or, on a party's motion for a protective order, constitutes 'good cause' for such an order as an 'annoyance' or 'undue burden' within the meaning of Rule 26(c)(1)." *Performance Sales & Mktg. LLC v. Lowe's Companies, Inc.*, No. 5:07-CV-00140-RLV, 2012 WL 4061680, at *4 (W.D.N.C. Sept. 14, 2012).

### III. Argument

#### A. The information sought from Mr. Higham is unavailable from other sources.

Plaintiff seeks information from Mr. Higham regarding clinic costs, revenues, budgeted operations, regulatory compliance, and legal entity structure. Plaintiff has attempted to seek this information from other sources. Plaintiff requested production of Spartanburg clinic budgets and operating costs, personnel files for counselors at the Spartanburg clinic, and electronically stored data on the frequency of counseling sessions, but BHG has refused to provide the requested information. *See* 2d Mot. Compel, ECF No. 75. Plaintiff also asked witnesses for this information, including subordinate executives BHG identified under Rule 30(b)(6) to speak for BHG on these topics. But no one could provide answers.

For example, Plaintiff sought to learn whether the number and qualification of counselors at BHG's Spartanburg clinic complied with South Carolina regulations, which allow no fewer than one counselor for every fifty patients or fraction thereof. BHG identified Samson Teklemariam under Rule 30(b)(6) to speak for BHG on topics including "counseling policy and procedure," "counseling operations," or any "counseling-related matter." *See* **Exhibit A** (Defendants' amended Rule 30(b)(6) designations).[1] On the question of counseling compliance, he testified,

> Q. Ok. And do you know the names of the counselors at the Spartanburg clinic?
>
> A. The current counselors or the counselors on this case?
>
> Q. On this case
>
> A. Yes. I don't know them but I know their record or I looked at their names.

---

[1] BHG's designations state that Mr. Teklemariam would testify to "non-patient specific" counseling matters. Plaintiff objected that someone had to testify regarding counseling matters specific to Trent Neal and the issues in this case. That objection was resolved, however, when Mr. Teklemariam testified in his Rule 30(b)(6) deposition that he was familiar with Trent Neal's treatment. See Teklemariam Dep. Tr. 8:4–7. Counsel agreed at the conclusion of the Teklemariam deposition that his testimony did in fact cover "Trent Neal-specific" counseling matters.

> Q. Do you know about their certifications or licensure?
>
> A. I don't, unfortunately. I didn't look at their HR record, you know, their historical record.
>
> . . .
>
> Q. Do you know how many counselors, ballpark?
>
> A. No. Again, that's more in the HR records. I mean, if I -- I could have looked that up. It wouldn't have taken me long.

Samson Teklemariam Dep. Tr. 10:1–11, 12:1–4 (attached as **Exhibit B**).

> Q. And I'm going to now kind of skip to page 14 so we can have these definitions. And under -- in kind of in the middle of the page, there's section 505 and (D) says" The opioid treatment program shall have at least one full-time counselor on staff for every 50 patients or fraction thereof," and then "Counselor shall be qualified as specified . . ." in a later section.
> 	During the time of Trent Neal's treatment, did the Spartanburg clinic have at least one full-time counselor for every 50 patients?
>
> A. I could guess that would be it, but I didn't have access to the staffing records. I have access to the clinical service model, clinical service delivery, clinical policies.
>
> Q. Okay.
>
> A. But I could guess that they did, you know.
>
> Q. And then skipping to the next page, 15, the section 508 that was referenced, and it says "Each facility shall have at least one staff counselor who's fully certified or licensed," and then "Non-certified or licensed counselors shall be under direct supervision . . . ."
> 	And, again, I realize this might be a little repetitive but I'll just ask and move on.
> 	Trent Neal's treatment at BHG Spartanburg clinic, was there a fully-licensed certified staff counselor supervising the non-certified staff counselors?
>
> A. I haven't looked at the staffing records.

*Id.* 17:9–18:24.

> Q. Okay. You don't know if the -- the two, Timothy Nesbitt or McKinley Anderson [Mr. Neal's counselors], have any certifications?
>
> A. No, no.

4

Teklemariam Dep. Tr. 19:23–20:3.

> Plaintiff put the same question to the director of the Spartanburg clinic, Joseph Barr:
>
> Q. --well, let me ask it this way. Do you -- do you know how many counselors you currently have who were employed in 2020?
>
> A. Oh, wow.

Joseph Barr Dep. Tr. 79:20–23 (attached as **Exhibit C**). Mr. Barr was unable (or unwilling) even to answer basic questions about the clinic's operations and budget. He testified that "every month the regional director and myself will go over budget, and she'll let me know if I met budget or didn't meet budget for the month," *id.* 28:4–7, but when asked what the monthly profit is, he could only say:

> Q. . . .So, I mean, just if it helps you remember -- I assume you're not going to remember any of these numbers from 2020.
>
> A. I don't remember the numbers --
>
> Q. That's what I'm saying --
>
> A. -- two months ago.
>
> Q. -- but just the last one that you had, then. Just to give some sense, like, what was the bottom number?
>
> A. I honestly cannot remember. I know we --
>
> Q. Was it a positive number?
>
> A. I honestly don't remember. I know we met budget, so. I can't give you the -- the exact number.
>
> Q. Well, I'm going to assume -- am I fair to assume that meeting budget means that the bottom line was -- was more than zero?
>
> A. Yes.
>
> Q. Okay.
>
> A. Yeah.

> Q. And can you give me any sense of the scale of these numbers? And what I mean by that is, are we talking about, you know, a thousand dollars profit in a month, a million dollars, you know, profit in a month? Just some --
>
> A. Yeah.
>
> Q. -- idea because I honestly have --
>
> A. That's --
>
> Q. -- no idea how big a operation it is.
>
> A. Yeah. It's definitely not a million. I can say that. Yeah. To be honest, like, I really can't tell you because it's – it's very detailed. Hopefully, if -- as I continue to progress in the company, I'll get more, you know, into the knowledge of how they come up with some of the information. Like, I don't -- I hear these names like adjusted EBITDA. I can't tell you what that means, so.
>
> Q. Do you remember the EBITDA number?
>
> A. I don't.

Ex. C 30:4–31:17 (Barr). Despite being the most senior manager of the Spartanburg clinic, Mr. Barr could not even say how much BHG pays for methadone:

> Q. Okay. You know how -- how much does the -- the actual -- does the Methadone cost? Do you know?
>
> A. I don't know.

*Id.* 33:6–8.

There is an intermediate, regional management structure between Mr. Barr and Mr. Higham—the regional management Mr. Barr meets with monthly—but BHG testified that it would be fruitless to seek answers from there:

> Q. Who was the regional director over the Spartanburg clinic at the relevant time period?
>
> A. Yeah, I'm not sure about the exact name, and in fact, the regional director was left a couple of times, so I can tell you that the Regional Vice President who filled in in that role was Amanda Karistai.

6

Marlin Martin Dep. Tr. 19:7–13 (attached as **Exhibit D**). Dr. Martin was identified under Rule 30(b)(6) to speak for BHG on topics including "any non-counseling corporate governance or compliance matters," "any non-counseling corporate policy and procedure," "any non-counseling operations matter," and "[t]he legal entity structure, organizational structure, and management structure of, and the administrative, operational, and financial relationship between, BHG Holdings, LLC, BHG XXXVIII, LLC, and the BHG Spartanburg Treatment Center." Ex. A.

Legal entity structure now is an especially relevant topic because until the present motion for a protective order, BHG had never argued BHG Holdings is an improper defendant in this action. BHG now appears to argue, for the first time, that BHG Holdings may not be a proper defendant:

> BHG Spartanburg is a South Carolina limited liability company headquartered in Spartanburg, South Carolina. BHG Spartanburg is a separate legal entity from its parent company, BHG Holdings. . . . At this time, it is entirely irrelevant and there is no evidence that BHG Holdings and there is no evidence that BHG Holdings and BHG Spartanburg have failed to follow corporate formalities.

Mem. Supp. Defs.' Mot. Protective Order 10–11, ECF No. 77-1.[2]

BHG identified Mr. Martin under Rule 30(b)(6) to testify about legal entity structure. He testified as follows:

> Q. And then, on the sort of legal entity structure, is the Spartanburg clinic in its own LLC?
>
> A. Yes.
>
> Q. And it's the BHG, I think it's XXXVIII?

---

[2] Plaintiff disputes Defendants' representation to the Court that there is no evidence of failure to follow corporate formalities. One example of BHG's failure to follow formalities is that the insurance coverage BHG has identified as being applicable to Plaintiff's claims was purchased by BHG Holdings and BHG Holdings is the only named insured. BHG Spartanburg carries no insurance for the primary risk of the business because it is a "façade for the operations of the dominant" owner, which does carry insurance for its operations. *Cf. Mid-S. Mgt. Co. Inc. v. Sherwood Dev. Corp.*, 649 S.E.2d 135, 141 (S.C. Ct. App. 2007).

> A. I believe that's correct, yes.
>
> Q. And who's the LLC, you know, manager?
>
> A. The officers of the LLC would include myself. It would also include our chief financial officer for the organization and then also our chief executive officer. So we are considered the board for that entity.
>
> Q. And then, for the members, obviously, there's a BHG Holding. Is that a direct relationship or is there an intermediate structure?
>
> A. It is an intermediate structure, so it's above the organization, yeah, as a funder.
>
> Q. Well, and maybe I wasn't clear. Well, who are the members of BHG XXXVIII?
>
> A. The members of BHG XXXVIII are the individuals that I named, including myself and we are employed by BHG Holdings.
>
> Q. Okay. When I say a member of an LLC, I'm referring to an owner, not necessarily --
>
> A. On owner?
>
> Q. Yeah.
>
> A. Yeah, we're --
>
> Q. Who owns [] BHG XXXVIII?
>
> A. Yeah, so, BHG Holdings is the owner and we are the representatives reflected as the point of contact for that entity.

Ex. D 17:4–18:8 (Martin). Mr. Martin appears to have testified that BHG Holdings is the only member of BHG XXXVIII, and that the managers of BHG XXXVIII are himself, Mr. Higham, and James Hopwood (BHG's Chief Financial Officer), who are all employed by BHG Holdings.

Mr. Martin's testimony is inconsistent with BHG's answers to the Court's Local Civil Rule 26.01 interrogatories, which state:

> (1) BHG Holdings, LLC is owned by TVG-BHG Intermediate Blocker Corp., a Delaware corporation, and BHG XXXVIII, LLC is owned by VCPHCS L.P., a Delaware limited partnership.

8

"TVG-BHG" apparently refers to "The Vistria Group", the private equity fund that currently owns BHG, and BHG.  A "blocker" corporation is "an entity treated as a corporation for U.S. federal income tax purposes that is interposed between" U.S. tax-exempt organizations or non-U.S. investors "and the underlying investment."  Erin Cleary et al., *Thinking Through the Tax-Blocker Endgame*, Private Equity Report Vol. 20 No. 3., Debevoise & Plimpton (Dec. 2020), *available at* https://www.debevoise.com/insights/publications/2020/12/thinking-through-the-tax-blocker-end-game.  "[P]rivate equity sponsors often use blockers to 'block'" unrelated business taxable income for tax-exempt organizations and taxation on income effectively connected with a U.S. business for foreign investors.  *Id.*  BHG's blocker structure means non-American entities may be investing in selling addictive drugs to drug addicts in the Upstate.

BHG Holdings, LLC appears to be a "splitter," a limited partnership or LLC created by the private equity sponsor "to avoid tax leakage on its own interest."  *Id.*  Often, a private equity fund will have an operating partnership below the splitter, which may be the VCPHCS limited partnership that owns the Spartanburg clinic (at least according to the interrogatory responses).  Per public records, the general partner of VCPHCS, LP, is VCPHCS Management, LLC.  Presumably VCPHCS Management, LLC, is ultimately owned by BHG Holdings, but the relationship is unknown to Plaintiff.

**B.     Mr. Higham has special knowledge relevant to this case.**

Mr. Higham has been BHG's CEO for ten years, and he was President or CEO of a fertility clinic chain for nine years before that.  Having nearly 20 years of CEO leadership experience, he must know what EBITDA means and what the budgeted EBITDA for his clinics is, at least within an order of magnitude.  He must know whether his clinics comply with applicable regulations.  And having been CEO of a business selling methadone for ten years, he will certainly know what his company pays to buy methadone.

Perhaps most importantly, Mr. Higham is familiar with the complex legal entity structure of his company that BHG now claims is a defense to Plaintiff's claims. Mr. Martin clearly cannot answer questions about BHG's legal structure despite being designated to speak on that topic by BHG. Mr. Martin's testimony is inconsistent with BHG's interrogatory responses, and he did not even know that LLCs are owned by "members." And he is a senior BHG executive who is Mr. Higham's direct subordinate. There is no one else to turn to but Mr. Higham.

BHG's Rule 30(b)(6) witness for legal entity structure questions, Mr. Martin, did not even know what an LLC is, but Mr. Higham has deep knowledge and experience regarding the complex legal entity structures of businesses, like BHG, that are owned by private equity firms. In addition to being BHG's CEO for 10 years, Mr. Higham is (or until recently was) a member of the board of directors of a fertility clinic in Dubai that for some reason has satellite offices in India, and that was owned by a private equity firm (TVM Capital Healthcare, which invests in healthcare companies in "the Middle East and North Africa (MENA) region and Southeast Asia") until it was "flipped" to a Dubai-based hospital chain. Now that BHG argues BHG Holdings may somehow be shielded from liability by its subsidiary BHG XXXVIII, Plaintiff has a pressing need to depose the *only* employee can speak to BHG's convoluted legal entity structure—Jay Higham.

### IV.   Conclusion

For the foregoing reasons, the Court should deny the motion for a protective order.

Respectfully submitted,

s/Phillip D. Barber
Richard A. Harpootlian (Fed. ID No. 1730)
Phillip D. Barber (Fed. ID No.12816)
Andrew R. Hand (Fed. ID No. 12176)
RICHARD A. HARPOOTLIAN P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, South Carolina 29202
Phone (803) 252-4848

Facsimile (803) 252-4810
rah@harpootlianlaw.com
pdb@harpootlianlaw.com
arh@harpootlianlaw.com

Matthew E. Yelverton (Fed. ID No. 7966)
YELVERTON LAW FIRM, LLC
60 Folly Road
Charleston, South Carolina 29407
(843) 574-8822
Facsimile (843) 574-8824
myelverton@ylitigators.com

ATTORNEYS FOR PLAINTIFF
VANIDA KHAUTISEN, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
KHOUANEXAY BILL SIVILAY

August 9, 2023
Columbia, South Carolina.