IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Vanida Khautisen, as Personal Representative of the Estate of Khouanexay Bill Sivilay,<br><br>Plaintiff,<br><br>v.<br><br>BHG Holdings, LLC, and BHG XXXVIII, LLC,<br><br>Defendants. | C/A No. 7:21-cv-3775-TMC<br><br>**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT, DR. NATHAN STRAHL** |

Plaintiff Vanida Khautisen, as Personal Representative of the Estate of Khousanexay Bill Sivilay, by and through undersigned counsel, hereby responds in opposition to Defendants BHG Holdings, LLC, and BHG XXXVIII, LLC's (collectively, "BHG") motion to exclude testimony from Plaintiff's expert Dr. Nathan Strahl (ECF No. 86).

I.      **Introduction**

BHG is the largest chain of methadone clinics in America. Methadone clinics are supposed to help persons addicted to opioid drugs to stop using those drugs. But BHG is owned by a Chicago-based, private-equity investment fund that does not provide actual addiction treatment to addicts. It just sells drugs to them at a 1600% markup.

Trent Neal was a 21-year-old heroin addict who came to BHG seeking help in June 2020. He received methadone at BHG's Spartanburg clinic daily for seven months. While at BHG he had thirty state-mandated urine drug tests. He tested positive for illegal opiates every time. After a few months he also began testing positive for other drugs, including benzodiazepines that have a debilitating effect when combined with methadone. BHG was aware of the danger but took no action other than to continue to sell methadone to Mr. Neal.

1

On the day after Christmas in 2020, Trent Neal ran a red light and slammed into the driver's side door of a car driven by Plaintiff's husband, Bill Sivilay, killing him.  He was arrested at the scene and tested positive for methadone and benzodiazepines.

Mr. Sivilay was 46 years old.  He is survived by his wife and two daughters, then 8 and 11 years old.  His widow was forced to take a $16/hour textile mill job to support their little girls, who are now enrolled in public assistance programs.

Plaintiff's expert Nathan Strahl, Ph.D., M.D., testified that BHG's treatment of Mr. Neal was "wholly inadequate," "[e]gregiously below the standard of care," and a "failure to monitor and protect the community and Mr. Neal from ongoing substance abuse."  Strahl Dep. Tr. 15:25–17:15, 81:17–21 (attached as **Exhibit A**).  In his opinion, "What mattered to me was that he's abusing everything under the sun, and they are not doing anything about it."  *Id.* at 68:20–69:9.  As a result, BHG "allowed the continuation of substance abuse to the point where a catastrophic event finally happened on benzos" combined with methadone—the death of Mr. Sivilay.  *Id.* at 62:23–63:12.  "[A]t any time during [Mr. Neal's] tenure at BHG, the level of intoxication he might have had at any time would have potentially caused an accident, which finally did manifest itself on December 26, 2020," when Mr. Neal killed Mr. Sivilay while high on methadone BHG provided and benzodiazepines BHG knew he was taking.  *Id.* at 15:25–17:15.

Dr. Strahl has treated patients suffering from addiction for over 30 years, and he still maintains a heavy case load, spending 60 hours a week providing direct patient care.  *Id.* at 5:18–6:17.  He has a research doctorate in biopharmaceuticals and a medical degree.  Nathan R. Strahl Curriculum Vitae (attached as **Exhibit B**).  He completed his residency at Duke University, and is board certified in psychiatry and neurology.  *Id.*  He has worked as a medical director of a methadone clinic.  *Id.*  He has published books on beating addiction to opioids, Nathan R. Strahl,

Freedom from Addiction to Narcotic Painkillers and Heroin (2015) and was even the author of the American Psychiatric Association's study guide for the American Board of Psychiatry and Neurology's oral examination for certification in psychiatry, Nathan R. Strahl, Clinical Study Guide for the Oral Boards in Psychiatry (4th ed. 2013). He has served as an expert in dozens of federal and state actions, including the *Santandreu v. Colonial Management Group* case in this District that arose from facts practically identical to the facts of this case. Case No. 3:16-cv-3042-TLW (filed Sept. 8, 2016). He was also an expert in *Taylor v. Smith*, a case in which a methadone clinic was sued by a motorist injured when a patient the clinic knew was combining methadone with benzodiazepines crossed the center line and crashed into her car. 892 So. 2d 887 (Ala. 2004). Dr. Strahl's opinions were block-quoted at length by the Supreme Court of Alabama when it held "the duty of care owed by the director of a methadone-treatment center to his patient extends to third-party motorists who are injured in a foreseeable automobile accident with the patient that results from the director's administration of methadone." *Id.* at 897.

Given Dr. Strahl's resume, at first glance it may appear extraordinary that BHG would move to exclude him as expert on the basis that his decades of experience treating addicts, which continues through the present day, are "out of date." But BHG's motion would not surprise anyone who watched BHG's deposition of Dr. Strahl. That deposition was, from BHG's perspective, a trainwreck. Dr. Strahl's poised and articulate testimony, grounded in decades of direct experience working with addicts, derailed BHG's excuses for its negligence. BHG realizes Dr. Strahl's testimony will be devastating at trial, and that its own experts will not be able to rebut him. Hence the instant motion.

## II.     Legal Standard

Under Rule 702 of the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell*

3

*Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Thus, the trial court must ensure that (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) the expert's "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

### III.     Argument

**A.     Dr. Strahl is manifestly qualified under Rule 702(a) of the Federal Rules of Evidence.**

Dr. Strahl's opinions are based both on his 16 years of formal education in pharmacy and medicine and more than 30 years of experience treating patients suffering from addiction, Ex. B, during which he has acquired intimate knowledge of standards of care and best practices for the treatment of substance use disorders. He therefore has "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue" in this case. *See* Fed. R. Evid. 702(a).

BHG first faults Dr. Strahl for not having served as the medical director of a methadone clinic since 2002. That criticism is absurd for at least three reasons. First, that Dr. Strahl has served as a methadone clinic director in addition to many other roles only enhances his experience. He has experience with methadone and with buprenorphine. Ex. B. He has experience treating patients with substance abuse disorders in an office, in a methadone clinic, in a hospital, and even in prison. *Id.*

Second, serving as a "medical director" for a methadone clinic does not necessarily mean one has any actual expertise in addiction medicine. BHG's current (and, to date, only) medical director for its Spartanburg clinic, James Haber, III, M.D., has no such expertise whatsoever. He is an internal medicine practitioner, which he describes as "things just like well-checks for

4

relatively healthy people all the way up to complex medical problems, COPD, CHF, coronary disease, diabetes, hypertension, and all of the typical things that adults may have." James Haber Dep. Tr. 8:6–25, 10:15–11:8 (attached as **Exhibit C**).  His principal employment is with Spartanburg Regional Health System's short-term rehabilitation facilities for Medicare patients "transitioning out of a hospital for injury, illness, joint replacements, things like that." *Id.*  Dr. Haber testified that his knowledge of addiction medicine is limited to prescribing the appropriate dosage of methadone, and he expressly denied knowledge of the standard of care for counseling patients with substance abuse disorders, even though South Carolina law requires appropriate counseling as part of the treatment methadone clinics provide. *Id.* at 54:9–57:8; James Haber Rule 30(b)(6) Dep. Tr. 18:11–19:3 (attached as **Exhibit D**).  Dr. Haber demonstrates that working in a methadone clinic does not in itself provide useful expertise in the standards applicable to treatment in a methadone clinic.

Third, Dr. Strahl teaches substance abuse standards and best practices to other physicians. Not at weekend conferences like BHG's retained expert Dr. Eric Morse, but at Duke University's medical school as part of its program of formal physician training and certification. Ex. B.  The Duke University Medical Center is one of the top medical schools in the country and so is its psychiatry residency program.  If it considers Dr. Strahl an expert on treating substance abuse, Plaintiff respectfully submits this Court should as well.

BHG then proceeds to claim "Dr. Strahl has *never* attended a key conference where best practices and standards of care at OTPs are discussed." Mem. Supp. Mot. Exclude 7.  That is a misrepresentation.  BHG has never asked Dr. Strahl what conferences he has attended.  No one has asked him because it does not matter.  Dr. Strahl's expert knowledge was not gained by

5

networking at two-day weekend conferences. It is from over 16 years of formal education and three decades of experience treating patients with addiction disorders.

For that reason, BHG does not say Dr. Strahl has never attended a conference on addiction medicine or OTP best practices. It instead says has never attended a "key" conference. By "key," BHG means only programs offered by a North Carolina non-profit entity, the "Governor's Institute," that just happens to employ BHG's own retained expert, Dr. Morse. BHG complains Dr. Strahl "has never attended the Governor's Institute for OTP medical providers teleconference—in fact he had never heard of it" and he "has never attended one of the addiction medicine conferences (in either Asheville or Durham)" without explaining what those are or why Dr. Strahl should have attended them. *Id.*

The Governor's Institute is a non-profit organization in North Carolina. *See* https://governorsinstitute.org/. It employs BHG's retained expert, Dr. Morse, as a consultant. *See* https://addiction-medicine.org/training/otp/. Dr. Morse is a content creator for the Governor's Institute's "webisode series" entitled "OTP Medical Provider Essentials," which as best as Plaintiff can tell is what BHG refers to as the "Governor's Institute for OTP medical providers teleconference." *Id.* It is a series of short video recordings on YouTube, some as short as three minutes and others as long as eleven. *Id.* It is meant for unqualified physicians taking part-time jobs as medical directors at methadone clinics—like BHG's own Dr. Haber, an internal medicine practitioner who only works 10-hours per week, who does not engage in any clinical counseling or psychotherapy with any patients, and who has no experience whatsoever in addiction medicine beyond writing methadone prescriptions that BHG fulfills at a 1600% markup.

The conference in Durham BHG references is the Governor's Institute's "Addiction Medicine Essentials" conference, which "provide[s] addiction medicine basics for a range of

6

healthcare professionals working in primary care and behavior settings." Governor's Institute Facebook post, https://www.facebook.com/events/283416752255678/?active_tab=discussion. The target audience obviously is not physicians specialized in treating addicts who have over thirty years' experience treating addicts, like Dr. Strahl. The first Durham conference occurred in 2018. It started as a two-day, Friday-Saturday conference in Durham but now appears to be a remote teleconference event. Governor's Institute Essentials 2023, https://addiction-medicine.org/fall-conference/. BHG does not explain why Dr. Strahl should attend a conference explaining "basics" to "a range of healthcare professionals."

The conference in Asheville is the Governor's Institute's two-day, Friday-Saturday conference to "provide clinically relevant SUD [substance use disorder] knowledge and skills for physicians, APPs [nurse practitioners and physician assistants] and other providers working in a variety of healthcare settings." Governor's Institute 2024 Addiction Medicine Conference, https://addiction-medicine.org/spring-conference/. Of course, BHG's expert is employed to conduct workshops at that weekend mountain getaway. *Id.* Again, BHG does not explain why Dr. Strahl's failure to participate in Dr. Morse's workshops reflects a lack of expertise on his part. While Dr. Morse was making YouTube videos on "basics" and giving weekend workshop presentations to nurse practitioners at a hotel in Asheville, Dr. Strahl was lecturing on substance abuse treatment to psychiatry residents in training at the Duke University Medical Center, one of the top medical schools in America.

**B.      BHG's argument that Dr. Strahl's opinions are "in direct conflict with accepted standards in [Opioid Treatment Programs]" is merely a conclusory statement of its own disagreement with his opinions.**

BHG complains that Dr. Strahl's expertise is out of date and that he is "not familiar with the current standards governing [methadone clinics]." Mem. Supp. Mot. Exclude 9. BHG goes on to complain that "Dr. Strahl contends that from the time of his admission in June 2020, [Trent

Neal] should have only been given a 'month to a month and a half' to decrease his illicit drug use; and, once [Trent Neal]'s benzodiazepine use began, [Trent Neal] 'should have been referred immediately to an inpatient treatment program because things are getting really bad'" and that "Dr. Strahl's views are universally rejected in the OTP world." *Id.* at 10.

Far from being "universally rejected," Dr. Strahl's opinion is aligned with U.S. Department of Health and Human Service's Substance Abuse and Mental Health Services Administration (SAMSHA)'s recommended response to concurrent use of benzodiazepines and methadone. Ironically, it is BHG's own expert, Dr. Morse, who is unfamiliar with this federal standard.

> Q. And I'll -- what do those -- what does SAMHSA recommend be done when someone is using benzodiazepines while in opioid-dependence treatment?
>
> A. I believe the recommendation is to continue to treat them with methadone or buprenorphine.
>
> Q. Is there any -- anything else that would be recommended in response to the benzo use?
>
> A. Well, like I said earlier, you would want to encourage them to discontinue the use of benzodiazepines, you know, and address the positive tests and counseling sessions.

Eric Morse Dep. Tr. 11:20–12:12 (ECF No. 81-26).

Dr. Morse was wrong—SAMSHA's guidance is not to "continue to treat them with methadone" without doing anything else.  For illicit benzodiazepine use concurrent with methadone treatment, SAMSHA recommends ensuring patients understand the risk, determining whether the patient requires supervised withdrawal or tapering from benzodiazepines, attempting gradual outpatient supervised withdrawal for benzodiazepines, and increasing the frequency of counseling.  Substance Abuse & Mental Health Servs. Admin., Treatment Improvement Protocol 63, Medications for Opioid Use Disorder, pt. 3 pp. 19–20 (2021), available at https://store.samhsa.gov/sites/default/files/pep21-02-01-002.pdf.  It also recommends providers

8

"Gauge level of care and setting needed (e.g., residential, outpatient)" and that "Inpatient treatment may be best for patients with poor motivation, limited psychosocial support, serious or complicated comorbidity, or injection or binge use." *Id.* That is exactly what Dr. Strahl opined. Yet according to BHG it is Dr. Strahl who somehow is unfamiliar with current SAMSHA guidance.

Further, Dr. Strahl never said methadone treatment should be terminated in a "month to a month and a half" or in less than 12 months.[1] He said that the standard requires treatment modality to match the patient's needs—in other words, rather than just continuing to sell methadone at a 1600% markup, BHG should have followed SAMSHA's published standard and "Gauge[d] the level of care and setting needed" by Mr. Neal.

Rather than characterizing Dr. Strahl's opinions with cherry-picked phases, Plaintiff will quote him at length so that the Court can judge for itself:

> Q. Okay. So if that is -- you know, they say, okay. Would it have been inappropriate for him to stay at 60 [mg] for another month or so at that point?
>
> A. Well, I'm not sure about a month, but I'm not even sure that the methadone is even the issue. You're trying to focus on an OTP that dispenses methadone. Once he's turned into starting to use benzos, whether it's an abstinent model or a harm reduction model, it's getting worse not better. I don't know how else to say that.

---

[1] BHG quotes a "what is methadone" public information page on the SAMSHA website with no attributed author (https://www.samhsa.gov/medications-substance-use-disorders/medications-counseling-related-conditions/methadone) that paraphrases the National Institute on Drug Abuse's (NIDA) publication Principles of Drug Addiction Treatment: A Research-Based Guide (Third Edition) in a manner that makes it seem the NIDA publication contradicts Dr. Strahl's opinions when in fact his opinions are consistent with it. The NIDA ***does not say*** "the length of methadone treatment should be a minimum of 12 months. Some patients may require long-term maintenance." The actual publication states, under the heading "How long does drug addiction treatment usually last," that "Generally, for residential or outpatient treatment, participation for less than 90 days is of limited effectiveness, and treatment lasting significantly longer is recommended for maintaining positive outcomes. For methadone maintenance, 12 months is considered the minimum, and some opioid addicted individuals continue to benefit from methadone maintenance for many years." Methadone maintenance is just one modality of methadone treatment, specifically, the type that goes on for more than 12 months.

9

> You're looking at methadone as the criteria for good or bad. If he stayed on a week or less a week or whatever, it doesn't make a difference. The fact is that under the auspices of an OTP where they are prescribing methadone as a means of curtailing or maybe even harm reduction, and the harm is increasing rather than decreasing, more needed to be done.
>
> The whole crux of my argument had nothing to do with methadone itself. It had to do with the lack of recognizing long-range potential of polysubstance abuse in an OTP [methadone clinic] that is supposed to know better because that's their job. That's specifically their job, and that they didn't do anything of any substantial change to make things better for Mr. Neal.
>
> They let him say, I'll control my treatment.  Sure.  I don' feel like it right now.
>
> Okay.
>
> Whose responsibility is that?  Is that Mr. Neal's responsibility, or is it the clinic's responsibility to say, if that's the way you feel, you're continuing to use, we need to do something else.  And what else would that be? Well, higher level of care, intensive therapy every day, group therapy twice a week, inpatient treatment for detox. All those are accessible and possible and can be mandated without him having to raise the methadone up one milligram.
>
> The clinic has the power and the pen to demand that there be compliance with treatment.  The patient is not the one to control their treatment. With substances that are addictive, if patients control their treatment, a bad outcome is invariable. Invariable.

Ex. A at 60:1–61:18 (Strahl).

> Q. Do you agree that it is a patient's decision whether or not they want to continue substance abuse or not?
>
> A. Yes, it is the patient's decision whether they want to continue substance abuse or not with the proviso that the therapeutic intervention is designed to help the patient come to recognize the importance of cleanliness in their life so that things that might not be attainable, like family, job opportunities, physical health, emotional health, can be improved.
>
> So through therapy, that individual who may have complete lack of knowledge of any of these things, is thereby educated and comes to appreciate that life will be a lot better without substances than with substances. Therein therapeutic interventions become extremely important. Methadone and of itself is not always the answer. If someone comes into the clinic -- not Mr. Neal -- comes in and is only on cannabis, let's say, and the clinic says, we'd like you to stop that.
>
> I can do that. I can do that.

> And the urines are clean and you give them methadone 40, 60, 80 whatever is necessary, the need for therapeutic intervention is lessened than someone who says, yes, I have all these problems, but doesn't voluntarily stop.
>
> So the power of the pen of the doctor is less controlling here. We as a physicians, we as treatment providers are supposed to know better, what's best for the patient, than the patient themselves, and we are to provide that intensive therapy or services depending upon their unique needs.
>
> Now, the patient has responsibility, but our responsibility is greater to offer and then demand that there be changes or else, and the power of the pen says or else we can't continue methadone or else we need to send you to an inpatient service.

*Id.* at 30:18–32:3.

> Q. Six months is a lot time, in your opinion, for a patient like Trent Neal to be in this setting?
>
> A. For a patient like Trent Neal, that's way too much time. For a patient who maybe is only occasionally abusing cannabis or once a month has a dirty urine, it is adequate time. For Mr. Neal it was inadequate time, and the consequences of that are, I think, fairly obvious.
>
> Benzos are in his systems. They don't stop the benzos. They don't really force the change or increase the treatment modalities or send him inpatient, and he has benzos in his system when he has this accident. What else needs to be said? I mean, they allowed the continuation of substance abuse to the point where a catastrophic event finally happened on benzos.

*Id.* at 62:23–63:12.

> Q. Okay. Other than inpatient substance use treatment or substance misuse treatment, what other higher levels of care does an OTP have available to them?
>
> A Oh, my goodness. That's a wonderful question and a wonderful answer to that. There are long-term facilities available where people can go and work for two years at a time and get long-term treatment from abstinence of substances while they're working and while they're recovering.
>
> For the most extreme cases of patients who simply fail every option, including inpatient – I mean, I just had a patient where the day he left his detox center, he called his drug dealer to start again, the same day. Not uncommon. Not uncommon at all. And the urine, of course, would come up positive.
>
> So if those interventions including a higher level of care for detoxification, 3 to 5 days, even 21 to 28-day program fail, there are programs available for one to two

> years where you can live, work, and get help to remain substance free for up to two years.
>
> We have a place in Durham that does that, as an example. There are long-term facilities that are for more extreme cases. After that I don't know anything that I could do other than, you know -- I mean, that's the ultimate I think is to refer to a long-term care facility.
>
> Q. Do you agree with me that the standard of care at an OTP would not be to send a patient to an acute care facility for substance abuse if they're not showing up intoxicated to get dosed?
>
> A. Well, no, I don't. My goodness, no. The measure of intoxication as a criteria is fallacy because if a person is abusing benzodiazepines and becoming tolerant to them, the consideration of showing verbal evidence, you know, wording, intoxication look, may not be manifest for continued abuse of benzodiazepines because the concept for methadone, which emphasizes being tolerant so you may not see anything, is true for benzodiazepines as well. You become tolerant to them.
>
> Now, once you are at a point where you are seeing intoxication, you've passed the point of redemption. You're in trouble now. But the positive continuation of benzodiazepines at the clinic would have raised the bar for me that that has to stop one way or another. No question. Danger.

*Id.* at 73:19–75:15.

These are some of the opinions BHG does not want the jury to hear. BHG does not want to keep them from the jury because decades of experience treating, and teaching the treatment of, substance abuse disorders are an inadequate basis for his opinions because he did not also reply on PowerPoint presentations at weekend conferences. *Cf.* Mem. Supp. Mot. Exclude 8 (complaining Dr. Strahl did not "list an OTP conference PowerPoint presentation in his report or deposition"). BHG does not want to keep them from the jury because they are contrary to the federal SAMSHA guidelines about which its own expert expressed ignorance. BHG wants to keep his opinions from the jury simply because they are damaging to its defense. That desire is not a basis to exclude his testimony. "A difference in opinion is not a basis for exclusion of an expert opinion under *Daubert* standards." *In re Fisher-Price Rock 'N Play Sleeper Mktg., Sales Pracs. & Prod. Liab. Litig.*, 567 F. Supp. 3d 406, 415 (W.D.N.Y. 2021).

**IV.     Conclusion**

For the foregoing reasons, Defendants' motion to exclude the opinions of Dr. Nathan Strahl should be denied.

Respectfully submitted,

s/Phillip D. Barber
Richard A. Harpootlian (Fed. ID No. 1730)
Phillip D. Barber (Fed. ID No.12816)
Andrew R. Hand (Fed. ID No. 12176)
RICHARD A. HARPOOTLIAN P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, South Carolina 29202
Phone (803) 252-4848
Facsimile (803) 252-4810
rah@harpootlianlaw.com
pdb@harpootlianlaw.com
arh@harpootlianlaw.com

Matthew E. Yelverton (Fed. ID No. 7966)
YELVERTON LAW FIRM, LLC
60 Folly Road
Charleston, South Carolina 29407
(843) 574-8822
Facsimile (843) 574-8824
myelverton@ylitigators.com

ATTORNEYS FOR PLAINTIFF
VANIDA KHAUTISEN, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
KHOUANEXAY BILL SIVILAY

August 23, 2023
Columbia, South Carolina.